UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 19-2413 _____          Caption [use short title]

Motion for: Bond and Reassignment of Case

_____

_____

Set forth below precise, complete statement of relief sought:

Bond during continued pendency of Appellant's petition pursuant

to 28 USC 2255 and reassignment of case upon remand.          US v Callahan

_____

_____

_____

_____

MOVING PARTY: Brian R. Callahan                OPPOSING PARTY: United States of America

☐ Plaintiff          ☐ Defendant

☑ Appellant/Petitioner     ☐ Appellee/Respondent

MOVING ATTORNEY: Andrew J. Frisch          OPPOSING ATTORNEY: AUSA Christopher Caffarone

[name of attorney, with firm, address, phone number and e-mail]

The Law Offices of Andrew J. Frisch          US Attorney's Office

One Penn Plaza, Suite 5315, New York, N.Y. 10119          610 Federal Plaza, Central Islip, N.Y. 11722

212-285-8000; afrisch@andrewfrisch.com          613-712-6000; christopher.caffarone@usdoj.gov

Court- Judge/ Agency appealed from: Eastern District of New York (Spatt, U.S.D.J.)

Please check appropriate boxes:                FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:

Has movant notified opposing counsel (required by Local Rule 27.1):     Has this request for relief been made below?   ☑ Yes ☐ No
☑ Yes ☐ No (explain): _____          Has this relief been previously sought in this court?  ☑ Yes ☐ No

                                    Requested return date and explanation of emergency:
                                    As explained in the accompanying papers, we believe that Petitioner-Appellant has already
Opposing counsel's position on motion:          served his correct Guideline sentence and remains incarcerated. Callahan previously sought bond
☐ Unopposed ☑ Opposed ☐ Don't Know          unsuccessfully in support of a direct appeal which this Court dismissed. See Case No 17-3177.
Does opposing counsel intend to file a response:
☑ Yes ☐ No ☐ Don't Know

Is oral argument on motion requested?   ☑ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   ☐ Yes ☑ No If yes, enter date: _____

Signature of Moving Attorney:

/s/ _____     Date: August 7, 2019   Service by: ☑ CM/ECF ☐ Other [Attach proof of service]

Form T-1080 (rev.12-13)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

------------------------------------------------------------

USA v. CALLAHAN

------------------------------------------------------------

DECLARATION IN SUPPORT
OF APPEAL FROM DENIAL OF BOND

Docket No. 19-2413

Andrew J. Frisch hereby declares the following under 28 U.S.C. § 1746:

Introduction

1.      I am counsel to Petitioner-Appellant Brian R. Callahan and make this Declaration in support of Callahan's appeal from a Memorandum of Decision and Order, issued by the Honorable Arthur D. Spatt, United States District Judge, Eastern District of New York, on July 31, 2019 (Exhibit A), denying Callahan's application for bond during the continuing pendency of his Petition, filed pursuant to 28 U.S.C. §2255.  On August 2, 2019, Callahan duly filed a timely notice of appeal.  Exhibit B.  I respectfully request oral argument on this application.

2.      On September 15, 2017, Callahan was sentenced to a term of imprisonment of 144 months on his plea of guilty to wire and securities fraud.  An amended judgment of his conviction was filed on October 2, 2017.  Exhibit C.  Callahan's Petition was filed on September 28, 2018.  *Callahan v. United States*, 13 CR 453 (E.D.N.Y.) (Exhibit D).[1]

3.      Callahan demonstrated in District Court that bond is necessary to preserve the effectiveness and adequacy of his requested relief [*see Illarramendi v. United States*, 906 F.3d 268, 271 (2d Cir. 2018 (*citing Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001)], as he is currently eligible for release from confinement under his correct Guideline range (15 to 21 months), and that his substantial claims demonstrate a likelihood if not a certainty of success on the merits. *See, e.g., United States v. Whitman*, 153 F. Supp. 3d 658, 661 (S.D.N.Y. 2015).  Though the government did not address the merits of Callahan's claims in opposing Callahan's application for

---

[1] The Memorandum of Law in support of Callahan's Petition is attached as Exhibit D;  attachments thereto are separately attached hereto as exhibits to the extent discussed herein.

bond (Exhibit F) and has not yet otherwise responded to the merits, Judge Spatt ruled that his Honor was satisfied from reviewing Callahan's Petition that it was not "sufficiently compelling" to warrant bond. Exhibit A at 6. Judge Spatt did not, however, explain anything about his reasoning that caused him to conclude summarily that Callahan's plainly compelling claims were not "sufficiently compelling," nor otherwise address the merits of Callahan's claims in any way. Nor did Judge Spatt order the parties to appear for oral argument or request further briefing from the government so he might understand how the government could ever persuasively defend the merits of Callahan's claims. Like a Judge at sentencing who fails to state reasons for imposing a particular sentence [*see* 18 U.S.C. §3553(c)], Judge Spatt's failure to support his conclusion with any explanation provides no guidance as to his thinking and is entitled to no deference. *See, e.g., United States v. Aldeen*, 792 F.3d 247, 253-54 (2d Cir. 2015).

4.      The government's response to Callahan's Petition in District Court is due on August 19, 2019. Meanwhile, on June 19, 2019, Callahan and his co-defendant Adam Manson, whose sentencing is scheduled for October 2019 (and who is also represented by the undersigned counsel), moved for permission to supplement Callahan's Petition; to disqualify the United States Attorney's office from prosecuting this case in favor of another office; for recusal of Judge Spatt under the reasoning of *United States v. Wilson*, 920 F.3d 155, 168 (2d Cir. 2019); for an order requiring the government to honor its plea agreement with Manson; and for bond for Callahan. *See United States v. Callahan, et al.*, 13 CR 453 (Exhibit E).[2] The government's responses to those motions are also due on August 19, 2019.

5.      A motions panel of this Court has heard this case before. Upon Callahan's timely filing of a notice of appeal from his judgment of conviction, this Court, on December 28,

---

[2] Callahan's Memorandum of Law in support of his (and Manson's) motions is attached as Exhibit E and attachments thereto are separately attached as exhibits to the extent discussed herein.

2017, granted the government's motion to dismiss Callahan's appeal, ruling that the record did not demonstrate why he was not bound by his waiver of appellate remedies. *See United States v. Callahan*, No. 17-3177 (2d Cir.) (Dkt 67). That ruling does not control here. Callahan's Petition filed on September 28, 2018 (Exhibit D), together with the supplement thereto proffered in District Court on June 19, 2019 (Exhibit E), are based on matters *de hors* the appellate record, including Callahan's Declaration (Exhibit G), email exchanges between Callahan and the lawyer who represented him at sentencing (Exhibit H), a fifteen-page spreadsheet of 32 columns and 1,917 rows produced by the government in February 2019 after the undersigned counsel sought review of this case by the United States Attorney's executive office, and a Declaration of Mazars USA ("Mazars"), a highly-respected accounting firm which compared the indictment to the government's spreadsheet. Exhibit I.

6. These new off-the-record facts establish that the government breached its plea agreement with Callahan, thereby invalidating the agreement's constituent waiver of post-conviction remedies, and that Callahan's counsel at sentencing was ineffective in not calling the government on the obvious and severely prejudicial breach. In *United States v. Mizell*, 671 Fed. Appx, 826 (2d Cir. 2016), this Court declined to enforce a waiver of post-conviction remedies and reached the merits of Mizell's arguments because the government breached the plea agreement by advocating a different Criminal History Category based on facts known to it at the time of the guilty plea*:* "Mizell had a 'reasonable understanding' that the Criminal History Category calculation the government presented to the district court would match the calculations in the plea agreement." *Id.* at 830 (citation omitted). *See United States v. Rosa*, 123 F.3d 94, 101 (2d Cir. 1997) (a request to review a case notwithstanding a waiver "will cause us to examine carefully the facts of the case and to look at the manner in which the agreement and the sentence were entered into and applied to determine whether it merits our review"). The "decisive considerations" motivating the Court's

3

decision to enforce a waiver of appeal are the "nature of the right at issue" and "whether the sentence was reached in a manner that the plea agreement did not anticipate." *United States v. Riggi*, 649 F.3d 143, 148 (2d Cir. 2011) (*quoting United States v. Liriano-Blanco*, 510 F.3d 168, 174 (2d Cir. 2007); *see also United States v. Khattak,* 273 F.3d 557, 563 (3d Cir. 2001) (when deciding if a waiver should be enforced, the guiding consideration should be "whether the [sentencing] error would work a miscarriage of justice"); *United States v. Ready*, 82 F.3d 551, 559 (2d Cir. 1996) (*superseded on other grounds as stated in United States v. Cook*, 722 F.3d 477, 481 (2d Cir. 2013)) ("courts construe plea agreements strictly against the Government. This is done for a variety of reasons, including the fact that the Government is usually the party that drafts the agreement, and the fact that the Government ordinarily has certain awesome advantages in bargaining power").

7.      More, as explained herein, the government's most recent submission in District Court suggests that the government breached its duty under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory information before Callahan was sentenced.

A.      The Government's Breach of its Plea Agreement
        with Callahan and Apparent Violation of *Brady*

8.      The circumstances underlying Callahan's pending Petition and associated motions appear unprecedented and are obviously extraordinary. Callahan was an investment manager who made misrepresentations about certain investments in the Panoramic View, a Montauk resort owned by Manson, his brother-in-law. While the government sometimes claimed in District Court that Callahan's fraud amounted to a *Ponzi* scheme, it was not a Madoff-style fraud: the government at sentencing (Exhibit J at 3) acknowledged applicable credits against loss under the United States Sentencing Guidelines based on real investments of up to $120.8 million, including redemptions to investors ($74 million) and the sale of the Panoramic View for the benefit of investors ($40.3 million).

4

9. The government valued Callahan's fraud at $96 million in the plea agreement it drafted (Exhibit K) (as well as in its plea agreement with Manson); in correspondence with Judge Spatt (Exhibit L at 2); in the United States Attorney's press statements to the public (Exhibit M); *and in its description of the fraud to the Probation Department for preparation of Callahan's presentence report ("PSR")*. The government's valuation of the fraud at $96 million was the plea agreement's most important term: Callahan accepted the government's plea agreement, relying on the government's valuation of the fraud at $96 million, expecting that his Guideline range would be properly adjusted to embrace applicable credits. Even Judge Spatt, in the months before Callahan accepted the government's plea agreement, noted that the Panoramic View, then being marketed for the benefit of Callahan's investors, had an estimated value of between $52 million and $88 million. *See United States v. The Real Property Located at 272 Old Montauk Highway, Montauk, New York, et al.*, 12 CV 1880 (E.D.N.Y. Feb. 22, 2014 (Dkt 69 at 19). In fact, as explained in greater detail herein, a forensic analysis undertaken by Mazars ultimately proved that applicable credits served to offset the $96 million loss. Exhibit I.

10. During more than four years from Callahan's arrest in August 2013 until September 13, 2017, two days before Callahan's sentencing, the government consistently valued Callahan's fraud at $96 million and never claimed that it was wrong about the $96 million on which it based Callahan's plea agreement, and which it reported to the Probation Department for the PSR and otherwise repeated to the Court and the public. By letter dated September 13, 2017, however, filed literally 41 hours before sentencing, the government re-valued the fraud at $140.6 million (Exhibit J), *without any new information or explanation for the change*, thereby breaching its plea agreement with Callahan [*see United States v. Wilson*, 920 F.3d at 155; *United States v. Palladino*, 347 F.3d 29, 33 (2d Cir. 2003)], and invalidating the agreement and its constituent waiver of post-conviction remedies. It appears clear, whatever the government's success may be at cobbling

5

together an alternate explanation, that the government inflated the value of the fraud to neutralize the substantial applicable credits. The improper increase of the fraud from $96 million to $140.6 million had the effect of creating a false purported loss of $19.7 million, for which Callahan was sentenced to 144 months. His true range, however, was 15 to 21 months, which he has served. *See* Exhibit E (Callahan's Supplemental Memorandum) at 17-18.

11. Callahan also accepted the government's plea agreement on the wholly reasonable assumption that the government at sentencing would not juice its valuation of loss to include market loss in investments *which the government had expressly alleged in the indictment to be proper and non-criminal. See* Exhibit D at 7-9 (Callahan's Memorandum of Law in support of his Petition detailing the Indictment's exclusion of proper investments). In fact, the key underlying premise of the indictment was that Callahan had been obliged to invest in certain hedge funds, not divert funds to the Panoramic View: it was thus entirely reasonable for Callahan to rely on the indictment and the plea agreement in believing that the consequent market loss in those proper investments in hedge funds would not be added to the $96 million for sentencing after he accepted the plea agreement. *See* Exhibit D at 24-26.

12. The government's letter of September 13, 2017 (Exhibit J), in which it increased its valuation of loss from $96 million to $140.6 million, thereby breaching its plea agreement with Callahan, was misleading and false. For example,

- the government in its letter claimed that it was taking a "conservative approach" to Callahan's sentencing [Exhibit J at 3], serving to obfuscate its breach of the plea agreement and deviation from its own earlier and repeated pronouncements that the value of the fraud was $96 million, not $140.6 million;

- the government analogized Callahan to Bernard Madoff and other truly loss-causing defendants and urged imposition of a term of imprisonment commensurate with

Madoff [*see, e.g.,* Exhibit J at 17-21; Exhibit N (Transcript of Callahan's Sentencing) at 46], even as the government knew that it had artificially inflated loss to create the false comparison with Madoff and induce the District Court to believe that a severe sentence [in excess of Callahan's true range] was warranted;

• the prosecutor in his letter cited and relied on the Probation Department's view that the entirety of money invested with Callahan should be used as loss, even though the prosecutor knew that the Probation Department did not draft the indictment and neither drafted nor was privy to the plea agreement, did not thereby induce Callahan's reliance on those documents, and did not have the same duty as the prosecutor to adhere to the "most meticulous standards of both promise and performance" in honoring its plea agreement that fixed the loss at $96 million. *See In re Altro*, 180 F.3d 372, 375 (2d Cir. 1999) (*quoting United States v. Lawlor*, 168 F.3d 633, 636 (2d Cir. 1999); *United States v. Wilson*, 920 F.3d at 155 (a guilty plea should be vacated when the prosecutor violates a term of a plea agreement which induced the plea and which the defendant reasonably expected would be honored); and

• the government increased its valuation of loss from $96 million to $140.6 million in a letter filed on a Wednesday night before Mr. Callahan's Friday sentencing without taking any step to ensure that the Court or Mr. Callahan's then-new counsel fully understood the fact and consequence of the change given the extremely short notice.

13.    While the government has yet to address the merits of Callahan's Petition or his later associated motions, the government's letter in opposition to bond (Exhibit F at 2) quoted a portion of Callahan's plea agreement which described its valuation of $96 million as an "estimate," but the government did nothing other than quote that language.  The government (a) failed to explain why its purported estimate of $96 million missed the mark and by a staggering

$44.6 million representing a 46% increase; (b) did not proffer any explanation as to why such a gargantuan change did not constitute a breach of the plea agreement under *Wilson*; and (c) did not deny that it had inflated loss to neutralize credits or, to put it less pejoratively, had increased loss upon realizing that the extent of applicable credits created a gulf between the reality of Callahan's case and the government's rhetoric about the case.

14. If, however, the $96 million was truly a mere estimate that the government was permitted to increase by $44.6 million absent new facts, the government was thereby in violation of *Brady v. Maryland*, 373 U.S. 83 (1963): as Callahan explained in District Court (Exhibit E at 4), Callahan's current counsel in December 2018 sought review of this case by the United States Attorney's executive office. He did so to address Callahan's challenges, but also the sentencing of co-defendant Adam Manson (now scheduled for October 2019), whose plea agreement is expressly based on the same loss of $96 million, and against whom the government intends to press the same artificially inflated loss of $140.6 million as it did with Callahan. Exhibit E at 8, 13-15. After rejecting defense counsel's challenges to the government's conduct of this case, and at counsel's request, the United States Attorney's executive office produced a fifteen-page spreadsheet of 32 columns and 1,917 rows (and an associated summary) as the basis for the government's view that $140.6 million comported with the government-drafted indictment and plea agreements. Exhibit E at 4. The spreadsheet represented the government's first meaningful disclosure of the basis for its calculation of fraud loss. Counsel immediately provided the spreadsheet to Mazars, which analyzed the spreadsheet and compared it to the indictment.

15. From a comparison of the government's spreadsheet and the indictment, Mazars concluded that Callahan was entitled to credits of $95,541,738 against loss of the total credits of $120.8 million (Exhibit I; Exhibit E at 5-7), acknowledged by the government in its letter of September 13, 2017. Exhibit J at 3. The government at Callahan's sentencing, however, made no

effort to allocate the total credits to conform to the indictment's allegations as required, but changed the loss from $96 million to $140.6 million to neutralize the offsetting credits. *See* Exhibit E at 6-7.

16. Thus, even if the government's valuation of $96 million was a mere estimate that it was entitled to increase by $40.6 million at the eleventh hour absent new facts in contravention of *Wilson*, the government had been obligated to produce its exculpatory underlying data before Callahan was sentenced, whether in the form of the spreadsheet or otherwise. If the government in fact argues in its response to Callahan's Petition (or in opposition to this application for bond) that the $96 million was truly a mere estimate that it was entitled to increase by $44.6 million absent new facts (as opposed to just quoting Callahan's plea agreement without explanation), Callahan will argue a violation of *Brady* as another grounds for relief. See United States v. Malcolm, 432 F.2d 809, 818 (2d Cir. 1970) ("One of the important functions of the prosecutor upon a sentence is to make sure that all information in his possession material to punishment and favorable to the accused is presented to the court and that the sentence is not based on mistakes of fact or faulty information").

B. Defense Counsel Were Ineffective, Causing Manifest Prejudice to Callahan

17. Callahan was never told by his counsel at the time of his guilty plea that the plea agreement permitted the government to remove from the plea agreement or so dramatically change the most important leg on which it stood: the government's valuation of the fraud. Exhibit G (Callahan Declaration). If the $96 million was subject to be wildly changed on the prosecutor's say-so by an additional $44.6 million without any new facts, Callahan's plea agreement was meaningless and provided him no real benefit. More, the change amounted to a camouflaged motion for an upward departure, which the government promised in its plea agreement with Callahan (and with Manson) that it would not seek. Exhibit K at 5. The parties knew that credits would be calculated in advance of sentencing, including for the pending sale of the Panoramic View, and Callahan

reasonably relied on the $96 million as the starting point for anticipated offsets acknowledged by the government to be applicable. Callahan did not have the bargaining power to force the government to estimate the totality of applicable credits in his plea agreement, but he was absolutely entitled to rely on the $96 million in making his own evaluation of the potential offset in deciding to accept the agreement. *See, e.g., United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998) (per curiam) ("[K]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty") (citation and internal quotation marks omitted).

18.     More, Callahan was never told that his guilty plea served as a waiver of his right to be sentenced only for criminal conduct, and that the government at sentencing could juice the loss by the value of conduct acknowledged expressly in the indictment to be proper and non-criminal. Callahan certainly was not told that the plea agreement's fraud loss was not truly a "likely" estimate, the word used in the plea agreement (Exhibit K at 3), but might have no relationship at all to the fraud loss which the government could advocate at sentencing. If the government was truly entitled to change its case as dramatically as it did, Callahan's lawyers were ineffective in not advising him of that possibility. *See Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2002) (failure to advise a client of the sentencing consequences of a guilty plea and leaving him uniformed is not strategic, but ineffective); *United States v. Riggi*, 649 F.3d 143 (2d Cir. 2011) (a defendant needs to be aware of his rights and the consequences in order to plead guilty effectively).

19.     Conversely, if the government was wrong to change its case as it did and add a staggering $44.6 million to fraud loss at literally the eleventh hour, Callahan's counsel at sentencing (not the same lawyer who represented Callahan at the time of the guilty plea) was ineffective in not seeking to adjourn sentencing, as was Mr. Callahan's statutory right when the Probation Department issued an addendum to the PSR on the day before sentencing [Fed. R. Cr. Pro.

10

32(g); 18 U.S.C. §3552(d)], so he could consider and act on the legal and constitutional implications of the government's change.

20. In fact, upon counsel's receipt of the government's letter announcing the change from $96 million to $140.6 million, less than two days from Callahan's scheduled sentencing on September 15, 2017, Callahan's counsel emailed Callahan (without any prompting from Callahan) that he opposed an adjournment upon receiving and just "skimming" the government's letter "quickly" on the night of September 13, 2017. Counsel urged Mr. Callahan to just "be done" or else risk annoying Judge Spatt. Exhibit H. Counsel did not take the time, or even *have or ask for* adequate time, to consider the legal and constitutional implications of the government's new position on such short notice and to review all the relevant documents. Counsel was right to see the wisdom in avoiding side skirmishes with the government about, for example, whether the fraud truly constituted a Madoff-style *Ponzi* scheme, and Callahan agreed. But counsel was wrong, in fact he was constitutionally ineffective, in recommending that Callahan proceed immediately to sentencing and "be done" without proper analysis of the government's new position. Had counsel taken the time to analyze the government's new theory of liability and advance a proper challenge, it is virtually unthinkable that he would have failed to realize that the government's new theory was a breach of the government's plea agreement with Callahan, was based on a manufactured and false Guideline range, and constituted violations of due process and fundamental fairness.

C.   The Subsequent Motions for Disqualification of the
     United States Attorney's Office and Judge Spatt's Recusal

21. On June 19, 2019, upon analysis of the government's exculpatory spreadsheet and the corresponding conclusions of Mazars, Callahan moved in District Court for bond and to amend his pending Petition pursuant to 28 U.S.C. §2255, and he and Manson moved for disqualification of the United States Attorney's office and Judge Spatt's recusal.

22. Disqualification of the United States Attorney's Office was sought on

11

grounds that the government had plainly breached Callahan's plea agreement and had expressed its intention to press the same arguments against Manson at his sentencing that it had successfully advanced against Callahan. Exhibit E at 8-12. Callahan and Manson argued that the government's breach of Callahan's agreement and prospective breach of Manson's agreement created a *prima facie* case of prosecutorial conflict of interest: it raised a substantial question of conflict between the Office's (1) public role in advocating its cases; and (2) its private interest in insulating itself from personal or professional liability for its success in changing the case against Callahan, thereby violating the plea agreement it drafted, the principle of this Court's holding in *Wilson*, and basic norms of due process and fundamental fairness. While acknowledging that disqualification of a United States Attorney's office is drastic and unusual, Callahan and Manson argued that so too are the apparently unprecedented circumstances of this case. Exhibit E at 8-12. The government's apparent violation of *Brady* adds fuel to the fire.

23. Callahan (and later Manson) made a total of three arguments in District Court in support of Judge Spatt's recusal. In Callahan's first filing in support of his Petition, he suggested to Judge Spatt that the case was better re-assigned to another Judge because his Honor had imposed what appeared to be a plainly unconstitutional sentence on Callahan, and because Callahan's counsel at the time had emailed Callahan that he opposed seeking an adjournment notwithstanding the government's eleventh-hour change in the case because he feared annoying Judge Spatt. Exhibit D at 4-5.

24. The argument for Judge Spatt's recusal became stronger after the analysis of Mazars was complete and is now even stronger still. The analysis of Mazars demonstrated that the government had in fact breached its plea agreement with Callahan and, if the government followed through on its expressed intent to apply its same new view of loss to Manson, would breach its plea agreement with him as well. Meanwhile, this Court in *Wilson* reaffirmed its practice of

12

reassigning a case on remand to a new Judge rather than returning the case to the same Judge who had imposed sentence despite the government's breach of a plea agreement. That concern is particularly present here because Judge Spatt, after sentencing Callahan based on an exaggerated fraud loss to neutralize credits, commended the lawyers for their submissions: Callahan's counsel who had failed to call out the prosecutor's breach, and the prosecutor for his eleventh-hour letter (Exhibit J), which constitutes the breach:

> [I] would have to say there was an equally excellent response by Assistant United States Attorney Christopher Caffarone. I thought you did an excellent job, especially the exploratory chart . . . . That was very helpful.

Exhibit N (Transcript of Callahan Sentencing) at 59.

25. Also troubling is Judge Spatt's take on the law authorizing bond on petitions pursuant to Section 2255. While a high bar is properly set for bond in these circumstances [*see Illarramendi v. United States*, 906 F.3d at 271; *Mapp v. Reno*, 241 F.3d at 221], Judge Spatt repeated the government's unsupportable position that a petitioner's continued confinement does not qualify as an extraordinary circumstance warranting bond [Exhibit A at 6-7], but the cases cited by the government and re-cited by Judge Spatt do not support that position, nor is that a correct statement of the law. Courts have held, unremarkably, that continued confinement in the face of a claim of unconstitutional imprisonment is not itself an extraordinary circumstance warranting bond [*see, e.g., Iuteri v. Nardoza*, 662 F.2d 159, 162 (2d Cir. 1981) (disagreeing with district court's finding of likelihood of success)], but a circumstance warranting bond is in fact extraordinary where the petitioner's claim has such obvious merit that success is likely. *See, e.g., Harris v. United States*, No. 97-CV-1904, 1997 WL 272398 at *1 (S.D.N.Y. May 21, 1997) ("One can conceptualize a habeas petition where fundamental trial defects are so readily apparent that the Court can at an early stage determine that there is a "demonstrated likelihood" or "high probability" of success, thereby justifying bail"); *Tam v. INS*, 14 F. Supp. 2d 1184, 1190 (E.D. Cal. 1998) (bail is appropriate "when

the petitioner has raised substantial constitutional claims upon which he has a high probability of success"); *Richard v. Abrams*, 732 F. Supp. 24, 25 (S.D.N.Y. 1990) (the high hurdle requires that petitioner show a "demonstrated likelihood the petition will prevail" such that the petitioner has a "high probability of success") (internal quotation marks and citations omitted); *Beras v. United States*, 2012 U.S. Dist. LEXIS 82297, 2012 WL 2148986, at *1 (S.D.N.Y. June 12, 2012) ("Judges in this district have ruled that this high hurdle requires that the petitioner show a 'demonstrated likelihood the petition will prevail' such that the petitioner has a 'high probability of success'") (citations omitted).

26.     Many of the following additional features of Judge Spatt's conduct of this case are typically below the radar of this Court, constitute day-to-day case management which are exclusively in a district judge's domain, or are otherwise individually unremarkable. Here, however, Judge Spatt denied bond based on what he described as his review of Callahan's Petition, without saying *anything* about any of the Petition's underlying arguments, or even venturing to opine why the apparently obvious and severe breach of the government's plea agreement with Callahan was not actually an obvious and severe breach; Judge Spatt essentially asked this Court and Callahan to trust his judgment. It is in that context that the Court should consider whether the following facts should contribute to the understandably limited circumstances on which a case should be remanded to a different Judge:

> • Mr. Callahan's Petition was filed in September 2018, but Judge Spatt did not order the government to respond, take any other action or acknowledge its receipt in any way until nine months later in June 2019, after Mr. Callahan filed his motions for disqualification of the United States Attorney's office and recusal of Judge Spatt [*see* Order of June 25, 2019, entered between Dkts 207 and 209 on District Court Docket], even as the clock continued to tick for nine months on Callahan's correct Guideline range of 15 to 21

14

months;

• The government defaulted on Judge Spatt's deadline for its response to Callahan's Petition, his motion for bond and other relief, and sought an extension of time only after Callahan's counsel emailed the government and questioned the apparent default. Exhibit O. Judge Spatt granted the government's subsequent and untimely request for an extension of time within which to respond without asking the government to explain its default (Exhibit P);

• Even though the government reported in its late afternoon application for an extension of time that Callahan's counsel would file a letter the following day explaining why he opposed the application (because the government was not concomitantly willing to consent to or take no position on Callahan's application for bond, which had then been pending for a month) (Exhibit P), and even though counsel emailed the Court's case manager the following morning that a letter in opposition would be filed later that day upon counsel's return from a visit with another incarcerated client in another part of the country (Exhibit O), Judge Spatt granted the government's application without waiting to hear why counsel opposed the government's application.

27.	I have unqualified respect for Judge Spatt. I first appeared before Judge Spatt in the mid-1980's when his Honor was a Justice of the Appellate Division, and I was arguing appeals for the Kings County District Attorney. Since then, I have appeared before Judge Spatt in civil and criminal cases and have visited his Honor in Chambers as part of projects for the Eastern District Association. His Honor is very much a part of the Eastern District family of which I am also a longstanding member.

28.	But much more is at stake here than any particular defendant, prosecutor or Judge: public confidence in the fair adjudication of criminal cases, as well as the appearance

thereof, is as essential as the disposition of any particular case.  Here, Callahan has made a very substantial showing of an unacceptable and unconstitutional deprivation of his liberty to which there appears that no persuasive answer can be made; neither Callahan (nor Manson  prospectively) should be unduly incarcerated or bear the significant risk on the record before this Court that their only real avenue for redress will be applications for certificates of appealability somewhere down the road.

29.     If Judge Spatt did not find Callahan's claims sufficiently compelling even to demand that the government answer them before denying bond, it is highly unlikely he will ever sustain them.  Callahan has made more than a substantial showing of breach, itself a sufficient basis for recusal, and Judge Spatt's attempt to distinguish *Wilson* and this Court's  reasoning for remanding cases of breach to a different Judge (Exhibit A at 4-5) is unavailing:  a different Judge should be assigned to this case going forward.  At the very least, permitting Callahan to be at liberty during the pendency of the current litigation will signal that the issues here are, in fact, substantial and extraordinary.

D.     Callahan is Indisputably Not a Flight Risk

30.     Callahan fully complied with the terms of his release over the four years between his arrest and his current incarceration.  After Callahan's sentencing, he surrendered to serve his sentence of 144 months despite his firm belief that it was illegal and unjust, and he will surrender again to continue serving his sentence if and when the government proffers an explanation for its conduct of this case, and should this Court or the District Court sustain any such explanation if and when it is made.  The same substantial sureties who secured Callahan's release during the

16

pendency of his case remain ready, willing and able to post properties, and other security is available.

        I declare under penalty of perjury that the foregoing is true and correct.

        Respectfully submitted,

        /s/
        Andrew J. Frisch

Executed on August 7, 2018
New York, New York

17

EXHIBIT A

Case 19-2413, Document 11, 09/08/2019, 2628105, Page20 of 197

FILED
CLERK

7/31/2019 1:42 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

UNITED STATES OF AMERICA,

        -against-

BRIAN R. CALLAHAN,

**MEMORANDUM OF**
**DECISION & ORDER**
2:13-cr-00453 (S-1)(ADS)

-----------------------------------------------------------X

**APPEARANCES:**

**United States Attorney's Office, Eastern District of New York**
*Attorneys for the United States*
610 Federal Plaza
Central Islip, NY 11722
      By:    Christopher Charles Caffarone, Assistant United States Attorney,

271 Cadman Plaza East
Brooklyn, NY 11201
      By:    Brian D. Morris, Assistant United States Attorney,
                Karin K. Orenstein, Assistant United States Attorney,
                Shannon Cassandra Jones, Assistant United States Attorney, Of Counsel.

**Andrew James Frisch, Esq.,**
*Attorney for the Defendant*
One Penn Plaza Suite 5315
New York, NY 10119

**SPATT, District Judge**:

Defendant Brian R. Callahan ("Callahan") pleaded guilty, pursuant to a plea agreement, to securities fraud and wire fraud. He thereafter filed a motion pursuant to 28 U.S.C. § 2255, which is pending awaiting the Government's opposition.

Presently before the Court are motions by Callahan for recusal of the undersigned and for his release on bond pending the adjudication of his habeas petition. For the following reasons, the Court denies the motions.

1

# I.  BACKGROUND

## A. FACTUAL BACKGROUND.

Between 2005 and 2012, Callahan operated a large-scale Ponzi scheme. He took money from investors purportedly to invest in hedge funds, stocks, bonds and other investment vehicles. However, unknown to investors, Callahan used those funds to pay redemptions to prior investors; to pay himself $6 million; and to purchase and renovate the Panoramic View, a cooperative development in Montauk, New York in which he, personally, had a 50% ownership interest.

A grand jury sitting in the Eastern District of New York returned a 19-count indictment charging Callahan with securities fraud; wire fraud; conspiracy to commit securities fraud; conspiracy to commit wire fraud; and aggravated identity theft. Callahan pleaded guilty to securities fraud and wire fraud violations and received a 144-month sentence of incarceration based in part on the Court's calculation that he caused $19.7 million in loss.

Callahan's petition alleges that the Government violated his plea agreement by falsely representing to the Court the amount of loss caused by his behavior at the sentencing hearing. Specifically, he alleges that the Government initially agreed that he caused $96 million in fraud losses, but two days before the sentencing hearing changed its calculations to $140.6 million. In Callahan's view, the Government increased the estimate to avoid the fact that he was entitled to substantial credits against the loss, which exceeded its initial estimate of fraud loss and would have resulted in a significantly diminished range of 15-to-21 months under the Sentencing Guidelines. Therefore, Callahan alleges that his sentence was unconstitutional in light of the Government's knowing misrepresentations.

2

## B. PROCEDURAL BACKGROUND.

On April 29, 2014, Callahan pleaded guilty, pursuant to a plea agreement, to securities fraud and wire fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 18 U.S.C. § 1343, respectively.

On September 15, 2017, the Court sentenced Callahan to 144 months' incarceration and ordered Callahan to begin serving his sentence on November 27, 2017.

On November 19, 2017, Callahan moved to postpone his sentence, which the Court denied the next day.

On November 20, 2017, Callahan moved for bail pending appeal, pursuant to 18 U.S.C. § 3143(b)(1), which the Court denied on November 22, 2017.

Callahan filed a notice of appeal arguing that the government changed its theory of loss, as well as the Court's rejection of his motion for bail pending appeal.

On December 28, 2017, the Second Circuit dismissed Callahan's appeal on the ground that the he waived his right to appeal if he received a sentence of imprisonment of 327 months or below and found that the motion for bail was moot.

In January 2018, Callahan began serving his sentence.

On September 28, 2018, Callahan filed a motion to vacate his sentence pursuant to 28 U.S.C. §2255.

On June 19, 2019, Callahan filed a motion seeking: (1) an order disqualifying the United States Attorney's Office from prosecuting this case; (2) recusal of the undersigned; (3) an order requiring enforcement of a plea agreement between the Government and co-defendant Adam J. Manson; (4) permission to supplement Callahan's September 28, 2018 motion to vacate; and (5) Callahan's immediate release on bond.

Case 19-2443, Document 11, 09/08/2019, 2628105, Page 23 of 197

On July 22, 2019, the Government filed a motion seeking to extend the July 19, 2019 deadline for responding to Callahan's motions to August 19, 2019, which the Court granted.

On July 23, 2019, Callahan filed a motion seeking an immediate hearing regarding his bond application.

## II. DISCUSSION

### A. AS TO THE MOTION FOR RECUSAL.

Callahan urges the undersigned to exercise the Court's discretion to recuse itself from these proceedings in the interests of justice. Although Callahan does not question the undersigned's objectivity and acknowledges its ability to "dispassionately resolve[]" his request "on the merits," ECF 196-1 at 5, he believes that its imposition of an unconstitutional sentence acts as an unnecessary taint that would affect the resolution of his habeas petition. As the only basis for making such an extraordinary request, Callahan cites *United States v. Wilson*, 920 F.3d 155 (2d Cir. 2019), in which the Second Circuit explained:

> In cases where specific performance is the appropriate remedy, we typically remand the case for resentencing before a different district judge because the effect of the government's breach of its commitment is difficult to erase and it is likely that the same judge would reach the same result as he reached before.

*Id.* at 168.

Under normal circumstances, the Court would have preferred to wait until after it received the Government's opposition to determine whether to reassign the case to another judge. However, in light of the Callahan's accompanying demand for the immediate resolution of his bond application, the Court must decide the issue now. The Court's capacity to render decisions objectively in a case is a prior question that implicates its assessment of all motions pending before it. The Court could not reasonably decide Callahan's bond application without first ensuring that it could do so pursuant to a neutral evaluation of the merits.

In the Court's view, the circumstances do not warrant recusal. As Callahan admits, *Wilson* involved a different procedural posture, in which the Second Circuit found on appeal that the Government breached a plea agreement. *Id.* at 168. Pursuant to that finding, the Second Circuit had to decide when fashioning the remedy whether "to permit the plea to be withdrawn or to order specific performance of the agreement." *Id.* The court chose specific performance and remanded it to the district court for resentencing. *Id.* Thus, *Wilson* provides for the recusal of the judge who imposed the original sentence where the court (1) finds a violation of the plea agreement occurred; and (2) determines that specific performance is the appropriate remedy.

Here, the Court faces a totally different set of facts. This is a collateral proceeding challenging a sentence upheld by the Second Circuit, not an appeal of Callahan's original sentence. The Court has neither ruled that the Government violated the plea agreement nor ordered specific performance and resentencing. Put another way, Callahan's motion puts the proverbial cart before the horse. He seeks the remedy without first establishing the harm. Permitting recusal simply based on an *allegation* that the Government violated a plea agreement would not advance the goals articulated by *Wilson*. Also, it would create a new procedural mechanism whereby habeas petitioners could obtain a new judge simply by accusing the Government of bad faith.

If the Court in fact finds that a breach of the plea agreement occurred, it will entertain arguments for its recusal. Until then, it will continue to preside over these proceedings. Accordingly, the Court denies Callahan's motion for recusal.

**B. AS TO THE MOTION FOR A BOND.**

The Court has the "inherent power to release on bail a habeas petitioner who challenges his detention after a criminal conviction," but "[t]he standard ... is a difficult one to meet": "The petitioner must demonstrate that the habeas petition raise[s] substantial claims and that

5

extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective." *Mapp v. Reno*, 241 F.3d 221, 223, 226 (2d Cir.2001). Notably, the "the standard for release on bail under 28 U.S.C. § 2255 is even higher than . . . for release pending direct appeal." *United States v. Whitman*, 153 F. Supp. 3d 658, 661 (S.D.N.Y. 2015). For a petitioner to qualify for such relief, "'there must be a demonstrated likelihood that the petition will prevail, based upon claims of a substantial nature upon which the petitioner has a high probability of success, and demonstrating merits that are more than slightly in petitioner's favor, so that victory for petitioner can be predicted with confidence.'" *Muja v. United States*, No. 10-cv-2770, 2011 WL 1870290, at *1 (E.D.N.Y. May 16, 2011) (quoting *Beras v. United States*, No. 05-cv-2678, 2007 WL 195352 (S.D.N.Y. Jan. 24, 2007)).

In the Court's view, releasing Callahan on bail pending its resolution of his habeas application would be inappropriate.

First, the Court finds that his habeas petition does not raise "substantial questions" upon which he has a "high probability of success." The Court reviewed Callahan's habeas petition and does not agree that he presented a sufficiently compelling merits case that his victory can be predicted with confidence. Of course, the Court has not in fact decided the merits of the habeas petition and its determination at this stage will have no bearing on its ultimate assessment of the motion. *See Beras v. United States*, No. 05-cv-2678, 2012 WL 2148986, at *1 (S.D.N.Y. June 12, 2012) ("Although the Court does not yet decide the merits of the habeas petition, the Court finds that the Petitioner has failed to demonstrate a likelihood that the petition will prevail.").

Second, the Court finds the absence of extraordinary circumstances that would justify his release. Although he has alleged serious misconduct by the Government, Callahan's argument for bail is really a claim that vacating his sentence would end his incarceration because he already

6

served the sentence he should have received. However, a petitioner's continued confinement during habeas review is normally not considered an extraordinary circumstance entitling him to bail. *See Iuteri v. Nardoza*, 662 F.2d 159, 162 (2d Cir. 1981) ("Iuteri contends further that his case is extraordinary because, if the habeas writ is granted, it will mean that his incarceration after July 2, 1981, would have been without basis. However, there is nothing unusual about this. Virtually all habeas corpus petitioners argue that their confinement is unlawful.'); *Harris v. United States*, No. 97-cv-1904, 1997 WL 272398, at *1 (S.D.N.Y. May 21, 1997) ("The fact that [petitioner's] post-petition incarceration will have been without just basis if his petition eventually succeeds does not constitute an extraordinary circumstance entitling him to bail."); *Livingston v. Miller*, No. 18-cv-0803, 2019 WL 2281111, at *3 (N.D.N.Y. May 29, 2019) ("The fact that petitioner is incarcerated in alleged violation of his constitutional rights does not constitute an extraordinary circumstance."); *Welch v. Artus*, No. 04-cv-205, 2007 WL 949652, at *60 (W.D.N.Y. Mar. 29, 2007) ("If the Court is mistaken on this point, and Welch's habeas petition should eventually succeed, the fact that his post-petition incarceration will have been without a justified basis does not constitute an extraordinary, circumstance entitling him to bail.").

Callahan contests this conclusion, but neither case he cites supports his argument as both cases denied the petitioner's application for bail. *See Mapp v. Reno, 241 F.3d 221*, 230 (2d Cir. 2001); *Illarramendi v. United States*, 906 F.3d 268, 271 (2d Cir. 2018). The Court will not release him pending review of his habeas petition based solely on his subjective belief regarding the merits of his petition. As courts in this district have recognized:

> [T]here is abundant authority that federal district judges in .. section 2255 proceedings have inherent power to admit applicants to bail pending the disposition of their cases, but a power to be exercised very sparingly. The reasons for parsimonious exercise of the power should be obvious. A defendant whose conviction has been affirmed on appeal ... is unlikely to have been convicted unjustly; hence the case for bail pending resolution of his postconviction

7

Case 19-2413, Document 11, 09/08/2019, 2628105, Page27 of 197

proceeding is even weaker than the case for bail pending appeal. And the interest in the finality of criminal proceedings is poorly served by deferring execution of sentence till long after the defendant has been convicted.

*Knutson v. United States*, No. 00-cv-4830, 2001 WL 477269, at *1 (E.D.N.Y. Mar. 7, 2001)

(quoting *Cherek v. United States*, 767 F.2d 335, 337 (7th Cir.1985)).

Therefore, the Court denies Callahan's application for release on bond pending the adjudication of his habeas petition.

## III.  CONCLUSION

For the foregoing reasons, the Court denies Callahan's motions for recusal and for bail pending habeas review.

It is **SO ORDERED**:

Dated: Central Islip, New York

July 31, 2019

____/s/ Arthur D. Spatt_____

ARTHUR D. SPATT

United States District Judge

8

EXHIBIT B

Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

## United States District Court

Eastern _____ District of New York _____

Caption:

US _____ v.

Brian R. Callahan _____

Docket No.: 13 CR 453 _____

Hon. Arthur D. Spatt _____

(District Court Judge)

Notice is hereby given that __Brian R. Callahan_____ appeals to the United States Court of

Appeals for the Second Circuit from the judgment ____, other | ✓ __Memorandum and Decision and Order denying Bond (Dkt 216)__

(specify)

entered in this action on __July 31, 2019_____ .

(date)

This appeal concerns: Conviction only |___| Sentence only |___| Conviction & Sentence |___| Other [ ✓

Defendant found guilty by plea | ✓ | trial | | N/A [ .

Offense occurred after November 1, 1987? Yes | ✓ | No [ N/A [

Date of sentence: __September 15, 2017_____ N/A |___|

Bail/Jail Disposition: Committed | ✓ Not committed | | N/A [

Appellant is represented by counsel? Yes ✓ ] No | | If yes, provide the following information:

Defendant's Counsel: Andrew J. Frisch

Counsel's Address: The Law Offices of Andrew J. Frisch

One Penn Plaza, Suite 5315, New York, New York 10119

Counsel's Phone: 212-285-8000

Assistant U.S. Attorney: Christopher Caffarone

AUSA's Address: 610 Federal Plaza

Central Islip, New York 11722

AUSA's Phone: 631-715-7900

Signature

EXHIBIT C

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
                        Sheet 1

# UNITED STATES DISTRICT COURT

Eastern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) _(Amended)_ |
| v. | ) **JUDGMENT IN A CRIMINAL CASE** |
| BRIAN R. CALLAHAN | ) Case Number: CR-13-0453-01 (ADS) |
| | ) USM Number: 82618-053 |
| | ) Roland Riopelle, Esq. (Ret) |
| | ) Defendant's Attorney |

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 02 2017 ★

LONG ISLAND OFFICE

## THE DEFENDANT:

☑ pleaded guilty to count(s)     4, 11 (24 COUNT INDICTMENT)

☐ pleaded nolo contendere to count(s)
  which was accepted by the court.

☐ was found guilty on count(s)
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 15:78j(b), 15:78ff | SECURITIES FRAUD, a Class C Felony | | 4 |
| 18:1343 | WIRE FRAUD, a Class C Felony | | 11 |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s)  remaining  ☐ is  ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

9/15/2017
Date of Imposition of Judgment

s/ Arthur D. Spatt

Signature of Judge

ARTHUR D. SPATT, U.S.D.J.
Name and Title of Judge

10/2/2017
Date

AO 245B (Rev. 11/16) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __2__ of __7__

DEFENDANT: BRIAN R. CALLAHAN
CASE NUMBER: CR-13-0453-01 (ADS)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

ONE HUNDRED FORTY FOUR (144) MONTHS TO RUN CONCURRENT ON COUNT 4 AND COUNT 11 SO THAT HIS TOTAL TERM OF IMPRISONMENT IS ONE HUNDRED FORTY FOUR (144) MONTHS.
THAT THE DEFENDANT BE GIVEN CREDIT FOR TIME ALREADY SERVED, IF ANY.

☑ The court makes the following recommendations to the Bureau of Prisons:

THAT THE DEFENDANT SERVE HIS TERM OF IMPRISONMENT AT FCI DANBURY, CT TO BE NEAR HIS FAMILY. THAT THE DEFENDANT PAY RESTITUTION FROM MONEY ACCRUED DURING HIS TERM OF IMPRISONMENT AT A RATE OF 10 OF HIS GROSS MONTHLY INCOME. (PLEASE SEE PAGE 5 FOR MORE INFORMATION)

☐ The defendant is remanded to the custody of the United States Marshal.

☑ The defendant shall surrender to the United States Marshal for this district:

    ☑ at __12:00__ ☐ a.m. ☑ p.m. on __11/27/2017 or Institution designated__

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 11/16) Judgment in a Criminal Case
　　　　　　　　Sheet 3 — Supervised Release

Judgment—Page　3　of　7

DEFENDANT:　BRIAN R. CALLAHAN
CASE NUMBER:　CR-13-0453-01 (ADS)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :　THREE (3) YEARS.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

|  | Judgment—Page | 4 | of | 7 |

DEFENDANT: BRIAN R. CALLAHAN
CASE NUMBER: CR-13-0453-01 (ADS)

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
                        Sheet 3B — Supervised Release

Judgment—Page    5    of    7

DEFENDANT:   BRIAN R. CALLAHAN
CASE NUMBER:   CR-13-0453-01 (ADS)

# ADDITIONAL SUPERVISED RELEASE TERMS

1. THE DEFENDANT IS SUBJECT TO THE TERMS OF THE ORDER OF RESTITUTION DATED 9/15/2017 AND IS ATTACHED TO THIS JUDGMENT AND CONVICTION ORDER. RESTITUION IS IN THE SUM OF SIXTY SEVEN MILLION SIX HUNDRED FIFTEEN THOUSAND FOUR HUNDRED AND SEVEN DOLLARS AN SEVENTY SEVEN CENTS ($67,615,407.77). PAYMENTS SHALL BE MADE TO THE CLERK OF THE COURT, 225 CADMAN PLAZA EAST, BROOKLYN  NY 11201 AT A RATE OF 10% OF HIS GROSS MONTHLY INCOME DURING HIS INCARCERATION AND DURING SUPERVISED RELEASE UNTIL THE FULL AMOUNT OF RESTITUTION IS PAID EVEN AFTER HIS TERM OF SUPERVISED RELEASE HAS TERMINATED. ONCE RELEASED FROM INCARCERATION PAYMENTS SHALL COMMENCE SIXTY (60) DAYS AFTER HIS RELEASE. THE CLERK OF THE COURT SHALL DISTRIBUTE RESTITUITON PAYMENTS TO THE  VICTIMS AS DIRECTED IN THE ATTACHED ORDER OF RESTITUTION ON A PRO RATA BASIS.

2. THE DEFENDANT IS SUBJECT TO THE TERMS OF THE FINAL ORDER OF FORFEITURE DATED 9/29/2017 AND IS ATTACHED TO THIS JUDGMENT AND CONVICTION ORDER.

3.  THE DEFENDANT SHALL SUBMIT FULL FINANCIAL DISCLOSURE TO THE PROBATION DEPARTMENT AS DIRECTED.

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
                        Sheet 5 — Criminal Monetary Penalties
_____

Judgment — Page __6__ of __7__

DEFENDANT: BRIAN R. CALLAHAN
CASE NUMBER: CR-13-0453-01 (ADS)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ 0.00 | $ 0.00 | $ 67,615,407.77 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| See Order of Restitution attached to this Judgment & Conviction Order. | | | |

**TOTALS**          $ _____          $ _____

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

DEFENDANT:  BRIAN R. CALLAHAN                                    Judgment — Page    7    of    7
CASE NUMBER:  CR-13-0453-01 (ADS)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ __200.00__ due immediately, balance due

        ☐  not later than _____ , or
        ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☑  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

    ADAM MANSON CR-13-0453-02 (ADS)

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

EXHIBIT D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------- x

BRIAN R. CALLAHAN,

             Petitioner,

                                  13 CR 453 (ADS)
     - against -                  18 CV ___ (ADS)

UNITED STATES OF AMERICA,

             Respondent.

------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF BRIAN R. CALLAHAN'S PETITION PURSUANT TO 28 U.S.C. §2255

Andrew J. Frisch
The Law Offices of Andrew J. Frisch
One Penn Plaza, Suite 5315
New York, New York 10119
(212) 285-8000

*Attorneys for Petitioner*

Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.  Your Honor Should Order the Random
    Reassignment of this Case to Another Judge . . . . . . . . . . . . . . . . . . . . . . . 4

Statement of Facts

A.  Until 41 Hours Before Sentencing, the Government Excluded
    Investor Funds Properly Invested in Hedge Funds Like Kinetics
    From Its Theory of Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

B.  Upon Realizing that Mr. Callahan Was Entitled to Credits that
    Exceeded Loss, the Government Changed Its Theory of Fraud
    to Create a More Severe Sentencing Range . . . . . . . . . . . . . . . . . . . . . . . . 9

Argument

Mr. Callahan is Entitled to be Resentenced Because of the Ineffectiveness
of Counsel; to Remedy the Injustice of the Government's False Theory
of Liability; and Pursuant to Coram Nobis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

A.  Ineffective Assistance of Counsel at the Time
    of the Guilty Plea and at Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

B.  Counsel's Failure to Consult and Present the Opinion of an Expert . . . 24
.
C.  The Purported Waiver of Remedies Is Unenforceable . . . . . . . . . . . . . . 26

D.  Writs of Habeas Corpus and Coram Nobis . . . . . . . . . . . . . . . . . . . . . . . 30

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------ x

BRIAN R. CALLAHAN,

                Petitioner,

                              13 CR 453 (ADS)
        - against -               18 CV ___ (ADS)

UNITED STATES OF AMERICA,

                Respondent.

------------------------------------------------------ x

### MEMORANDUM OF LAW IN SUPPORT OF BRIAN R. CALLAHAN'S PETITION PURSUANT TO 28 U.S.C. §2255

#### Introduction

Forty-one hours before Petitioner Brian R. Callahan's sentencing, after the indictment in this case had been pending for more than four years, and after the government had consistently excluded properly-made investments from its theory of fraud in its indictment, plea agreement, public statements about the case, correspondence with the Court, and disclosures to the Probation Department for its presentence report ("PSR"), the government changed its theory of criminal liability to add a staggering $44.6 million of loss to its Guideline calculation. The government's new theory of liability was not based on any new information or a different application of the Sentencing Guidelines to the facts, but was manufactured to justify a grossly inflated sentencing range upon the government's realizing that required credits against loss exceeded loss. The government's new theory of liability

- was false as a matter of fact and law and based on non-criminal conduct;

- served to breach the government-drafted plea agreement;

● was not identified by Mr. Callahan's lawyers at the time of his guilty plea as a basis on which the plea agreement's fraud loss could be increased at sentencing;

● was not challenged by Mr. Callahan's counsel at sentencing as a breach of the plea agreement, outside the scope of the case, and as based on a false theory of liability manufactured to create an inflated sentencing range, and for which counsel did not seek even a statutorily-required adjournment of sentencing to have sufficient time to consider the legal implications of the government's 41-hour notice of a new theory of liability and an additional $44.6 million of loss.

Mr. Callahan was never advised that his plea agreement permitted the government to increase his sentence for conduct which the government had consistently and expressly alleged was not criminal, which was in fact not criminal, and which was not part of the case. Mr. Callahan is entitled to be resentenced on any of a number of theories of constitutional error, as explained below.

The Antiterrorism and Effective Death Penalty Act of 1996 was intended to reform the protocols for post-conviction relief, not foreclose relief for or animate prosecutorial aversion to a defendant's valid post-conviction claims. The government is not always right: sometimes the government acts improperly. Where the violations are of constitutional magnitude and require the limited relief of a resentencing, they must be remedied to vindicate the rule of law and produce a process which serves to underscore rather than undermine the community's confidence in basic constitutional norms. With due respect to the government, we do not believe that the violations in this case can responsibly or fairly be defended.

A    Your Honor Should Order the Random Reassignment of this Case to Another Judge

While we are not arguing that Your Honor's recusal is required as a matter of law, nor suggesting that Your Honor has prejudged this Petition, we ask, respectfully, that Your Honor consider whether the interests of justice would be best advanced by assignment of this Petition to a different Judge.

We believe that Your Honor presided over a sentencing infected by a gross constitutional deprivation and imposed what we believe was an unconstitutional sentence. More, though the government advanced a new theory of criminal liability and an additional $44.6 million loss just 41 hours before sentencing, Mr. Callahan's then-counsel opposed even seeking an adjournment to analyze the new claim because in part, as he then explained in an email to Mr. Callahan, he feared annoying Your Honor. Under the circumstances of the government's eleventh-hour change of theory and increase in loss, we do not believe that Your Honor would have been annoyed by a request for an adjournment, but would have dispassionately resolved such a request on the merits. Any legitimate concern about Your Honor's sensibilities was enormously outweighed by the need to consider carefully the propriety of a new theory of criminal liability with such staggering consequences in a case of atypical complexity – precisely to avoid the rush that contributed to what we believe was an unconstitutional sentence.

We nonetheless believe that the interests of justice favor review and resolution of this Petition by another Judge of the Court.

### Statement of Facts

A.      Until 41 Hours Before Sentencing, the Government Excluded Investor Funds
        Properly Invested in Hedge Funds Like Kinetics From Its Theory of Fraud

On April 29, 2014, Mr. Callahan pled guilty to securities fraud and wire fraud. The fraud to which Mr. Callahan pled guilty was misrepresenting to his clients the fact and nature of investments he made on their behalf in the form of loans to Distinctive Investments, LLC ("Distinctive"), the owner of the Panoramic View, a resort in Montauk. The government alleged that Mr. Callahan's diversion of investor funds to the Panoramic View was part of

transactions that qualified the fraud as a *Ponzi* scheme.

The government's theory of fraud was that he had promised investors that he would invest their money in independently-managed domestic funds, including Kinetics Institutional Partners, L.P. ("Kinetics") and Millennium USA, L.P. ("Millennium"). The indictment alleged that Mr. Callahan properly invested investor funds in the hedge funds, but did not invest as much as he should have. Indictment at ¶¶4-6, 22 (Exhibit B to accompanying Declaration of Brian R. Callahan). Thus, in the government's various statements about the case, it distinguished fraudulently-invested monies from properly-invested monies and distinguished its estimated value of the fraud ($96 million) from the total amount of money raised by Mr. Callahan from investors ($118.7 million). Indictment at ¶22 (Exhibit B); *see* Exhibit F. Those statements of the government included the indictment (Exhibit B), press statements of United States Attorney Loretta A. Lynch (Exhibit F), correspondence with the Court (Exhibit G at 2), disclosures to the Probation Department for Mr. Callahan's presentence report ("PSR"), and civil complaints of the government in a collateral *in rem* action and the Securities Exchange Commission ("SEC") in civil enforcement actions. Exhibits C, D and E. All of those statements of the case either expressly or by implication alleged that Mr. Callahan raised a total of $118.7 from investors and that the value of the fraud was $96 million.

Thus, the government alleged in an *in rem* action against the Panoramic View (and other property) that Mr. Callahan raised more than $90 million from his investors, promised that funds would be invested in Kinetics and other domestic funds not managed or controlled by Mr. Callahan, made investments in the hedge funds, but fraudulently diverted funds to the Panoramic View. *United States v. The Real Property Located at 272 Old Montauk Highway, et*

*al.*, 12 CV 1880 (ADS) (Exhibit C at ¶¶24-27, 30, 40, 42).

Likewise, upon announcing the indictment of Mr. Callahan and later guilty pleas in the case, United States Attorney Loretta Lynch, the Federal Bureau of Investigation and Internal Revenue Service issued a total of at least four press releases upon indictment and guilty pleas in the case that described the charged crime as a "$96 million securities fraud" upon a total of "$118 million" obtained by Mr. Callahan from investors. Exhibit F. The public, like Mr. Callahan, clearly understood that the government's theory of the fraud did not embrace all the monies he obtained. *See, e.g., The New York Times*, nytimes.com, N.Y. Region, Aug. 1, 2013 (reporting that Mr. Callahan had "siphoned nearly $100 million" from investors).

Less than three weeks before April 29, 2014, when Mr. Callahan entered his guilty plea, the government wrote a letter to the Court, responding to an application by the law firm then representing Mr. Callahan, Sher Tremonte LLC, for release of funds from seized assets for legal fees. The government in response reported to the Court that Mr. Callahan stood indicted for a fraud valued at "$96 million." Exhibit G at 2.

The government-drafted plea agreement that Mr. Callahan accepted on April 29, 2014, was consistent with the government's letter (Exhibit G) and all of the other above-described government pronouncements about the government's theory of criminal liability, the scope of the case, and the value of the fraud. The plea agreement estimated that the likely value of the loss caused by the fraud was governed (under the Guidelines in effect as of November 2013) by U.S.S.G. §2B1.1(b)(1)(M), corresponding to a loss amount of more than $50 million, but less than $100 million, that is, the $96 million. Exhibit H at 3. As to the scope of the fraud resulting in the government's likely estimate of a loss of $96 million, the plea agreement

represented that the "related conduct" covered by the agreement was "*obtaining money from investors*" for the offshore investment funds *controlled* by Mr. Callahan (emphasis added). The plea agreement made no mention that *withdrawals* from *independently-managed* hedge funds like Kinetics were themselves inherently fraudulent, nor of market loss in funds in Kinetics where the government alleged that Mr. Callahan had properly invested funds. Exhibit H at ¶5.

The SEC and United States Attorney worked together in this case and announced the same theory of liability; the SEC's complaints reinforced the government's theory of liability. The SEC's initial complaint against Mr. Callahan [SEC *v. Callahan, et al.*, 12-CV-1065 (ADS)], alleged that Mr. Callahan misrepresented that investments would be made in New York-based hedge funds, including Kinetics; that Kinetics and the other New York-based hedge funds were *"unrelated and unaffiliated"* with the Callahan Funds [Exhibit D at ¶29 (emphasis added)]; Mr. Callahan should have invested more money in the hedge funds than he invested [*see, e.g.*, Exhibit D at ¶¶58, 60-61, 66, 71]; and instead invested in the Panoramic View (not identified by name in the Complaint). Exhibit D at ¶¶31, 34-35, *et seq.* On May 31, 2012, two months after the SEC filed its complaint against Mr. Callahan, it filed a first amended complaint (Exhibit E), alleging a "Ponzi scheme" based on substantial the same facts alleged in the SEC's initial complaint; re-alleging that the hedge funds were "unrelated and unaffiliated" funds in which Mr. Callahan should have invested more than he did [Exhibit E at ¶¶2, 36-38, 40, 91, 94, 99]; and distinguishing Mr. Callahan's proper investments in the hedge funds from separate allegations that he "misused" investor monies to invest in the Panoramic View and for redemptions to other investors. Exhibit E at ¶¶2-3.

The day after Mr. Callahan entered his guilty plea, he complained to his attorney

Case 19-2413, Document 11, 08/08/2019, 2628105, Page47 of 197

by email about United States Attorney Lynch's press release which continued to claim that the purported $96 fraud was a *Ponzi* scheme (and which continued to distinguish the $96 million from the $118.7 million total monies invested with Mr. Callahan).  An email in response from Mr. Callahan's lawyers confirmed that the value of the fraud was $96 million:

> In court yesterday you pled guilty to two counts of the indictment.  In the Government's view, those two counts related to a $96 million Ponzi scheme.

Exhibit R.   Defense counsel did not advise Mr. Callahan then or ever that the language of the plea agreement, especially in the context of Paragraph 22 of the Indictment, permitted the government to change its theory and claim that withdrawals from Kinetics were themselves part of his fraud or that market loss in Kinetics was part of the fraud.  Nor did counsel ever advise Mr. Callahan that his plea of guilty constituted a waiver of his right to due process at sentencing, and that the government could thereby seek to enhance his sentence for conduct that was not criminal and had expressly excluded from the case.

When the government, presumably through the case agent, described the fraud to the Probation Department for Mr. Callahan's PSR, it again distinguished its estimated value of $96 million from the total amount of investor monies obtained by Mr. Callahan of $118.7 million.  As a result, the Probation Department reported to the Court, just as the indictment alleged, that at least "$96,000,000 was inappropriately used for redemption requests by other investors, payment on Panoramic View expenses, and personal expenses."  PSR at ¶39.

B.      Upon Realizing that Mr. Callahan Was Entitled to Credits that Exceeded Loss, the Government Changed Its Theory of Fraud to Create a More Severe Sentencing Range

At some point after the case agent reported to the Probation Department that the value of Mr. Callahan's fraud was $96 million based on a total of $118.7 million obtained from

investors, he apparently realized that Mr. Callahan was entitled to credits against loss that exceeded loss. Thus, for example, by the time of Mr. Callahan's sentencing on September 15, 2017, the government acknowledged that it had recovered from sale of the forfeited Panoramic View even more than the value of the loans that Mr. Callahan had diverted to it:

> [B]ecause of the government's efforts, investors are going to receive $2 million more than the defendant diverted to the Panoramic. Specifically, [Mr. Callahan] illegally diverted approximately $38 million of investor monies to the Panoramic. The government recovered approximately $40.3 million from the sale of the Panoramic. As a result of the government's tremendous work, investors will recoup $40.3 million or $2 million more than the $38 million that the defendant diverted.

Exhibit J at 4. As required by the Sentencing Guidelines, and as the government expressly acknowledged at sentencing [Exhibit J at 3-4], this $40.3 million represented a credit against fraud loss under the Guidelines. *See* U.S.S.G. §2B1.1 (2013), *Commentary*, Application Note 3(E)(I) and (ii); *United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008) (defendant is entitled to credit for value provided).

The government also alleged that Mr. Callahan's investment in the Panoramic View was part of a *Ponzi* scheme in which he essentially used money from some investors to satisfy redemptions to other investors. While Mr. Callahan argued that the above-described sale of the underlying asset at issue (the Panoramic View) helped defeat the inference of a *Ponzi* scheme, the government expressly acknowledged at Mr. Callahan's sentencing that the total value of redemptions and related monies for which Mr. Callahan was entitled to credits under the Sentencing Guidelines, apart from the sale of the Panoramic View, and even assuming a *Ponzi* scheme, totaled $80.4 million. Exhibit J at 3. *See* U.S.S.G. §2B1.1, Commentary Application Note 3(E)(I).

Thus, the government at sentencing acknowledged that Mr. Callahan was entitled to credits under the Guidelines totaling at least $120.7 million ($40.3 from the sale of the Panoramic View plus $80.4 million of redemptions and related monies). As noted, however, as of September 13, 2017, the Court and Mr. Callahan were aware of two government estimates of the value of the fraud, and the $120.7 million of undisputed credits was greater than *both* of those estimates.

*First*, the government's indictment, plea agreement and public pronouncements about the case valued the fraud at $96 million, as explained above. *Second*, the Probation Department in its PSR, presumably on information provided by the case agent, reported to the Court that at least "$96,000,000 was inappropriately used for redemption requests by other investors, payment on Panoramic View expenses, and personal expenses" [PSR at ¶39] (though the Probation Department took the view that the value of the fraud should be the larger number of $118.7 million previously announced by the government as the total amount raised by Mr. Callahan, PSR at ¶46).

Thus, as the government prepared its submission for Mr. Callahan's sentencing, it knew that Mr. Callahan was entitled to credits against loss ($120.7 million) which exceeded both the government's ($96 million) and the Probation Department's ($118.7 million) estimates of fraud loss and resulted either way in a modest adjusted range under the Sentencing Guidelines (which we believe was 15 to 21 months). While the credits would not have disabled the government from advising the Court of its view of Mr. Callahan's fraud nor the Court from imposing imprisonment, we believe that the case agent was determined to increase the likelihood of a severe sentence of imprisonment. Thus, on the night of September 13, 2017, with

11

sentencing 41 hours away, the government announced that Mr. Callahan's fraud loss was $140.6 million, embracing a staggering $44.6 million more than the $96 million alleged in the indictment and estimated in the government's plea agreement, including a staggering $21.9 million more than even the Probation Department's $118.7 million estimate of the fraud. As explained above, that new theory of loss had been expressly *excluded* from the case; was demonstrably *not* caused by fraud and was non-criminal conduct; and was wrong as a matter of law and fact.

Under the case agent's new theory, the additional $44.6 million above the government's previous estimate of $96 million, appeared to include one or both of the following: (a) monies in hedge funds like Kinetics not used to advance the fraud; and (b) market loss in Kinetics caused by the global financial crisis. The government, however, had earlier conceded in its indictment among other places that the investments in Kinetics and the other independently-managed hedge funds were proper, and that Mr. Callahan should have invested even more in those funds. The SEC, in its first amended complaint, distinguished Mr. Callahan's proper investments in the hedge funds from separate allegations that he "misused" investor monies to invest in the Panoramic View and for redemptions to other investors. Exhibit E at ¶¶2-3.

More, the case agent's new $44.6 million included a market loss of as much as $21.9 million in Kinetics indisputably caused by the global financial crisis of 2008. Even if a defendant could theoretically be criminally accountable for market loss [*see, e.g., United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007) (a defendant is accountable only for loss caused by fraud); *Dura v. Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005)], the government here *conceded* that Mr. Callahan had not fraudulently induced the investments in Kinetics, which

suffered the market loss.

Despite these indisputable facts and the government's repeated pronouncements about its case, the government, for the first time on the virtual eve of sentencing, theorized that Mr. Callahan was accountable for this additional $44.6 million of loss, including the portion representing the market loss in Kinetics caused by the global financial crisis, because Mr. Callahan had (1) diverted funds from Kinetics and other hedge funds to make redemptions to other investors; (2) diverted funds from Kinetics and other hedge funds to invest in the Panoramic View; and (3) otherwise lacked authority to make *any* withdrawals from those funds. Exhibit J at 3-4. The government's claim was demonstrably false as a matter of logic, law and fact.

The value of funds for redemptions as part of the purported *Ponzi* scheme and diverted by Mr. Callahan to the Panoramic View was already included in the $96 million repeatedly and consistently estimated by the government to be the value of the fraud in, for example, the indictment, plea agreement, correspondence with the Court and United States Attorney Lynch's public pronouncements about the case. In fact, presumably based on information provided by the case agent, the PSR reported to the Court that the $96 million embraced the value of funds diverted to the Panoramic View as well as transactions that qualified the fraud in the government's view as a *Ponzi* scheme. *See* PSR at ¶39. The government's new calculation of fraud loss was thus not just a new application of the Guidelines to the facts, but a new theory of liability that added non-criminal conduct into the case to arrive at a higher sentencing range upon the case agent's realization that credits against loss exceeded loss.

The delta between the government's new estimated fraud loss of $140.6 million

[Exhibit J at 3] and the $118.7 million previously reported by the government as the total amount obtained by Mr. Callahan [See Exhibit B at ¶22] was $21.9 million. That precise amount, $21.9 million, was the value of the market loss in Kinetics. Exhibit K at 4. Because the government had alleged that Mr. Callahan had properly invested the money in Kinetics that suffered the loss, it could not have been fraud loss, even if a defendant theoretically could ever be accountable for a loss caused by the market.

By 2008's global financial crisis, the value of Kinetics was in free fall, as was consumer wealth around the world generally. By the end of 2008, the fund had already lost 68% of its value. Exhibit P. About eleven of Mr. Callahan's investors through a total of about eighteen entities were invested in Kinetics. Callahan Declaration at ¶10. On their behalf, Mr. Callahan exercised prudent if not necessary discretion to salvage the dwindling value in Kinetics as it suffered losses of $21.9 million: he withdrew most of his investors' remaining holdings in the fund, converted those holdings to cash, and used portions of that cash to pay redemptions to investors (monies included in the above-described $96 million) and to invest in Distinctive's Panoramic View (monies also included in the $96 million).

The market loss in Kinetics and the corresponding redemptions were all dutifully disclosed to investors in Internal Revenue Service Forms K-1 in or just after 2008. *See* Exhibit K at 4. Investors in Kinetics had acknowledged in writing that Mr. Callahan had full discretion to manage the investments in Kinetics as he saw fit, including liquidation. Callahan Declaration at ¶ 12; Exhibits L, M, N and O. Even apart from those writings, one investor wrote Mr. Callahan an email, declining to invest in Kinetics precisely because he did not want to cede discretion over management of the investment. Exhibit Q. No misrepresentations to investors were made, apart

14

from Mr. Callahan's misuse of a portion of the withdrawals, which was part of the government's estimated $96 million of fraud loss. Even if Mr. Callahan had lacked authority to liquidate any holdings in Kinetics, however, the loss had already occurred by the time of the liquidation; the loss was indisputably not *caused* by the liquidation, a prerequisite for including it as fraud loss. *See, e.g., Rutkoske*, 506 F.3d at 179.

On September 13, 2017, in theorizing that Mr. Callahan was criminally accountable for the market loss, the government claimed, for the first time, that the fraud loss included market loss in Kinetics because the loss was "directly caused by the defendant's fraud, namely, the defendant caused this loss when he illegally diverted funds from the Kinetics fund into the Panoramic View without investors' approval. This was not a legitimate loss." Exhibit J at 3-4. The value of the diversion to the Panoramic View, however, was already part of the government's estimate of $96 million, as it had expressly represented over and over again. Further, funds from Kinetics were liquidated *after* the market loss was incurred; the liquidation could not have caused what had already happened.

The government also claimed that withdrawals from Kinetics *after the market loss had been suffered* had served to deny investors the benefit of an increase in value when Kinetics later rebounded. Exhibit J at 3-4. Fraud loss, however, does not include future returns that an investor might have earned but for fraud. *See United States v. Nolan*, 136 F.3d 265, 273 (2d Cir. 1998); U.S.S.G. §2B1.1, *Commentary*, Application Notes 2 and 3(D); *United States v. Pouparina*, 577 F. App'x 939, 941 (11th Cir. 2014) (the purpose of that application note is to ensure that "the offense level for a financial crime is not increased if the prosecution is delayed, even though the delay increases the cost of the crime"). To the extent that Kinetics began to

15

rebound between the global financial crisis in 2008 and Mr. Callahan's indictment in 2013, no investor ever complained during that period (or could have ever persuasively complained) that Mr. Callahan committed fraud by denying them the benefit of that rebound, and the government at sentencing did not even attempt to quantify its value. Instead, the government argued that Mr. Callahan was criminally liable for a pre-existing market loss he could not possibly have foreseen in a fund in which the government had expressly alleged he had properly invested.

At some point after Mr. Callahan pled guilty, he changed lawyers; the lawyers who represented Mr. Callahan when he pled guilty were permitted to withdraw when their application for legal fees from seized assets was denied. Callahan Declaration at ¶14. On September 13, 2017, at 9:45 p.m., Mr. Callahan's new lawyer emailed Mr. Callahan that the government had filed its letter in aid of sentencing an hour before, he had "skimmed it quickly" and was opposed to seeking to adjourn sentencing because doing so would "irritate the judge." Exhibit S. Mr. Callahan and his lawyer, however, had not previously discussed the need to adjourn sentence upon receiving the government's submission. Callahan Declaration at ¶14. After Mr. Callahan responded with a one-sentence email noting that the government's letter maintained its claim of a *Ponzi* scheme despite reason to believe that the government had abandoned that allegation [Exhibits S, U], counsel sent a second email to Mr. Callahan within an hour of the first one. Anticipating that Mr. Callahan might want a letter submitted to the Court challenging that the fraud was a *Ponzi* scheme, counsel emailed Mr. Callahan that such a further submission would "only result in further vociferous and damaging submissions by the government." Exhibit S.

The following morning, at 10:17 a.m., Mr. Callahan sent an email to his counsel,

explaining that the government's new theory of loss was not and had never been understood to be part of the case and otherwise mixed apples and oranges:

> The Govt is conflating two separate transactions; 1) the liquidation of a collapsing investment[] where the investment and losses were fully disclosed. [and] 2) an investment in the [D]istinctive promissory notes that was not properly disclosed to investors. Separately, I was not charged in the indictment with fraud for liquidating the collapsing hedge funds without getting permission from the investors as there is no document that supports the Govts assertion that I needed permission to make investment decisions. To the contrary, I was the only person legally responsible for making investment decisions.

Exhibit T. Later that day, the Probation Department issued an addendum to its PSR, noting the parties' submissions in aid of sentencing, and including a new calculation of the Guidelines which adopted the government's view and increased Mr. Callahan's fraud loss from $118.7 million to $140.6 million, resulting in an adjusted offense range of 151 to 188 months.

Mr. Callahan knew as a matter of fact that the government's new theory of a loss of $140.6 million was false, and that it included investments outside the scope of the existing case. Despite Mr. Callahan's above-quoted email and the record of the case, however, his counsel never advised him on whether the government's new allegation served to violate Mr. Callahan's constitutional right to due process and constituted a breach of the plea agreement and government misconduct for advancing a theory of liability that was false and at odds with the indictment. It does not appear from counsels' emails (and was never otherwise discussed with Mr. Callahan) that counsel considered those possibilities, consulted the record of the case with these issue in mind, or had sufficient time between his receipt of the government's letter on the night of September 13th and sentencing on September 15th to do so.

More, though the fact of the Probation Department's addendum to the PSR

entitled Mr. Callahan to an adjournment of sentencing as a matter of statutory right [*see* Fed. R. Cr. Pro. 32(g)], Mr. Callahan's lawyer never so advised him. Callahan Declaration at ¶20. By this Petition, Mr. Callahan does not argue that he is entitled to relief simply because he was not advised of his right to an adjournment of sentencing, but that less than two days was manifestly insufficient notice for proper analysis of the government's new theory of a loss of $140.6 million after literally four years of the government's pronouncements of a loss of $96 million. A full stop was required when the government changed its theory of the case and increased its fraud loss a staggering $44.6 million. Proper analysis of the case and all the documents cited in support of Mr. Callahan's Petition (and many others) could not possibly be accomplished on less than two days notice. Upon adequate time for proper analysis, the government's new theory should have been challenged as a violation of due process, breach of the plea agreement, and governmental misconduct based on the case agent's bogus theory of criminal liability, which created a more severe adjusted sentencing range than logic, the law and the facts permitted. Had the proper challenges been made, it seems highly improbable if not impossible that the Court would have sentenced Mr. Callahan on the government's terms.

Judge Spatt sentenced Callahan to a term of imprisonment of 144 months. In imposing sentence, Judge Spatt repeated the indictment's allegations about Callahan's inducement of investments into offshore funds he managed. Judge Spatt made no mention of Kinetics or the other hedge funds, nor liquidation of funds in Kinetics when value declined, nor the government's reliance on market loss in a fund in which investor money was properly invested. Sentencing at 60. Instead, without inquiry, Judge Spatt expressed deference to the government's view of loss:

18

> [A]pparently, according to the government, when everything is worked out with Panoramic View, the loss will probably be approximately $19.7 million.

Sentencing at 61. In fact, Mr. Callahan's fraud loss was zero. Mr. Callahan noticed an appeal, but the government successfully moved to dismiss it on the basis of the plea agreement's waiver of post-conviction remedies. As explained herein, that waiver is not enforceable based on the allegations in this Petition because counsels' ineffectiveness rendered the waiver unknowing and incompetent, the government at sentencing breached the plea agreement, and because the sentencing on non-criminal conduct constituted an abuse of discretion and a miscarriage of justice.

Mr. Callahan believed that the scope of the case as expressed in the plea agreement did not include the value of monies properly invested in hedge funds and consequent market loss caused by the global financial crisis. In effect and reality, on September 13, 2017, the government charged Mr. Callahan with a new, unprovable fraud valued at over $40 million and sentenced him for it on September 15, 2017, 41 hours later. Mr. Callahan's first counsel should have advised him that the plea agreement permitted this extraordinary increase in theory or fraud loss (if it did), and his counsel at sentencing should have taken the time to consider the legal implications of the case agents's bogus theory and challenge it, but resolved within an hour of learning of the theory not even to seek an adjournment.

ARGUMENT

MR. CALLAHAN IS ENTITLED TO BE RESENTENCED BECAUSE OF THE
INEFFECTIVENESS OF COUNSEL; TO REMEDY THE INJUSTICE OF THE
GOVERNMENT'S FALSE THEORY OF LIABILITY; OR PURSUANT TO *CORAM NOBIS*

A.      *Ineffective Assistance of Counsel at the Time of the Guilty Plea and at Sentencing*

If it is the government's position that its plea agreement permitted it before

sentencing to change its theory of Mr. Callahan's liability and rely on non-criminal conduct

excluded from the case as reflected in the indictment and plea agreement, Mr. Callahan's counsel

at the time of his guilty plea were ineffective in not so advising him.  Instead, Mr. Callahan pled

guilty in reliance of the government's consistently expressed allegation that he committed fraud

by misusing $96 million of investor monies to pay redemptions to other investors, for investment

in the Panoramic View, and for personal expenses.  Indictment at ¶22; *see* PSR at ¶39.

Mr. Callahan is not complaining because of a new Guidelines analysis applied to

the facts; the Court and the government did not misapply an offense characteristic under the

Sentencing Guidelines or illegally resolve a garden-variety sentencing issue.  Rather, after four

years of the government *excluding* Kinetics from the case and acknowledging it was a proper

repository of investor funds, the government theorized a way to get Kinetics back in the case;

after four years of valuing the fraud at $96 million, the government found a staggering $44.6

million to add to fraud loss, apparently including $21.9 million of market loss in Kinetics which

the government had theorized all along was a place where investor money belonged.

Mr. Callahan was not told that his guilty plea could permit the government to

remove from the plea agreement one of the legs on which it stood.  He was not told that his guilty

plea served as a waiver of his right to be sentenced for only criminal conduct: the government's

belatedly-announced theory was not just wrong, it was false. He certainly was not told that the plea agreement's fraud loss was not truly a "likely" estimate, the word used in the plea agreement, but might have no relationship at all to the fraud loss which the government could advocate at sentencing on the same facts. If the government was truly entitled to change the theory of the case as dramatically as it did, his lawyers were ineffective in not advising him.

"The decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in a criminal case . . [and] counsel may and must give the client the benefit of counsel's professional advice on this crucial decision." *Boria v. Keane*, 99 F.3d 492, 496-97 (2d Cir. 1996) (internal quotation marks and citations omitted). Constitutionally effective counsel must communicate the possible sentences to which the client will be exposed. *Purdy v. United States*, 208 F.3d 41, 45 (2d Cir. 2000). "[K]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998); *Carrion v. Smith*, 365 Fed. Appx 278 (2d Cir. 2010). Failure to advise a client of the sentencing consequences of a guilty plea and leaving him uniformed is not strategic, but ineffective. *Eze v. Senkowski*, 321 F.3d 110 (2d Cir 2002). *See Wilson v. McGinnis*, 413 F.3d 196 (2d Cir. 2005) (a plea of guilty stands if a defendant enters the plea with full awareness of its direct consequences); *United States v. Riggi*, 649 F.3d 143 (2d Cir. 2011) (a defendant needs to be aware of his rights and the consequences in order to plead guilty effectively).

Conversely, if the government was wrong to change its theory as it did and add a staggering $44.6 million to fraud loss at the eleventh hour, Mr. Callahan's counsel at sentencing was ineffective in not seeking to adjourn sentencing, as was Mr. Callahan's statutory right when

21

the Probation Department issued an addendum to the PSR on the day before sentencing [Fed. R. Cr. Pro. 32(g)], so he could consider and act on the legal and constitutional implications of the government's change of theory.  Had counsel taken the time to analyze the government's new theory of liability and advance a proper challenge, it is virtually unthinkable that he would have failed in revealing the government's new theory as a breach of the plea agreement, as governmental misconduct for the case agent's manufacture of a false theory of liability to create a more severe sentencing range, and for violations of due process and fundamental fairness.

Just before sentencing, counsel told Mr. Callahan that he opposed an adjournment, by his own acknowledgment, upon just "skimming" the government's letter "quickly" on the night of September 13, 2017.  Though the government all along alleged a $96 million fraud and added a staggering $44.6 million to fraud loss at the last minute, counsel urged Mr. Callahan to just "be done."  Counsel did not take the time, or even *have or ask for* adequate time, to consider the legal and constitutional implications of the government's new position and to review all the documents discussed in this Memorandum and Mr. Callahan's accompanying Declaration.  Counsel was right to see the wisdom in avoiding side skirmishes with the government about, for example, whether the fraud constituted a *Ponzi* scheme, and Mr. Callahan agreed.  But counsel was wrong, in fact he was constitutionally ineffective, in recommending that Mr. Callahan proceed immediately to sentencing without proper analysis of the government's position so as not to annoy Judge Spatt.

Judge Spatt has served on federal or state benches since 1978 and would not be expected to take umbrage if a lawyer exercised his client's right to an adjournment [*see* Fed. R. Cr. Pro. 32(g)] upon a government submission 41 hours before sentencing that increased fraud

loss by $44.6 million in an atypically complex case. In fact, a judge's role at sentencing is to get it right; it was not any kind of defensible strategy to compromise Mr. Callahan's interests to assuage a judge's hypothesized pique. *See Irizarry v. United States*, 553 U.S. 708, 715 (2008) ("a judge will normally be well-advised to withhold her final judgment until after the parties have had a full opportunity to present their evidence and their arguments"); *United States v. Cavera*, 550 F.3d 180, 194 (2d Cir. 2008); *United States v. Robin*, 545 F.2d 775, 778 (2d Cir. 1975) (a defendant must be afforded adequate time to prepare a rebuttal); U.S.S.G. § 6A1.3(a) ("When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor").

Had counsel taken the full stop required by the government's letter of September 13, 2017, he would have seen that the government had so changed the playing field as to have breached the plea agreement and manufactured a false theory of liability at odds with the facts and the law. He failed to see that the plea agreement was based on exclusion of Kinetics and consequent market loss from the case, as demonstrated in the indictment and the government's other pronouncements about the case.

Counsel also did not take the time to see the paramount reason why Mr. Callahan was not criminally accountable for market loss in Kinetics: it wasn't just that it was, as he argued, "unfair" to treat losses caused by the global financial crisis as fraud, but the government had consistently conceded throughout the case that investor funds were properly invested in Kinetics in the first place. Counsel never made that winning argument to Judge Spatt, and Mr. Callahan was saddled with an additional loss of *$21.9 million*, the very purported fraud loss that resulted in the erroneous range of 151 to 188 months on which he was sentenced. Nor did

counsel argue that the government's theory that withdrawals from Kinetics could cause a pre-existing loss was contrary to law and logic, as well as the government's theory of the case.

Counsel may have erred failed by deferring too greatly to the government's arguments because it was the government that made them. Mr. Callahan, however, explained the issue to counsel as best as he could as a non-lawyer and relied on counsel to advise him of the legal and constitutional implications and available remedies; non-lawyers are entitled to lawyers in criminal cases for precisely such advise. It may be fair under the facts of this case to debate whether the fault for Mr. Callahan's unconstitutional sentence lies more with the lawyers who represented him when he pled guilty, the lawyer who represented him at sentencing, or the government. However this litigation may resolve that debate, Mr. Callahan's sentence should not be permitted to stand.

### B.      Counsel's Failure to Consult and Present the Opinion of an Expert

In the absurdly short window between the government's letter of September 13th and sentencing 41 hours later, Mr. Callahan explained to counsel that he had full discretion to make withdrawals in Kinetics, especially as its value plummeted during the global financial crisis, and that the government's claim to the contrary was false. Counsel's recommendation that Mr. Callahan proceed immediately to sentencing left counsel with no time adequately to consider and investigate Mr. Callahan's point and consult an expert to prove that the government's theory was bunk. *See* ABA Speedy Trial Standards 12-1.1, 12-2.6 (emphasizing that proper disposition of a case should not be compromised in the interest of speed, especially in a case with complex facts). Likewise, if counsel at the time of Mr. Callahan's guilty plea believed that withdrawals from Kinetics or pre-existing market loss were fair parts of the case, they also should have

24

consulted an expert.

In support of this Petition, Mr. Callahan has submitted a Declaration of Gregory L. Florio [Exhibit V], an accomplished expert with more than 22 years of experience with compliance and related issues for investment advisors and valuation of loss. Upon reviewing relevant documents in this case, Mr. Florio answers the government's claims about Kinetics. Mr. Florio concludes that Mr. Callahan had full discretion to withdraw funds from Kinetics; Mr. Callahan's clients were professional investors who were aware of that discretion; and Mr. Callahan exercised sound discretion in attempting to salvage the investors' dwindling investment during the near-catastrophic market downturn in 2008. *See* Exhibit V. Mr. Florio's Declaration helps prove that the government's eleventh-hour theory that Mr. Callahan had no authority to withdraw money from Kinetics was false, and the government's theory that he could be accountable for market loss suffered before the withdrawals is false and illogical. Without those theories, credits against loss exceeded loss, and Mr. Callahan's fraud loss was zero.

Where lawyers are confronted with evidence beyond their areas of expertise, constitutionally effective representation requires that counsel obtain expert advice. *See Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir. 2001) (*citing, e.g., Knott v, Mabry*, 671 F.2d 1208, 1212-13 (8th Cir. 1982) (counsel ineffective for failing to consult an expert where counsel is not sufficiently "versed in a technical subject matter"). *See Wiggins v. Smith*, 539 U.S. 525-29 (2003) (counsel's limiting of the scope of investigation not entitled to deference); *Williams v. Taylor*, 529 U.S. 362, 390 (2000) (counsels' failure to uncover and present evidence not justified by decision to focus on other issues); *Pavel v. Holland*, 261 F.3d 210, 220, 223 (2d Cir. 2001) (failure to call expert witness among grounds for ineffectiveness); *Eze v. Senkowksi*, 321 F.3d

25

110, 128 (2d Cir. 2003) (consultation with an expert was crucial because counsel lacked expertise necessary to evaluate allegation and make "a reasonable, informed determination"); *Lindstadt*, 239 F.3d at 201-02 (failure to consult expert constituted ineffective assistance where could have supported defense challenge to allegation).

C.       *The Purported Waiver of Remedies Is Unenforceable*

On its face, the plea agreement included a waiver of post-conviction remedies if Mr. Callahan's sentence was as much as 327 months [Exhibit H at 4], less than the 144 months to which he was sentenced. Waivers of appeal, however, are not enforceable where a defendant's waiver is not knowing and competent, where the government breaches the plea agreement, to remedy an abuse of judicial discretion at sentencing, to remedy a miscarriage of justice, or where a reviewing court otherwise deems it appropriate to hear a post-conviction challenge to a sentence. A request to review a case notwithstanding a waiver "will cause us to examine carefully the facts of the case and to look at the manner in which the agreement and the sentence were entered into and applied to determine whether it merits our review." *United States v. Rosa*, 123 F.3d 94, 101 (2d Cir. 1997). "No circuit has held these contractual waivers are enforceable on a basis that is unlimited and unexamined." Id. at 98, 100 ("We are not prepared today to outline an exhaustive list of the circumstances under which we would or would not accept . . . an appeal" that has nominally been waived) (citations omitted).

Waivers of appeal are of relatively recent vintage. *United States v. Gomez-Perez*, 215 F.3d 315, 318 (2d Cir. 2000). "A defendant who waives his right to appeal does not subject himself to being sentenced entirely at the whim of the district court." *Rosa*, 123 F.3d at 98 (*quoting United States v. Marin*, 961 F.2d 493, 496 (2d Cir. 1992)). "It has been recognized that

even under a standard plea agreement a court must carefully scrutinize the plea proceeding and search for a clear demonstration of the extent of the defendant's knowledge and the voluntary nature of the plea." Rosa, 123 F.3d at 100. "[T]he waiver provision could result in an unfair or potentially unconstitutional result even if the defendant did understand its terms, because he might not know of or perceive of the consequences of the harsh relevant conduct provision of the Guidelines." *Id.* The "decisive considerations" motivating the Court's decision to enforce a waiver of appeal are the "nature of the right at issue" and "whether the sentence was reached in a manner that the plea agreement did not anticipate." *United States v. Riggi*, 649 F.3d 143, 148 (2d Cir. 2011) (*quoting United States v. Liriano-Blanco*, 510 F.3d 168, 174 (2d Cir. 2007); *see also United States v. Khattak,* 273 F.3d 557, 563 (3d Cir. 2001) (when deciding if a waiver should be enforced, the guiding consideration should be "whether the [sentencing] error would work a miscarriage of justice").

.        A waiver of post-conviction remedies, like every provision of every contract, is not properly evaluated in a vacuum. Thus, upon examination, it is not enough to say that Mr. Callahan's sentence of 144 months was below the top of the Guidelines range of 327 months, or for the government to cast him as ungrateful for the beneficence of the difference between 327 months and his sentence of 144 months; Mr. Callahan's sentence was based on a last-minute change of the government's theory of the case which was false as a matter of fact and law. More, the parties knew that the sentencing range in the plea agreement would be reduced by substantial credits to which Mr. Callahan would be entitled for the eventual sale of the Panoramic View and redemptions.

        The government may not have intended to use the waiver of appeal as a Trojan

27

Horse when it drafted its plea agreement, but it became one at sentencing when it was used as cover to advance a theory of liability which entered the case at the last minute improperly disguised as just another garden-variety sentencing issue. The waiver of appeal may have started as an innocuous vehicle of legitimate prosecutorial policy, but by the time of sentencing was abused by the government as a tool to justify an artificially severe sentencing range. Waivers of appeal are often legitimate and part of the parties' true bargain, but the government here used it to shield a bogus theory which all along was not a part of the case.

"[C]ourts construe plea agreements strictly against the Government. This is done for a variety of reasons, including the fact that the Government is usually the party that drafts the agreement, and the fact that the Government ordinarily has certain awesome advantages in bargaining power." *United States v. Ready*, 82 F.3d 551, 559 (2d Cir. 1996) (*superseded on other grounds as stated in United States v. Cook*, 722 F.3d 477, 481 (2d Cir. 2013)); *accord United States v. Cimino*, 381 F.3d 124, 127 (2d Cir. 2004); *United States v. Aleman*, 286 F.3d 86, 90 (2d Cir. 2002). "Even if the plea agreement is ambiguous, we construe plea agreements strictly against the Government." *United States v. Carmichael*, 216 F.3d 224, 228 (2d Cir. 2000) (internal quotation marks omitted). *United States v. Mergen*, 764 F.3d 199, 208-09 (2d Cir. 2014).

Mr. Callahan's plea agreement and its constituent waiver of appeal were based on "likely" fraud loss of $96 million, which in context embraced the government's three stated ingredients of the fraud (using monies for the Panoramic View, Mr. Callahan's personal expenses and redemptions of other investors), but otherwise not Kinetics. Ambiguities in plea agreements are properly construed against the government, but there was nothing ambiguous about the

government's theory of Mr. Callahan's case which provided the context for the $96 million. Counsel at sentencing was ineffective in not taking the time to figure that out and so advise the Court.

"[T]he right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970). The constitutional guarantee applies to all critical stages that are part of the whole course of a criminal proceeding, a proceeding in which defendants cannot be presumed to make critical decisions without counsel's advice. proceeding. *Lafler v. Cooper*, 566 U.S. 156, 165 (2012). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Id*. at 690. The general test to gauge whether a defendant's right to effective assistance of counsel has been infringed so as to overcome this presumption is two pronged. The first prong concerns performance. The question is whether the lawyer's performance, "fell below an objective standard of reasonableness under prevailing professional norms" such that the defendant was deprived of his Sixth Amendment right to counsel. *Id. at 687; Lafler v. Cooper*, 566 U.S. at 163. "[A] lawyer who fails adequately to investigate and introduce evidence that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Wiggins v. Smith*, 539 U.S. 510, 525 (2003). A lawyer must investigate law and fact before he makes important strategic decisions and he must be "informed" when

declining to raise an issue. *Richter v. Hickman*, 578 F.3d 944, 956-57 (9th Cir. 2009). "[T]here is no relevant difference 'between an act of commission and an act of omission' in this context." *Padilla v. Kentucky*, 559 U.S. 356, 369-370 (2010).

The second prong concerns the effects of the deficient assistance of counsel. There must be "a reasonable probability that, but for counsel's ... errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland.* at 694. *Lafler v. Cooper*, 566 U.S. at 163. Prejudice should be found in favor of the defendant in situations with a reasonable probability even where there is "less than a fifty-fifty chance . . ." that the proceeding was negatively impacted. *Hernandez v. Chappell*, 878 F.3d 843, 846 (9th Cir. 2017). "[A]ny amount of [additional] jail time has Sixth Amendment significance." *Lafler.* 566 U.S. at 165.

These standards are more than amply met by the highly atypical circumstances of this case.

*D.      Writs of Habeas Corpus and Coram Nobis*

While Mr. Callahan has demonstrated how his lawyers failed by not protecting him from a bogus theory of liability not criminal and not alleged as part of the case, a claim under the Sixth Amendment for ineffectiveness assistance of counsel is not the only basis on which he is entitled to relief.

A writ of *habeas corpus* should issue even absent ineffective assistance of counsel under exceptional circumstances or to remedy a fundamental defect that results in a miscarriage of justice.  For the reasons explained herein, the sentencing constituted a violation of Mr. Callahan's rights to due process and fundamental fairness. *See, e.g. Davis* v. *United States,*417

U.S. 333, 346-347 (1974) (defendant may not stand punished for an act that the law does not make criminal); *Bousley v. United States*, 523 U.S. 614, 626 (1998); *Graziano v. United States*, 83 F.3d 587, 589-90 (2d Cir. 1996 (*per curiam*) (*quoting United States v. Bokun*, 75 F.3d 8, 12 (2d Cir. 1995). *See also United States v. Azeem*, 946 F.2d 13, 15 (2d Cir. 1991) (error to include foreign crimes in calculation of defendant's base offense level because the conduct was not a crime against the United States).

Further, a writ of *coram nobis* may issue to correct errors which "escaped attention," which were "material to the proceeding" [*Bronson v. Schulten*, 104 U.S. 410, 416 (1881)], or which affect the "validity and regularity" of the judgment. *United States v. Morgan*, 346 U.S. 502, 507, 511 (1954) (the writ lies under circumstances compelling such action to achieve justice"); *United States v. du Purton*, 891 F.3d 437 (2d Cir. 2018). *Coram nobis* "can issue to redress a fundamental error," including "a legal or factual error." *United States v. Denedo*, 556 U.S. 904 (2009).

Here, whether pursuant to Section 2255 based on ineffective assistance of counsel or a fundamental defect resulting in a miscarriage of justice, or as a writ of *coram nobis*, the law and the facts cry out for a resentencing. Mr. Callahan is in prison for conduct that was not criminal, which the government acknowledged in its indictment was not criminal, and which the government cannot prove was criminal. He was sentenced on a government theory of liability which was false as a matter of law and fact. *See United States v. Jawa*, 508 F.3d 694 (2d Cir. 2007) (a defendant must be sentenced on accurate information); *United States v. Delacruz*, 862 F.3d 163 (2d Cir. 2016) (a defendant may not be sentenced on materially untrue assumptions or misinformation; a district court necessarily abuses its discretion if it bases its ruling in an

erroneous view of the law or on a clearly erroneous assessment of the evidence"); *United States v. Lee*, 818 F.2d 1052 (2d Cir. 1987) (district court must assure itself that information on which it bases a sentence is reliable and accurate); *Darden v. Bureau of Prisons*, 707 F. Supp. 2d 363 (E.D.N.Y. 2009) (defendant may not be sentenced on false information); *McGee v. United States*, 462 F.2d 243 (2d Cir. 1972) (a defendant need only show that reliance on an improper factor at sentencing was quite probable); *United States v. Mescaine-Perez*, 849 F.2d 53 (2d Cir. 1988) (sentence within statutory limits violates due process if based on inaccurate information).  *See also  United States v. Azeem*, 946 F.2d 13, 15 (2d Cir. 1991) (error to include foreign crimes in calculation of defendant's base offense level because the conduct was not a crime against the United States).

A fundamental prerequisite of relevant conduct is *it must be criminal.  See, e.g., United States v. Anderson*, 689 F. App'x 53, 55 (2d Cir. 2017) (prior possession of marijuana); *Carrasco v. United States*, 820 F. Supp. 2d 562, 567 (S.D.N.Y. 2011) (use of dangerous weapon in furtherance of cartel activities); *United States v. Broxmeyer*, 699 F.3d 265, 282 (2d Cir. 2012) (distribution of illicit images of children); *United States v. Leo*, 706 F. Supp. 2d 544, 545 (S.D.N.Y. 2010) (extortion); *United States v. Shuster*, 361 F. App'x 208, 210 (2d Cir. 2010) (fraud); *United States v. Turner*, 624 F. Supp. 2d 206, 220 (E.D.N.Y. 2009) (defrauding foreigners); *United States v. Singh*, 390 F.3d 168, 191 (2d Cir. 2004) (healthcare fraud).

Further, the timing and nature of the government's belatedly-announced theory of liability and loss denied him his fundamental due process rights to proper notice and a fair opportunity to defend himself.  *See Cole v. Arkansas*, 333 U.S. 196, 201 (1948); *Lankford v. Idaho*, 500 U.S. 110, 126 (1991).

The government may choose to resist the obvious need for a resentencing and fill its opposition to Mr. Callahan's Petition with the prosecutorial bombast that served to camouflage its improper change of theory at and just before sentencing. The fact of Mr. Callahan's fraud, however, makes him no less deserving of constitutional protections; to the contrary, the law exists precisely to guard against overreach, and to ensure that the guilty are punished fairly, based on the law and the facts and consistent with constitutional norms.

*Respectfully submitted,*

Andrew J. Frisch
The Law Offices of Andrew J. Frisch
One Penn Plaza, Suite 5315
New York, New York 10119
(212) 285-8000

*Attorneys for Petitioner*

EXHIBIT E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------ x
BRIAN R. CALLAHAN,

                Petitioner,

      - against -                   13 CR 453 (ADS)

UNITED STATES OF AMERICA,

                Respondent.
------------------------------------------------------ x

UNITED STATES OF AMERICA,

      - against -                   13 CR 453 (ADS)

BRIAN R. CALLAHAN and
ADAM J. MANSON,

                Defendant.

------------------------------------------------------ x


## MEMORANDUM OF LAW IN SUPPORT OF ORDERS (1) DISQUALIFYING THIS UNITED STATES ATTORNEY'S OFFICE; (2) FOR RECUSAL AND REASSIGNMENT OF THESE CASES TO ANOTHER JUDGE; (3)  REQUIRING THE GOVERNMENT TO HEW TO ITS INDICTMENT AND HONOR ITS PLEA AGREEMENT WITH MR. MANSON; (4) FOR MR. CALLAHAN'S IMMEDIATE RELEASE ON BOND; AND (5) PERMITTING MR. CALLAHAN TO SUPPLEMENT HIS PENDING PETITION PURSUANT TO 28 U.S.C. §2255

Andrew J. Frisch
The Law Offices of Andrew J. Frisch
One Penn Plaza, Suite 5315
New York, New York 10119
(212) 285-8000
afrisch@andrewfrisch.com

*Attorney for Brian Callahan and Adam Manson*

## TABLE OF CONTENTS

Introduction                                                                                                 2

A.    Background                                                                                          4

B.    This United States Attorney's Office is Conflicted                                    9

C.    Second Circuit Law Favors Reassignment of this Case to Another Judge    11

D.    The Government Has Breached Its Plea Agreement with Mr. Manson         12
      for the Same Reasons that Mr. Callahan's Waiver of Post-Conviction
      Remedies is Invalid

      1. The Government Should Be Ordered to Honor its Agreement              12
      with Mr. Manson

      2. For the same reasons, Mr. Callahan's Waiver is Invalid                    14

E.    The Court Should Grant Bond to Mr. Callahan Pending Resolution           16
      of His Petition

      1. Under the Correct Guideline Range, Mr. Callahan is Now                   16
      Eligible for Release

      2. The Second Circuit Permits Bond on a Pending Petition                      17
      Pursuant to Section 2255

F.    The Court Should Permit Mr. Callahan to Amend His Petition                 17

Conclusion                                                                                                   19

Case 19-2413 Document 11 08/08/2019 2628105 Page 75 of 197

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x
BRIAN R. CALLAHAN,

                 Petitioner,

         - against -                        13 CR 453 (ADS)

UNITED STATES OF AMERICA,

                 Respondent.
------------------------------------------------------- x

UNITED STATES OF AMERICA,

         - against -

                               13 CR 453 (ADS)

ADAM MANSON,

                 Defendant.

------------------------------------------------------- x

MEMORANDUM OF LAW IN SUPPORT OF ORDERS (1) DISQUALIFYING
THIS UNITED STATES ATTORNEY'S OFFICE; (2) FOR RECUSAL AND
REASSIGNMENT OF THESE CASES TO ANOTHER JUDGE; (3)  REQUIRING
THE GOVERNMENT TO HEW TO ITS INDICTMENT AND HONOR ITS PLEA
AGREEMENT WITH MR. MANSON; (4) FOR MR. CALLAHAN'S IMMEDIATE
RELEASE ON BOND; AND (5) PERMITTING MR. CALLAHAN TO SUPPLEMENT
HIS PENDING PETITION PURSUANT TO 28 U.S.C. §2255

Introduction

> *Good authors too, who once knew better words,*
> *Now only use four-letter words*
> *Writing prose.*
> *Anything goes.*
>                     - Cole Porter, 1934

       Cole Porter's dismay about devolving norms should not be an acceptable standard

for prosecutorial action.  We afford the government great discretion to act and take positions in

criminal prosecutions, and so the government's candor is necessarily indispensable. Even where the government believes it appropriate to push the envelope, we reasonably expect it to guard fastidiously against any advocacy that serves, even negligently as opposed to recklessly or deliberately, to mislead or create a false impression. Prosecutorial legerdemain is unacceptable even in service of an objective perceived by any particular case agent, or even a prosecutor, as righteous. Customary deference to the government must yield where its conduct of a particular case crosses the line.

On February 6, 2019, after Brian Callahan filed his pending Petition pursuant to 28 U.S.C. §2255 (the "Petition," hereby incorporated by reference as if fully set forth herein), but before the sentencing of co-defendant Adam Manson, the Chief of the United States Attorney's Criminal Division responded to defense counsel's expressed concerns about this case by asking the assigned prosecutor to disclose a fifteen-page spreadsheet of 32 columns and 1,917 rows and an associated summary (both available for the Court's inspection) as the basis for the government's view that its view of fraud loss under the United States Sentencing Guidelines comports with the indictment's express allegations and the government-drafted plea agreements. Upon disclosure of the spreadsheet, defense counsel promptly provided it (together with other relevant case documents) to Mazars USA ("Mazars"), a highly-respected accounting firm. Mazars has now concluded an analysis of the government's spreadsheet (Exhibit A hereto with accompanying Declaration), which helps show that the government unfairly changed this case on the virtual eve of Mr. Callahan's sentencing to create a grossly unfair estimate of loss, thereby violating basic norms of due process and fundamental fairness and the government's plea agreements with Mr. Callahan and Mr. Manson.

Disqualification of an entire United States Attorney's office is drastic and unusual, but so too are the circumstances of this case, which appear unprecedented. As this Memorandum and the attached exhibits demonstrate, the only adequate remedy for the conduct of this case by this United States Attorney's Office is its disqualification so the Department of Justice can appoint another. More, as explained herein, and for the reasons stated in *United States v. Wilson*, 920 F.3d 155, 168 (2d Cir. 2019), we respectfully request the Court recuse itself in favor of another Judge.

A.   Background

From the beginning of this case in 2013, the government in its indictment and other public statements of the case represented to the Court and the defendants that this case charged a $96 million *Ponzi* scheme [*See* Indictment at ¶22], expressly alleging that certain investments made by Mr. Callahan into independently-managed hedge funds were not criminal nor induced by fraud and were properly made. *See* Indictment at ¶¶4-6, 22. The defendants both pled guilty, relying on the indictment itself and the government's repeated representations in correspondence with the Court [Exhibit B], press statements to the public [Exhibit C], and the government-drafted plea agreements [Exhibits D and E] that the charged crime was a $96 million Ponzi scheme that expressly excluded certain investments.

The government's view of this case did not change until September 13, 2017, two days before Mr. Callahan's sentencing, when it submitted a letter to the Court in aid of sentencing [Document 158, attached as Exhibit F], addressing the credits against loss to which the defendants were entitled under the Sentencing Guidelines. *See* U.S.S.G. §2B1.1 (2013) *Commentary*, Application Note 3(E)(i) and (ii); *United States v. Leonard*, 529 F.3d 83 (2d Cir.

Case 19-2413, Document 11, 08/08/2019, 2628105, Page78 of 197

2008).  The government in its letter identified total credits of $120,839,000, including $74 million of redemptions to Mr. Callahan's investors, $40.3 million from the sale of the Panoramic View resort, and $6.4 million recovered from the independently-managed hedge funds when Mr. Callahan's assets were seized.

Mr. Callahan was not, however, entitled to all of the credits of $120,839,000 against loss.  As Mazars explains in its accompanying analysis and Declaration [Exhibit A], Mr. Callahan was entitled to $95,541,738 of the total credits of $120,839,000 identified by the government in its letter.  *See* Exhibit F.  The credits to which Mr. Callahan was not entitled included three categories of credits as Mazars explains in its accompanying Declaration:

> *First*, Mr. Callahan was not entitled to a credit for the $6.4 million recovered from the independently-managed hedge funds.  The indictment expressly alleged that the investments made by Mr. Callahan into the independently-managed hedge funds were not criminal nor induced by fraud and were properly made, so they did not represent a credit against loss;
>
> *Second*, the government did not appear to include as loss the entirety of certain investments made in one of Mr. Callahan's investment vehicles, Pangea Offshore High Yield Portfolio, LLC ("Pangea"), and so Mr. Callahan was not entitled to treat all Pangea-related redemptions as credits; and
>
> *Third*, Mr. Callahan was not entitled to so much of the net proceeds from the sale of the Panoramic View that served to repay Pangea-related investments.

Exhibit A.

The government at Mr. Callahan's sentencing, however, made no effort to allocate the credits as required.  Instead, upon determining that the total value of credits was $120,839,000, the government changed the case to increase the loss from the $96 million alleged in the indictment and reflected in the plea agreements to $140.6 million.  Exhibit F at 3.  During the pendency of this case over the preceding four years, however, the government had never said

anything about any $140.6 million; after four years of repeatedly representing that the indictment charged a $96 million Ponzi scheme and expressly excluding certain investments – and after inducing reliance on those representations by inducing plea agreements that reflected a $96 million loss – the government reported to the Court in its letter of September 13, 2017, for the first time, that the total loss in this case against which credits should be applied was *$140.6 million*. See Exhibit F at 3. Rather than properly allocate credits, the government increased loss to neutralize them.

Even were it possible to hypothesize how such a change in the case could conceivably comport with due process and fundamental fairness, any such *timely* hypothesizing was stymied by the government's legerdemain in making the change. Thus, for example,

> • the government in its letter claimed that it was taking a "conservative approach" to Mr. Callahan's sentencing [*see* Exhibit F at 3], serving to obfuscate the government's deviation from its own earlier and repeated pronouncements that the case charged a $96 million fraud, not one based on $140.6 million;

> • the government took this new and dramatically different view of the case in a letter filed on a Wednesday night before Mr. Callahan's Friday sentencing without taking any step to ensure that the Court or Mr. Callahan's then-new counsel fully understood the fact and consequence of the change given the extremely short notice;

> • the government in its letter and at sentencing analogized Mr. Callahan to Bernard Madoff and other truly loss-causing defendants and urged imposition of a commensurate term of imprisonment [*see, e.g.,* Sentencing at 46; Exhibit F at 17-21], even as the government knew that it had inflated loss to create the comparison and ensure a severe sentence;

> • the government in its letter recited its starting point for its credits-loss analysis as $140.6 million, immediately after a paragraph in which it represented that "Probation holds the defendant accountable for all the money that he took from investors – more than $100 million," thereby creating the erroneous impression that the $140.6 million, mentioned for the first time in the letter, was nothing new [*see* Exhibit F at 3]; and

• the prosecutor cited and relied on the Probation Department's view that the entirety of money invested with Mr. Callahan should be used as loss even though the prosecutor knew that the Probation Department did not draft the indictment and was not privy to the plea agreements, did not thereby induce Mr. Callahan's reliance on those documents, and did not have the same duty as the prosecutor to adhere to the "most meticulous standards of both promise and performance" in honoring its plea agreement that fixed the loss at $96 million. *See In re Altro*, 180 F.3d 372, 375 (2d Cir. 1999) (*quoting United States v. Lawlor*, 168 F.3d 633, 636 (2d Cir. 1999); *United States v. Wilson*, 920 F.3d at 155 (a guilty plea should be vacated when the prosecutor violates a term of a plea agreement which induced the plea and which the defendant reasonably expected would be honored).

The government's eleventh-hour change in this case to gerrymander a false representation of loss at odds with its indictment, plea agreements and other representations about the case raises more than a garden-variety dispute that can be satisfactorily resolved with legal argument and any necessary fact-finding. Putting aside the question of whether the particulars of Mr. Callahan's investment business were reasonably foreseeable to Mr. Manson beyond the value of investments in Mr. Manson's Panoramic View (which we address separately), the government has advised counsel that it will press the same $140.6 million at Mr. Manson's sentencing that it pressed at Mr. Callahan's sentencing, despite the $96 million reflected in the indictment, plea agreements, and the government's other pronouncements about this case, on all of which Mr. Manson was entitled to rely in pleading guilty. The government's position creates a *prima facie* case of a prosecutorial conflict of interest: it raises a substantial question of conflict between the Office's (1) public role in advancing its cases; and (2) its private interest in insulating itself from personal or professional liability for its success in changing the case against Mr. Callahan, thereby violating basic norms of due process and fundamental fairness and the plea agreement it drafted.

As demonstrated hereinafter in Mr. Callahan's application for bond, Mr. Callahan

8

is already eligible for release under his *correct* Guideline sentence, but he faces additional

imprisonment of about a decade because of the government's eleventh-hour change of this case

and consequent violations.  It is reasonable to question whether and to what extent the

government can press its position of a loss of $140.6 million against Mr. Manson without

concern for its own personal and professional liability for the improper imprisonment of Mr.

Callahan.

This concern is not fanciful.  The Second Circuit just two months ago reaffirmed

its practice of reassigning a case on remand to a new Judge rather than returning the case to the

same judge who imposed sentence despite the government's breach of a plea agreement.  *See*

*United States v. Wilson*, 920 F.3d at 168.  The Circuit's concern that such a judge would find it

"difficult to erase" the effects of a breached plea agreement [*Wilson*, 920 F.3d at 168], would

presumably be greater when considering the conflict of a prosecutor interested in defending a

claimed breach that resulted in an inflated Guideline range and more imprisonment than should

have been imposed.  More is at stake now than a *post-mortem* of a concluded case.

It is no answer that Mr. Callahan was represented at sentencing by a lawyer.

Mr. Callahan's pending Petition claims ineffective assistance of his counsel at sentencing

precisely because counsel did not and could not possibly have fully understood all the

consequences of the government's letter of September 13, 2017, on little more than a day's

notice before Mr. Callahan's sentencing; had defense at least sought an adjournment, he would

have had time to consider the case with care and realize that the government's letter served to

increase loss to neutralize credits, not a garden-variety Guidelines dispute.  The lawyer who

represented Mr. Callahan at sentencing is an experienced member of the Bar, but his principal

mistake in this case, which we urge the Court not to replicate, was to assume that he could reasonably rely on the work of the case agent and the government's consequent representations. In fact, without the benefit of a proper contemporaneous objection, the Court at sentencing *commended* the prosecutor for his letter to the Court of September 13, 2017, which constituted the breach [Transcript at 59], and despite the prosecutor's failure to call the Court's attention to and explain how it could advance a new view of the case in irreconcilable conflict with the government-drafted indictment and in violation of the government-drafted plea agreement.

To permit the government to continue in this case is to risk entrusting the fox with an inventory of the looted henhouse. The government's conduct of this case may well be a sign of the times animating Cole Porter's sentiment about devolving norms, but it no less jeopardizes the reliability of fact-finding and the fairness of proceedings in this case going forward and is no less unacceptable. The government's success in getting us to this point does not necessarily mean that we should be here, or that we can or should try to justify the road taken. Anything, most certainly, should not go.

B.     This United States Attorney's Office is Conflicted

Prosecutors are no different from other lawyers in that they may face a circumstance which creates a conflict of interest. Though circumstances requiring disqualification are rare, so too is this case: there appears to be no case with even remotely similar facts. Here, the government succeeded in pressing an exaggerated Guideline range with nominal notice to Mr. Callahan that was wholly inadequate in the extreme and which resulted in a massive change to the indictment and the plea agreement. More, the government's change brought conduct into this case that the government had expressly alleged in the indictment was

not criminal, not induced by fraud and not part of the loss reflected in the plea agreement. The consequence is that Mr. Callahan has already served time in prison for his crime as required by his *correct* Guideline range and now remains imprisoned for non-criminal conduct of which he is *actually innocent, according to the indictment*; the government's continued persistence in its position threatens Mr. Manson with the same unacceptable and unconstitutional result.

For these reasons, this application raises a *prima facie* case of an actual conflict of this United States Attorney's Office between its public role in prosecuting a case and its personal interests in defending itself from personal or professional responsibility for a position in this case that continues severely to prejudice one defendant, is plainly irreconcilable with the indictment and the plea agreements, and about which the government did not properly alert the Court. *See, e.g.,* American Bar Association Model Rule of Professional Conduct 1.7(a)(2) and New York Rule of Professional Conduct 1.7 (a lawyer shall not represent a client if the representation will be materially limited by a personal interest); Commentary to ABA Rule 1.7 ("if the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice); ABA Standard 3-1.4 (the prosecutor has a heightened duty of candor to the courts).

While "[a]n entire U.S. Attorney's Office should only be disqualified, if ever, when special circumstances demonstrate that the interest of justice could only be advanced by this drastic remedy" [*see United States v. Basciano*, 763 F. Supp. 2d 303, 314 (E.D.N.Y. 2011), *aff'd*, 634 F. App'x 832 (2d Cir. 2015)], a District Judge "retains broad discretion in deciding a motion to disqualify." *See McLenton v. Menifee*, No. 05 CV 2844 (JGK), 2006 WL 2517002 at *1 (S.D.N.Y. Aug. 29, 2006) *(citing Cheng v. GAF Corp.*, 631 F.2d 1052, 1055 (2d Cir. 1980)

11

(collecting cases), *vacated on other grounds*, 450 U.S. 903 (1981)).  The extreme remedy of disqualification of a United States Attorney's Office requires a showing of prejudice if not actual bad faith or misconduct [*see United States v. Ramirez*, No. 03 CR 1079 (Judge Kram), 2004 WL 203034, at *3 (S.D.N.Y. Feb. 2, 2004)], which has been made here and renders any other remedy insufficient. This application presents a *prima facie* case that this United States Attorney's Office is conflicted.  *See, e.g., United States v. Heldt*, 668 F.2d 1238, 1276 n. 80 (D.C. Cir. 1981) (prospective civil liability for acts undertaken in a criminal matter would require proof by clear and convincing evidence of a *prima facie* case of misconduct justifying disqualification).

While disqualification of the entire Office might be justified by just the fact of the assigned prosecutor's supervisory position (as opposed to disqualification of just the assigned prosecutor), it is otherwise justified here by the fact of review of this case by the Chief of the United States Attorney's Criminal Division and his representation to defense counsel that he had discussed the case with other senior executives and had decided to press the government's stated position despite the breach and concomitant violations.

C.     Second Circuit Law Favors Reassignment of this Case to Another Judge

In Mr. Callahan's Petition, we asked Your Honor to consider recusal under the circumstances of this case. *See* Petition at 4-5.  We again urge that relief for the following additional reason.

In *Wilson*, 920 F.3d at 155, a case decided just two months ago, the Second Circuit reaffirmed its practice of reassigning cases on remand upon finding breach of a plea agreement:

In cases where specific performance is the appropriate remedy, we typically

remand the case for resentencing before a different district judge because the effect of the government's breach of its commitment is difficult to erase and it is likely that the same judge would reach the same result as he reached before.

*Wilson*, 920 F.3d at 168 (citation and quotation marks omitted).  The Court expressed its confidence in Judge Garaufis to sentence that defendant appropriately, but ruled it appropriate to reassign the case.

The procedural posture of this case is not identical to *Wilson*, but the reasoning favoring assignment to another Judge is the same.  Here, the Court has already sentenced one defendant, Mr. Callahan, on the basis of a Guideline range pressed by the government in violation of that defendant's plea agreement, and the government seeks to do the same to Mr. Manson.  The Court expressly *commended* the prosecutor for his letter of September 13, 2017 [Transcript at 59], in which the prosecutor announced his position constituting the breach.  Under *Wilson*, the case should be reassigned for both Mr. Callahan's pending Petition and Mr. Manson's sentencing. D.      The Government Has Breached Its Plea Agreement with Mr. Manson for the
Same Reasons that Mr. Callahan's Waiver of Post-Conviction Remedies is Invalid

*1. The Government Should Be Ordered to Honor its Agreement with Mr. Manson*

A guilty plea should be vacated when the government violates a term of a plea agreement which induced the plea and which the defendant reasonably expected would be honored.  *See United States v. Wilson*, 920 F.3d at 155; *United States v. Palladino*, 347 F.3d 29 (2d Cir. 2003) (vacating guilty plea where government at sentencing changed a term in the plea agreement on which the defendant relied.

A sentence imposed pursuant to a plea agreement "must follow the reasonable understandings and expectations of the defendant with respect to the bargained for sentence." *Id*

at 33; *Wilson*, 920 F.3d at 165 (a guilty plea is properly vacated where the government's change of position causes "serious unfairness" to the defendant and changed his "exposure so dramatically"). As the Honorable Jack B. Weinstein recently noted, "[b]ecause of the prevalence of plea agreements and the absence of arm's-length negotiation of the terms by parties of equal power, courts must review such agreements closely to ensure that defendants' rights are not crushed by the government's power." *United States v. Chua*, 349 F. Supp. 214, 218 (E.D.N.Y. 2018) (Weinstein, J). "[B]ecause plea bargains require defendants to waive fundamental constitutional rights, prosecutors are held to meticulous standards of performance . . . . [W]e construe plea agreements strictly against the government and do not hesitate to scrutinize the government's conduct to ensure that it comports with the highest standards of fairness." *Wilson*, 920 F.3d at 162 (citations and quotation marks omitted). *See also In re Altro*, 180 F.3d 372, 375 (2d Cir. 1999) (requiring district judges to hold the government to the "most meticulous standards of both promise and performance").

Mr. Manson's plea agreement put him on notice of the government's view that he was accountable for the $96 million fraud with which it charged Mr. Callahan. While Mr. Manson disagrees that he was accountable for Mr. Callahan's fraud beyond investments in the Panoramic View (valued at $38 million, according to the government), he knew that even the $96 million would be offset by the value of redemptions to Mr. Callahan's investors and sale of the Panoramic View. *See United States v. The Real Property Located at 272 Old Montauk Highway, Montauk, New York, et al.*, 12 CV 1880 (E.D.N.Y. Feb. 22, 2014) (Document 69 at 19) (Judge Spatt noted in the months just before the guilty pleas that the Panoramic View was then being marketed and had an estimated value of between $52 million and $88 million).

14

"In general, the remedy for a breached plea agreement is either to permit the plea to be withdrawn or to order specific performance of the agreement." *United States v. Vaval*, 404 F.3d 154 (2d Cir. 2005). The circumstances of this case favor holding the government to its estimate of loss, rather than permitting Mr. Manson to withdraw his guilty plea. As explained in the memorandum in aid of Mr. Manson's sentencing independently filed, he assisted the government in selling the Panoramic View for the benefit of investors, managing it on-site for a period of years, as he agreed as part of his guilty plea, to preserve it for the benefit of victims. The government sufficiently entrusted Mr. Manson to protect the Panoramic View, the principal asset at issue in this case, by delegating that duty to him without supervision. In the presence of undersigned counsel, the government expressly commended Mr. Manson for his diligence and excellence in maintaining the property. As the government acknowledges [Exhibit F at 4], it sold the property and was able to recoup more money for victims than was fraudulently diverted to the property, even after payment of mortgages and associated debts. In addition, Mr. Manson agreed to pay an additional $2.5 million to the government and forfeit $1.4 million in bank accounts. Mr. Manson fulfilled his part of the bargain; the government should be ordered to honor its part.

While Mr. Manson might opt to withdraw his guilty plea rather than face sentencing under an exaggerated Guideline range at odds with his plea agreement, he is entitled to the benefit of his bargain.

### 2. *For the same reasons, Mr. Callahan's Waiver is Invalid*

For the same reasons, the government violated its plea agreement with Mr. Callahan, invalidating its constituent waiver of post-conviction remedies. As Judge Weinstein has noted, a defendant "must have real notice of the true nature of the charge for a waiver to be

15

effective." *United States v. Chua*, 349 F. Supp. 3d at 218 (*quoting Frederick v. Warden, Lewisburg Corr. Facility*, 308 F.3d 192, 195-96 (2d Cir. 2002) (quotation marks omitted). A guilty plea (and thus its constituent waiver of post-conviction remedies) should be vacated where the government at sentencing changes a term on which the defendant reasonably relied based on information known to the government at the time of the plea. "A sentence imposed pursuant to a plea agreement "must follow the reasonable understandings and expectations of the defendant with respect to the bargained for sentence." *See United States v. Palladino*, 347 F.3d at 33 (*quoting United States v. Ferrara*, 954 F.2d 103, 105 (2d Cir. 1992).

A waiver of appeal is invalid where the government violates a plea agreement, especially here where (1) the government induced reliance on its repeated representation that the case charged a $96 million fraud; (2) by the time of the guilty plea, the government had expressly excluded from the case investments which it added back for sentencing; and (3) Mr. Callahan's counsel at the guilty plea failed to advise him that the plea agreement permitted the government at sentencing to change the case and argue for a different loss than in the plea agreement.

As Mr. Callahan's explains in his Declaration submitted with his Petition, he knew from counsel who represented him at his plea that the government's alleged loss of $96 million would be reduced by credits after the Panoramic View was sold and once the value of redemptions was determined. Mr. Callahan was not advised and had no reason to believe that the government could deal with credits by increasing loss to neutralize them.

The government may not be permitted to insulate itself from violation of a plea agreement by arguing that a defendant's sentence was less than the term of months associated with the waiver. It is not permissible for the government to cherry-pick the provisions of a plea

16

agreement, rely on one provision to defend against a claimed breach, while ignoring the context provided by other provisions and the defendant's reasonable expectations induced thereby. As explained in greater detail in Mr. Callahan's Petition, his counsel's ineffectiveness and the circumstances of this case invalidated any waiver of post-conviction remedies as unknowing and involuntary. *See, e.g., Garza v. Idaho*, 139 S. Ct. 738, 752 (2019). "[W]e temper the application of ordinary contract principles with special due process concerns for fairness and the adequacy of procedural safeguards . . . . [and so] construe plea agreements strictly against the Government." *United States v. Lutchman*, 910 F.3d 33, 37 (2d Cir. 2018) (*quoting United States v. Riggi*, 649 F.3d 143, 147 (2d Cir. 2011); *United States v. Podde*, 105 F.3d 813, 820 (2d Cir. 1997) ("we remain suspicious of the application of contract law doctrine in favor of the prosecution" in light of the practice of construing plea agreements against the government).

E.     The Court Should Grant Bond to Mr. Callahan Pending Resolution of His Petition

Based on Mr. Callahan's pending Petition and the filings made today, Mr. Callahan should be granted bond pending resolution of his Petition.

*1. Under the Correct Guideline Range, Mr. Callahan is Now Eligible for Release*

Mr. Callahan was sentenced to a term of imprisonment of 144 months on an erroneous Guideline range of 151 to 188 months. In fact, his correct Guideline range is an adjusted offense level 14, Criminal History Category I, corresponding to 15 to 21 months:

| | | |
|---|---|---|
| Base Offense Level [§2B1.1(a)(1)] | | 7 |
| Plus | More than Ten Victims [§2B1.1(b)(2)(C)] | +2 |
| Plus | Sophisticated Means [§2B1.1(b)(1)(C)] | +2 |
| Plus | Investment Advisor [§2B1.1(b)(19)(A)(iii)] | +4 |

17

| Plus | Aggravating Role [§3B1.1(c)] | +2 |
| Minus | Acceptance of Responsibility | 14 |

Under the correct Guideline range, Mr. Callahan is currently and has been eligible for release, at least to a halfway house. He is not a risk of flight nor does he present any danger to the community. From the time of Mr. Callahan's arrest in 2013 until his surrender in early 2018, he was fully compliant with the terms of his release. He has at least seven suretors ready and willing to sign a substantial bond secured by multiple properties.

*2. The Second Circuit Permits Bond on a Pending Petition Pursuant to Section 2255*

The Second Circuit has made clear that bond may be granted to a Petitioner awaiting decision on a pending petition pursuant to 18 U.S.C. §2255. *See Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001). Mr. Callahan's Petition raises a substantial claim and precisely the type of extraordinary circumstance that "make the grant of bail necessary to make the habeas relief effective.*" Illarramendi v. United States*, 906 F.3d 268, 271 (2d Cir. 2018) (citing *Mapp*). As Mr. Callahan's Petition and this supplement demonstrate, his lawyer was ineffective in not seeking redress for the government improper inflation of loss from $96 million to $140.6 million in order to neutralize applicable credits. Counsel failed to challenge the issue, argue that the government's position was at odds with the indictment and Mr. Callahan's plea agreement and was thus a violation of basic norms of due process and fundamental fairness.

F.    The Court Should Permit Mr. Callahan to Amend His Petition

While Mr. Manson is able to rely on the accompanying analysis of the government's spreadsheet by Mazars in challenging the government's view of loss at his upcoming sentencing, Mr. Callahan was sentenced without the benefit of the spreadsheet or the

18

analysis.

After Mr. Callahan filed his Petition, the Chief of the United States Attorney's Criminal Division responded to defense counsel's expressed concern about this case by asking the assigned prosecutor to provide defense counsel with the government's spreadsheet underlying the government's view of loss. Defense counsel immediately engaged Mazars, which analyzed the spreadsheet, properly allocated credits to loss, and concluded just within the past few weeks that applicable credits exceed loss.

As part of that analysis, Mazars analyzed the fair market value of at least some of the services associated with the investments acknowledged by the government to be non-criminal and proper. Under the Guidelines, that value represented a credit. U.S.S.G. §2B1.1 (2013) *Commentary*, Application Note 3(E)(i) (providing for certain credits against loss whether or not a defendant is entitled to retain the value of the credits). Mazars estimated a total of $3,401,238 of management and incentive fees associated with Mr. Callahan's legitimate investments. Exhibit A. Mr. Callahan's counsel at sentencing did not press this credit at sentencing, contributing to the prejudice to Mr. Callahan. This credit helped establish the fact of a gain. Counsel was ineffective in failing to seek the credit.

Mr. Callahan should be permitted to supplement his Petition with the government's disclosure and the subsequent analysis conducted by Mazars. *See* 28 U.S.C.A. §2242 (permitting petitions pursuant to Section 2255 to be supplemented as provided in the Federal Rules of Civil Procedure); Fed. R. Civ. P. 15(a)(2) (leave of the Court to amend should be given freely where justice requires); Fed..R. Civ. P. 15(d) (a party may permit a pleading with transactions, occurrences or events that occurred after the date of the original pleading).

<u>Conclusion</u>

For these reasons, we respectfully request that the Court issue orders:

1. Disqualifying this United States Attorney's Office in Favor of Another;

2. For Recusal and Reassignment of this Case to Another Judge;

3. Permitting Mr. Callahan to Supplement His Pending Petition;

4. Requiring the Government to Honor its Plea Agreement with Mr. Manson; and

5. Granting Bond to Mr. Callahan Pending Resolution of His Petition.

Dated: June 19, 2019

Respectfully submitted,

/s/
Andrew J. Frisch
The Law Offices of Andrew J. Frisch
One Penn Plaza, Suite 5315
New York, New York 10119
(212) 285-8000
afrisch@andrewfrisch.com

*Attorney for Brian Callahan and Adam Manson*

EXHIBIT F

Case 19-2413, Document 11, 09/08/2019, 2628105, Page94 of 197



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*610 Federal Plaza*
*Central Islip, New York 11722-4454*

July 24, 2019

By Hand and ECF

The Honorable Arthur D. Spatt
Senior United States District Judge
United States District Court
Eastern District of New York
1020 Federal Plaza
Central Islip, New York 11722

> Re:    United States v. Brian Callahan
>        Criminal Docket No. 13-453 (ADS)

Dear Judge Spatt:

The government writes to oppose the above-referenced defendant's July 23, 2019 motion for bail pending resolution of his habeas petition pursuant to 28 U.S.C. § 2255 petition.  As set forth below, the standard for bail pending disposition of a habeas petition is a demanding one and the defendant does not remotely come close to meeting it.  Accordingly, his request for bail should be denied without a hearing.

STATEMENT OF FACTS

I.    Overview of the Investigation

Between 2005 and 2012, Callahan operated a large-scale Ponzi scheme.  (PSR ¶¶ 8, 10-35, 39.)  Callahan took more than $100 million from dozens of investors purportedly to invest in hedge funds, stocks, bonds and other investment vehicles.  (Id.).  However, unbeknownst to investors, Callahan used those funds to pay redemptions to prior investors, to pay himself $6 million, and to purchase and renovate the Panoramic View, a cooperative development in Montauk, New York in which he, personally, had a 50% ownership interest. (Id.).  Callahan's criminal conduct caused his investors to lose more approximately $19.7 million.  (Id.).

Case 19-2413, Document 11, 09/08/2019, 2628105, Page95 of 197

2

During his fraudulent scheme, Callahan employed numerous deceitful tactics to keep his Ponzi scheme afloat.  (PSR ¶¶ 26-35).  Indeed, he created fictitious documents that he provided to investors, auditors and banks, including fictitious account statements, balance sheets, closing statements and promissory notes.  (Id.).  He also forged people's signatures. (PSR ¶¶ 27-28).  He even stole a person's identity to conceal his misuse of investor monies from the auditors.  (PSR ¶ 27).

For this, a grand jury sitting in the Eastern District of New York returned a 19-count indictment charging Callahan with securities fraud, wire fraud, conspiracy to commit securities fraud, conspiracy to commit wire fraud and aggravated identity theft.

II.      Callahan's Guilty Plea

A.      The Plea Agreement

On April 29, 2014, Callahan pleaded guilty, pursuant to a plea agreement, to securities fraud and wire fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 18 U.S.C. § 1343, respectively. (A copy of the plea agreement is attached hereto as Exhibit 1).  Paragraph 2 provided the government's estimate of the applicable United States Guidelines, including a loss enhancement of more than $50,000,000 but less than $100,000,000, resulting in a Guidelines range of imprisonment of 235 to 293 months.  (Id.).  Paragraph 3 of the plea agreement explained:

> The Guidelines estimate set forth in paragraph 2 is not binding on the Office, the Probation Department or the Court.  If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

(Exh. 1 ¶ 3).  Callahan agreed "not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 327 months or below."  (Id. ¶ 4).  Furthermore, Callahan agreed that "[t]his waiver is binding without regard to the sentencing analysis used by the Court."  (Id.).

In exchange, the government agreed (1) to dismiss the remaining counts in the indictment, (2) not to bring further criminal charges against Callahan for his defrauding investors, auditors, banks and the Internal Revenue Service, (3) to take no position concerning where within the Guidelines range determined by the Court the sentence should fall, and (4) to make no motion for an upward departure under the Guidelines. (Exh. 1 ¶ 5).

Case 19-2443, Document 11, 09/08/2019, 2628105, Page96 of 197

B.      The Presentence Investigation Report ("PSR")

The United States Probation Department ("Probation") prepared and submitted the PSR on December 16, 2015. Probation concluded that Callahan's advisory Guidelines offense level was 40 and he was a criminal history category I, resulting in a range of imprisonment of 292 to 365 months. (PSR ¶¶ 45-57, 90). This offense level was calculated using a base offense level of seven (U.S.S.G. § 2B1.1(a)(1)), adding twenty-six levels because Callahan was running a Ponzi scheme, took more than $100 million from investors during that scheme and therefore intended to cause that much loss (U.S.S.G. § 2B1.1(b)(1)(N)), adding two levels because Callahan victimized ten or more people (U.S.S.G. § 2B1.1(b)(2)(A)), adding four levels because Callahan was an investment advisor (U.S.S.G. § 2B1.1(b)(17)(A)(iii)), adding two levels because Callahan employed sophisticated means (U.S.S.G. § 2B1.1(b)(10)), adding two levels for being an organizer, leader, manager or supervisor (U.S.S.G. § 3B1.1(c)), and subtracting three levels for timely acceptance of responsibility (U.S.S.G. §§ 3B1.1(a), (b)). (PSR ¶¶ 45-57).

Callahan raised three objections to Probation's calculation. For purposes of the present motion, the only relevant objection is Callahan's objection to the loss enhancement, which he claimed was at most $2.7 million.

The government also objected to Probation's loss figure. Rather than holding Callahan accountable for his intended loss (i.e., all the monies he took from investors during his Ponzi scheme), the government argued that the loss enhancement should be limited to the actual loss that Callahan's criminal conduct caused. As a result, the government deducted the redemptions Callahan paid to prior investors and monies that the government recouped when it sold all the seized assets and what remained was a $19.7 million loss, resulting in a Guidelines range of imprisonment of 151 to 188 months.

On September 14, 2017, Probation issued an addendum reducing the loss enhancement to $19.7 million. (PSR Add. ¶ 46).

C.      Sentencing

Prior to sentencing hearing, Callahan submitted a sentencing memorandum, dated September 5, 2017, requesting a sentence of one year and a day. The government submitted a sentencing memorandum, dated September 13, 2017, asking the district court to impose a Guidelines sentence, namely, a sentence between 151 and 188 months.

On September 15, 2017, Callahan appeared for sentencing. (A copy of the transcript from Callahan's sentencing is attached hereto as Exhibit 2, at 2-3). After hearing extensive arguments from defense counsel and the government regarding the appropriate loss calculation, Your Honor rejected Callahan's argument and agreed with the government and Probation that Callahan caused $19.7 million in loss. (Id. at 11-13, 15, 44-46, 62). After also allowing Callahan's father, his wife, a family friend, defense counsel, Callahan, the

Case 19-2413, Document 11, 09/08/2019, 2628105, Page97 of 197

4

government and several victims to be heard regarding the appropriate sentence to be imposed, the Court sentenced Callahan to 144 months' incarceration. (Id. at 8-66).

In pronouncing sentencing, Your Honor first considered the Guidelines range of 151 to 188 months, acknowledging that while the Court must consider the Guidelines, those Guidelines were not mandatory. (Id. at 62-63). Next, the Court examined the factors set forth in 18 U.S.C. § 3553(a) and described the "nature and circumstances of the offense" as a "major fraud, one of the worst", "a very serious offense" and "despicable conduct." (Id. at 63, 64). Specifically, the Court explained

> [B]etween 2005 and 2012, this defendant created and maintained multiple offshore investment funds for which he solicited investors. . . . He set up all of these funds and got investors to put money into it, with the expectation that they would invest the funds in various projects, hedge funds, etc., and that they, the people who invested the money, would be paid, plus interest.
>
> However, in October 20006, the defendant and his brother-in-law agreed to purchase the Panoramic View, a cooperative in Montauk. . . . He obtained a $35 million acquisition loan and also money from the ventures.
>
> He used approximately $14 million in funds from the ventures, and during this time, he never said a word to the investors about this. He continued to solicit investments. He lied to the people involved. He lied to the Montauk Fire Department about how the money was invested, I believe it was $600,000 that the Montauk Fire Department invested. No mention of unauthorized diversion of the monies.
>
> The defendant also depleted monies for his personal expenses, and other fraudulent purchases in the sum – I hear various amounts, but approximately $3 million, and he continued to solicit new investors right along.
>
> He continued to send fraudulent account statements with regard to these investments that did not exist. Investors were told they could redeem on demand. That was false, because he had no funds left to redeem.
>
> He was unable to provide correct information to his accountants. He gave them fraudulent information.

Case 19-2413, Document 11, 09/08/2019, 2628105, Page98 of 197

5

> He sent out fraudulent balance sheets . . . This deceit, this fraudulent conduct went on and on. . . .
>
> The defendant took more than a hundred million dollars from investors and used these monies to pay redemptions to other investors, his own personal use, and buying this resort.  He lied to these investors for more than seven years.

(Id. at 59-61, 65).

The Court then considered the "history and characteristics of the defendant," explaining that

> [Callahan] has no criminal history, but he had another problem besides this.  When he worked at a company called Rochdale, his last employer before he began this fraudulent scheme, he engaged in some of the fraudulent conduct.  He forged and fabricated documents, engaged in private securities transactions without providing those to Rochdale, failed to respond to a request by a government body in charge called the Financial Industry Regulatory Authority.  FINRA requested documents from him, but he didn't respond.  And based on this conduct, in June 2009, FINRA barred the defendant from associating with any FINRA member, a fact that the defendant did not share with his now present investors, never told them anything about that one.

(Id. at 62, 63-64).

The Court next addressed the need for its sentence "to promote respect for the law" asking "[w]hat respect for the law did this defendant have in cheating and stealing and lying to these people?"  (Id. at 64).

The Court then explained that its sentence reflected the need to protect the public from future crimes of the defendant and to afford adequate general and specific deterrence.  (Id.).  In fashioning a just sentence, Your Honor credited some of Callahan's mitigating arguments, including his failed attempts at cooperation and the business that his wife started after Callahan was arrested.  (Id. at 65-66).

The Court also ordered Callahan to begin serving his sentence on November 27, 2017.  (Id. at 78).  Eight days before he was ordered to start serving his sentence and more than 60 days after sentencing, for the first time, Callahan asked the Court to postpone his surrender date.  The Court rejected that request.  The next day on November 20, 2017, Callahan moved for bail pending appeal.  Your Honor denied that motion.

Case 19-2443, Document 11, 09/08/2019, 2628105, Page 89 of 197

6

D.      Appeal

The defendant filed a notice of appeal arguing the government changed its theory of loss, and also appealed Your Honor's rejection of his motion for bail pending appeal. The government moved to dismiss the defendant's appeal. On December 28, 2017, the Second Circuit dismissed the defendant's appeal on the ground that the defendant waived his right to appeal if he received a sentence of imprisonment of 327 months or below and found that the motion for bail was moot. (A copy of the Second Circuit's decision is attached hereto as Exhibit 3).

In January 2018, the defendant began serving his sentence.

ARGUMENT

CALLAHAN IS NOT ENTITLED TO BAIL

I.      Legal Standard

The standard governing a defendant's release or detention pending appeal is set forth in 18 U.S.C. § 3143, a statute that creates a presumption that a defendant who has received a sentence of imprisonment will be detained pending appeal. See United States v. Randell, 761 F.2d 122, 124-25 (2d Cir. 1985). This presumption is based upon Congress's view that "[o]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even permit it in the absence of exceptional circumstances." United States v. Miller, 753 F.2d 19, 22 (3d Cir. 1985) (quoting H.Rep. No. 907, 91st Cong., 2d Sess. 186-87 (1970)). Section 3143 puts a heavy burden of proof squarely on the defendant, requiring that a defendant be detained unless he or she proves that certain criteria are met. See generally Randell, 761 F.2d at 125; Miller, 753 F.2d at 24; see also United States v. Abuhamra, 389 F.3d 309, 317 n. 5 (2d Cir.2004) (noting "the heavier burden imposed by 18 U.S.C. § 3143(b)" compared to release pending sentencing under § 3143(a)).

Where a defendant has been found guilty and sentenced to a term of imprisonment, the court should order detention pending appeal unless the court finds: (1) by clear and convincing evidence that the defendant is not likely to flee or pose a danger to the community; and (2) the appeal is not for the purpose of delay and raises a substantial question of law or fact, and (3) that, if the substantial question is answered in the defendant's favor, it is likely to result a sentence that is less than the time served plus the expected duration of the appeal process. See 18 U.S.C. § 3143(b); Randell, 761 F.2d at 125. A "substantial question" under Section 3143 is one that is "integral to the merits of the conviction" and "of more substance than would be necessary to a finding that it was not frivolous. It is a 'close' question or one that very well could be decided the other way." Randell, 761 F.2d at 125 (citation omitted).

Bail pending habeas, or a request for bail following a conviction that has been affirmed on appeal, is not mentioned in the Bail Reform Act.  Rather, bail pending habeas is based on the inherent power of the federal courts.  See, e.g., Mapp v. Reno, 241 F.3d 221, 226 (2d Cir. 2001).  However, consistent with the notion that courts are acting pursuant to their inherent power and not pursuant to statute, the Second Circuit has made clear that "this power is a limited one, to be exercised in special cases only."  Id.  Thus, "[t]he standard for bail pending habeas litigation is a difficult one to meet:  The petitioner must demonstrate that the habeas petition raise[s] substantial claims and that extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective."  Grune v. Coughlin, 913 F.2d 41, 44 (2d Cir. 1990) (internal quotation marks omitted) (alterations in original).

Courts have recognized that the standard for bail pending habeas is even higher than the standard for release pending appeal following a conviction.  See, e.g., United States v. Whitman, 153 F. Supp. 3d 658, 660 (S.D.N.Y. 2015) ("[A]s this Court and others in this District have held, the standard for release on bail under 18 U.S.C. § 2255 is even higher than under 18 U.S.C. § 3143(b).")  Such a higher standard makes sense; after all, the conviction has already been affirmed on appeal.  As part of this higher standard, release on bail pending habeas requires "a demonstrated likelihood that the petition will prevail, based upon claims of a substantial nature upon which the petitioner has a high probability of success . . . so that victory for petitioner can be predicted with confidence."  Id.  Moreover, release on bail pending habeas also requires that the petitioner show "extraordinary circumstances" to obtain "such exceptional relief."  Id. at 661.

The burden falls on the petitioner seeking relief to demonstrate both the "substantial questions" and the "exceptional circumstances" required.  Swerbilov v. United States, No. 04-CV-3320, 2005 WL 1177938, at *2 (E.D.N.Y. May 18, 2005).

II.     The Defendant Does Not Raise a Substantial Question That Has a High Probability of Success, Nor Does He Demonstrate Extraordinary Circumstances

Here, Callahan falls far short of meeting either prong of the demanding bail standard.  First, Callahan cannot demonstrate that his habeas petition raises "substantial questions" upon which he has a "high probability of success."  As will be discussed in more detail in the government's opposition to the defendant's habeas petition, none of Callahan's claims raise a substantial question, much less a meritorious claim.  Notably, the Court need not decide the habeas petition on the merits in order to reject Callahan's request for bail.  Other courts have rejected such claims prior to reaching the merits.  See, e.g., Beras v. United States, No. 05-CV-2678, 2012 WL 2148986, at *1 (S.D.N.Y. June 12, 2012) ("Although the Court does not yet decide the merits of the habeas petition, the Court finds that the Petitioner has failed to demonstrate a likelihood that the petition will prevail. Accordingly, the Court denies the motion for bail.").

Second, Callahan cannot demonstrate extraordinary circumstances justifying his release on bail.  He is in the same position as most other habeas petitioners seeking relief

Case 19-2413 Document 11 08/08/2019 2629105 Page 101 of 197

8

from convictions that they believe are improper:  He has been convicted, his conviction has been affirmed on appeal, and he has raised ineffective assistance claims by way of a habeas petition.  The Court can reach the merits of that petition while Callahan remains in custody. Callahan has been in custody for approximately 1½ years and still has approximately nine years left to serve.  The mere fact that he remains in custody during the pendency of the habeas petition is not an extraordinary circumstance.  See Iuteri v. Nardoza, 662 F.2d 159, 162 (2d Cir. 1981) (rejecting petitioner's contention that his case was extraordinary because "if the habeas writ is granted, it will mean that his incarceration . . . would have been without basis" and holding that "there is nothing unusual about this"); Harris v. United States, No. 97-CV-1904, 1997 WL 272398, at *1 (S.D.N.Y. May 21, 1997) ("The fact that [petitioner's] post-petition incarceration will have been without just basis if his petition eventually succeeds does not constitute an extraordinary circumstance entitling him to bail.").

The Court sentenced the defendant to 144 months based on a careful examination of the Section 3553(a) factors.  Were the Court to be required to resentence the defendant—which is highly unlikely—there is no legitimate reason to believe that the Court would impose a sentence of time served (i.e., 1½ years' incarceration).  As set forth above, even a cursory review of the offense conduct and the defendant's history supports a significant term of incarceration.  For approximately seven years, the defendant abused his position of trust as an investment advisor to convince dozens of unsuspecting investors to part with their hard-earned money for what they believed were strong, well-performing investments.  In reality, the defendant was running a massive Ponzi scheme.  The defendant went to great lengths to execute his fraud.  He lied to investors.  He lied to the auditors.  And he lied to the bank.  He also employed every trick in the fraudster book.  He created completely fake documents.  He forged people's signatures.  And he even stole a person's identity.  Despite that the defendant has no criminal history, this was not the first time that the defendant engaged in fraudulent conduct.  When he worked at Rochdale—his last employer before he began the instant fraudulent scheme—he engaged in some of the same fraudulent conduct as here.  This obviously did not deter the defendant from forging and fabricating documents and perpetrating a significant fraud; in fact, this experience with FINRA brings into view the recidivist nature of the defendant's crime.  For these reasons and other reasons announced at the sentencing hearing, the Court sentenced the defendant to a term of imprisonment of 144 months.

Finally, as set forth above, the government notes that following Callahan's conviction and prior to his appeal, Callahan was unable to meet the standard for release pending appeal, as Your Honor denied his motion for bail pending appeal.  The defendant appealed that decision.  Significantly, the Second Circuit found that the motion for bail was moot after it dismissed the defendant's appeal.  Thus, where Callahan was unable to meet the lesser standard for bail pending appeal, he cannot meet the even more stringent standard for bail pending habeas.

Case 19-2413, Document 11, 08/08/2019, 2628105, Page102 of 197

9

## CONCLUSION

For all of the reasons set forth herein, the defendant's motion for bail pending the disposition of his habeas petition should be denied.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:      /s/
Christopher Caffarone
Assistant U.S. Attorney

cc:    Andrew Frisch, Esq. (Via ECF and Email)

EXHIBIT G

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X

BRIAN R. CALLAHAN,

               Petitioner,

          - against -

UNITED STATES OF AMERICA,

               Respondent.

-------------------------------------------------------- X

13 CR 453 (ADS)
18 CV ___ (ADS)

DECLARATION

          BRIAN R. CALLAHAN hereby declares the following under 28 U.S.C. § 1746:

1.      I am the Petitioner in this case brought pursuant to 28 U.S.C. §2255. I believe that I was denied my constitutional right to effective assistance of counsel, who failed to advise me about, or seek proper relief in Court to remedy, the government's use of non-criminal conduct to inflate my sentencing range, the government's breach of my plea agreement, governmental misconduct, and violation of my constitutional right to due process. Based on my understanding of my rights and the law, I believe that I should be issued a writ of *habeas corpus* or *coram nobis* whether or not the Court finds that I was denied effective assistance of counsel.

2.      Between at least 2006 and up to 2012, I managed offshore investment funds for the benefit of investors. During that period, I also invested investor funds in third-party domestic funds which I did not manage, including Kinetics Institutional Partners, L.P. ("Kinetics") and Millennium USA, L.P. ("Millennium"). During this period, I invested investor funds in Distinctive Investments LLC ("Distinctive"), the sole asset of which was the Panoramic View, a

resort in Montauk, New York. I made misrepresentations to investors about the investments in Distinctive. I was indicted in July 2013 and pled guilty to securities fraud and wire fraud in April 2014.

3. Between March 5, 2012, and September 13, 2017, two days before I was sentenced on September 15, 2017, the United States Department of Justice, the federal agencies working with the United States Attorney's office, and the Securities and Exchange Commission ("SEC") consistently alleged and advanced the same view of my fraud in charging instruments and various pronouncements about my case. The government advanced that view in my indictment, my plea agreement, in describing the case to the Probation Department for its Presentence Report ("PSR"), its various press statements about this case, and in a civil *in rem* action that it filed with the Court: I allegedly defrauded investors in three ways: (a) by diverting investor monies to the Panoramic View; (b) inappropriately using investor monies for redemption requests from other investors (which allegedly qualified my fraud as a *Ponzi* scheme); and (c) for certain personal expenses. *See, e.g.,* Indictment at ¶22 (Exhibit B); PSR at ¶39.

4. At the same time, the government acknowledged that I had properly invested monies in hedge funds like Kinetics and Millennium as promised to investors, but should have invested more. Supporting this consistently-stated view of the case, the government distinguished the total amount of funds that I allegedly obtained from investors, $118.7 million, from the estimated value of the fraud, $96 million. *See, e.g.,* Indictment at ¶¶4, 5, 22 (Exhibit B); PSR at ¶39. Thus, in the indictment and in describing this case to the Probation Department for my PSR, the government said, as it had said all along, that I obtained from investors a total of

2

$118.7 million, but that at least "$96,000,000 was inappropriately used for redemption requests by other investors, payment on Panoramic View expenses, and personal expenses." PSR at ¶39; Indictment at ¶22.

5.  The government advanced that same theory in correspondence with the Court less than three weeks before I pled guilty [Exhibit G at 2] and in my plea agreement. Exhibit H. The plea agreement, drafted by the government, valued my fraud at $96 million (using the range identified in the applicable Sentencing Guidelines manual for loss between $50 million and $100 million), less than the $118.7 million alleged by the government to the total amount of money I had obtained from investors. Exhibit H at 3. In addition, paragraph 5(a) of the plea agreement described the "related conduct" covered by my guilty plea as "*obtaining* monies from investors." Exhibit H at 5. From that language and the context provided by the indictment and the government's other pronouncements about the case [*see, e.g.*, Exhibit F], I believed that the crime to which I pled guilty was obtaining money for the improper purposes of paying "redemption requests by other investors, payment on Panoramic View expenses, and personal expenses" [*see* PSR at ¶39; Indictment at ¶22], which the government valued at $96 million. By contrast, the plea agreement made no reference to *withdrawing* funds from Kinetics as by itself part of the fraud.

6.  The lawyers who represented me when I pled guilty did not advise me that the government's theory of its case as reflected in the plea agreement could be changed at sentencing to embrace conduct not alleged to have been criminal, like the mere fact of withdrawals from Kinetics or market loss in Kinetics where the government alleged that I properly invested money but should have invested more. To the contrary, my lawyers knew that the government had

3

distinguished the total of $118.7 million that I allegedly obtained from investors from the $96 million that the government viewed as the value of the fraud as reflected in the indictment and the plea agreement. My lawyers told me in a then-contemporaneous email that I had pled guilty to a fraud valued by the government at $96 million. Exhibit R.

7. I knew from speaking to my lawyers and from my own independent research that I would be entitled at sentencing to credits against loss for the sale of the Panoramic View, redemptions that I had made to investors, and investor assets recovered by the authorities before the time of indictment. Before sentencing, the government determined that the value of those credits was $120.8 million. Exhibit J at 3. In estimating my fraud loss, the PSR used the larger number of $118.7 million representing total monies invested from the government's $96 million valuation of the fraud. The $120.8 million of credits is larger than even the PSR's determination that my fraud could be valued at $118.7 million.

8. Thus, as of September 13, 2017, two days before my sentencing, according to the government, hedge funds like Kinetics and Millennium were relevant to this case in two ways: (a) I was supposed to have invested more monies in those funds than I invested; and (b) any monies from the hedge funds used to invest in the Panoramic View, pay redemption requests from other investors or for certain personal expenses were part of the government's valuation of the fraud at $96 million. Indictment at ¶¶4, 5, 22; PSR at ¶39.

9. The government's theory of my criminal liability changed after the government realized that I was entitled to credits against loss of $120.8 million [Exhibit J at 2], more than even the PSR's estimate of a loss of $118.7 million. On September 13, 2017, for the first time, the government claimed that I was criminally responsible for market loss in Kinetics on the

4

theory that I had no discretion to withdraw from Kinetics for any purpose *after* the market loss was suffered. Exhibit J at 3-4. The government also appeared to change its theory that deposits in Kinetics were part of the fraud though the government had previously theorized that those deposits were properly made. These government theories were false.

10.     By early 2008, the value of funds in Kinetics (in which eleven of my investors were invested through a total of about eighteen entities) was valued at $38,335,894 [Exhibit K at 4] after investments of $33.5 million. Exhibit C at 12. Because of the global financial crisis in 2008, the value of the funds in Kinetics decreased by $21,845,899. I caused Internal Revenue Service ("IRS") Forms K-1 to be issued to the eleven investors invested in Kinetics advising them and the IRS of that loss. Exhibit K at 4.

11.     When I pled guilty to the government's plea agreement that estimated a fraud loss of $96 million, I did not believe that I was pleading guilty to the total monies invested in hedge funds or any market loss in Kinetics. My belief was based on the government's acknowledgment in the indictment and elsewhere that investments in Kinetics, Millennium and other hedge funds had been promised to investors and was proper, and that I should have invested even more investor monies in those funds. As for market loss in Kinetics, the loss resulted from the global financial crisis not fraud, and investor money was properly invested in Kinetics in the first place, as the government acknowledged. It would have made no sense for the government to have alleged that I was criminally responsible for a market loss in a fund to which I was supposed to have invested money or the total monies invested.

12.     When the government changed its theory of the case two days before my sentencing, it argued that I was criminally responsible for the market loss in Kinetics because I

had no discretion to withdraw funds from Kinetics for any purpose. Exhibit J at 3-4. That statement was false and illogical. In fact, my investors were provided and acknowledged receipt of documents confirming their understanding that I had full discretion to hold, buy or sell their positions in Kinetics. *See, e.g.*, Exhibits L, M, N and O. Kinetics lost 68% of its value in 2008 [Exhibit P], and it would have been a dereliction of duty and an abuse of my discretion had I not acted to salvage the investment's dwindling value. Even apart from those documents, one of my investors sent me an email in 2007 [Exhibit Q], explaining that it was precisely my full discretion to manage investments in Kinetics as I saw fit that caused this investor not to authorize an investment in Kinetics on his behalf. As he put it, he saw "no language that would prevent [an investment in Kinetics] from changing its allocation to something else:"

> The Fund essentially has complete discretion to invest in whatever the Manager it [sic] sees fit. While the OM [offering memorandum] does note that currently it is mostly invested in Kinetics, I see no language that would prevent that from changing its allocation to something else. This is not a structure we would be comfortable investing in. Put differently, if we elect to invest in Kinetics, we want to know that we will be invested there and not elsewhere. While I know that I could redeem out of the fund if I did like a change in the underlying managers or overall investment strategy, given lags in reporting and redemption, this is of only limited comfort.
>
> Do I understand the documents correctly? And if so, why could we not simply have the Trusts invest directly in the Kinetics Fund?

Exhibit Q. I understand why amounts diverted for fraudulent purposes was part of the government's valuation of the fraud of $96 million. Beyond the diversions, the government's argument that I did not have discretion to make withdrawals from Kinetics under any circumstance is false. Also, it made no sense that the market loss in Kinetics was caused by fraud in light of the government's earlier concession that the money was properly invested in

Kinetics in the first place.

13.     I absolutely would not have pled guilty as I did had I believed that the government considered fraud loss to include market loss in Kinetics or total monies invested in hedge funds, or that the government could change its theory of criminal liability at sentencing to include conduct that was not criminal, appeared to have been expressly excluded from the case, and which could so dramatically increase the value of the fraud expressly alleged in the indictment and estimated in the plea agreement.

14.     The lawyers who represented me when I entered my guilty plea were permitted to withdraw when their application for legal fees from seized assets was denied.   On September 13, 2017, at 9:45 p.m., my new lawyer emailed me that the government had filed its letter in aid of sentencing an hour before, he had "skimmed it quickly" and was opposed to seeking to adjourn sentencing because doing so would "irritate the judge." Exhibit S.  I do not recall, however, that my lawyer and I had discussed before receiving the government's submission that it might necessitate an adjournment.

15.     Meanwhile, on August 22, 2017, a few weeks before my lawyer submitted a memorandum on my behalf in aid of sentencing, he emailed me and told me that he had met with the prosecutor on the case, and that "[i]t was pretty clear from our conversation that the government will not be pushing the idea that this was a Ponzi scheme." Exhibit U at 2.  In a subsequent link in the email chain, he wrote that "they will not press the Ponzi Scheme argument." Exhibit U at 1.

16.     On September 13, 2017, at 10:28 p.m., upon receiving counsel's email and reviewing the government's letter in aid of sentencing, I wrote a one-line email to counsel, based

7

on his email a few weeks earlier that he did believe that the government would press its theory of a Ponzi scheme. I wrote, "He has now taken the position that I ran a Ponzi scheme." Exhibit S at 2. Apparently interpreting my remark as a suggestion that we write to the Court challenging the inference of a *Ponzi* scheme, counsel responded that "further written submissions will only result in further vociferous and damaging submissions by the government," and that "[w]e should simply go to the sentencing on Friday [September 15, 2017] and be done. Putting this off will only make it worse." Exhibit S.

17.     The following morning, at 10:17 a.m., upon digesting the government's letter, I emailed my lawyer, agreeing that we should avoid an unnecessary fight with the government, but that the government's new theory of a fraud loss of $140.6 million included amounts that were not and had never been understood to be part of the case and otherwise mixed apples and oranges:

> The Govt is conflating two separate transactions; 1) the liquidation of a collapsing investment[] where the investment and losses were fully disclosed. [and] 2) an investment in the [D]istinctive promissory notes that was not properly disclosed to investors. Separately, I was not charged in the indictment with fraud for liquidating the collapsing hedge funds without getting permission from the investors as there is no document that supports the Govts assertion that I needed permission to make investment decisions. To the contrary, I was the only person legally responsible for making investment decisions.

I told counsel that the government "has shifted the entire debate of loss on this question." Exhibit T.

18.     The government dramatically changed its theory of loss, was announcing a position at odds with the theory in the indictment, and was seeking to include non-criminal conduct as loss. The government's new theory of loss was false. My lawyer never explained to

8

me all the legal implications of the government's letter of September 13, 2017.  For example, my lawyer never discussed with me or advised me that the government's new theory served to violate my constitutional right to due process, constituted a breach of the plea agreement, and was so plainly manufactured to increase my sentencing range as to constitute governmental misconduct.  Had I been advised about and understood all the legal implications, I would have insisted that a legal challenge be made.

19.     In addition, though my lawyer argued that it was unfair to hold me accountable for loss in Kinetics because it was caused by a market downturn, he never explained to the Court that the market loss was incurred in a fund in which the government had alleged that the affected investments had been properly invested, e.g., not as a result of fraud.  Further, none of my lawyers ever engaged the services of an expert in finance to review relevant documents and explain the scope of the fraud, and that it was wrong to claim that I lacked authority to make withdrawals from Kinetics for any purpose, and that I was accountable for market loss in Kinetics.   This Petition is supported by a declaration of expert Gregory L. Florio as to these issues.  Exhibit V.

20.     On September 14, 2017, the Probation Department issued an addendum to its PSR, noting the parties' submissions in aid of sentencing, and including a new calculation of the Guidelines which adopted the government's view and increased my fraud loss from $118.7 million to $140.6 million.  I now know that the Probation Department's issuance of the addendum gave me the right to an adjournment.  My counsel never so advised me.

21.     My lawyer was against filing anything in response to the government's letter.  He told me that everything had already been said, that I should "be done," and that "[p]utting this off

will only make it worse." In fact, everything had *not* already been said, and adjourning sentence, as was my right under Rule 32(g), would have afforded counsel time to evaluate and challenge the government's new position. My lawyer ultimately filed a short letter in reply to the government's submission [Exhibit K], but he never argued that it was improper to use market loss in Kinetics as fraud loss because the money was properly invested in Kinetics in the first place, nor did he ever argue that the government's new theory was new and sought to hold me accountable for a theory of loss that appeared to have been expressly disavowed by the government in its indictment, plea agreement and other pronouncements about the case.

22.      The government's changed theory of loss was itself reason to stop and ask for time to analyze the government's new position. The value of the change, representing an additional $44.6 million of loss than represented in the indictment and plea agreement ($140.6 million minus $96 million), and an additional $21.9 million of loss than determined by the PSR ($140.6 million minus $118.7 million), was staggering and itself required proper analysis. To my knowledge, however, within the 41 hours between receiving the government's letter of September 13, 2017, and my sentencing on September 15, 2017, my lawyer did not nor have the time to analyze properly the government's previous statements about the case, its indictment and plea agreement, the civil complaints related to the government's allegations, the United States Attorney's public statements about the case, and the government's correspondence to the Court representing that my fraud was valued at $96 million and had excluded from the case what it added on the virtual eve of sentencing. My lawyer did not properly advise me on the legal implications of the government's new theory and failed to challenge it as a breach of the plea agreement, violation of due process and as governmental misconduct in advancing a false theory

10

Case 19-2413, Document 11, 09/08/2019, 2628405, Page114 of 197

of loss to create a more severe sentencing range than the facts and the law permitted.

23.     Attached to this Declaration and incorporated by reference herein, is an

Addendum identifying exhibits filed herewith, which I represent are fair and accurate copies of

the documents as described and are what they purport to be.

I declare under penalty of perjury that the foregoing is true and correct.

Brian R. Callahan

Executed on September 26, 2018
Brooklyn, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x

BRIAN R. CALLAHAN,

                      Petitioner,

            - against -

UNITED STATES OF AMERICA,

                    Respondent.

------------------------------------------------------- x

             13 CR 453 (ADS)
             18 CV ___ (ADS)

### Addendum to Declaration of Brian R. Callahan

Exhibit A        Amended Judgment

Exhibit B        Indictment

Exhibit C        Government's Complaint in *In Rem* Action

Exhibit D        Complaint in *SEC v. Callahan, et al.*, 12 CV 1065 (ADS)

Exhibit E        First Amended Complaint *SEC v. Callahan, et al.*, 12 CV 1065 (ADS)

Exhibit F        Government Press Releases

Exhibit G        Government Letter to Judge Spatt, April 9, 2014

Exhibit H        Plea Agreement

Exhibit I         Sentencing Memorandum on Behalf of Brian R. Callahan

Exhibit J        Government Letter to Judge Spatt, September 13, 2017

Exhibit K        Letter to Judge Spatt, September 14, 2017

Exhibit L        Standard Investor Subscription Agreement

12

| Exhibit M | Confidential Offering Memorandum, Diversified Global Investments, L.P. July 2007 |
| Exhibit N | Confidential Offering Memorandum, Diversified Global Investments, L.P. April 2009 |
| Exhibit O | Supplement to Confidential Offering Memorandum 2007 |
| Exhibit P | Monthly Fact Sheet Provided by Kinetics Advisers, LLC to Investors |
| Exhibit Q | Email from investor Jonathan Cornish, November 7, 2007 |
| Exhibit R | Email exchange with defense counsel, April 30, 2014 |
| Exhibit S | Email exchange with defense counsel, September 13, 2017 |
| Exhibit T | Email exchange with defense counsel, September 13-14, 2017 |
| Exhibit U | Email exchange with defense counsel, August 22, 2017 |
| Exhibit V | Declaration of Gregory L. Florio |

EXHIBIT H

From: Roland Riopelle <RRiopelle@sercarzandriopelle.com>
Date: September 13, 2017 at 10:42:16 PM EDT
To: Brian Gmail <callbrian50@gmail.com>
Subject: **RE: Callahan sentencing memorandum**

And yet, he is seeking a significantly reduced sentence below the guidelines calculation of the Probation Department and the Plea Agreement, and, frankly, not all that far off of our calculation in terms of fraud loss.

Brian, I am sorry, but further written submissions will only result in further vociferous and damaging submissions by the government. The fact is that you did some pretty bad things, and some people were hurt pretty badly. Some of that hurt has resulted from the funds being tied up with the receiver and we have our arguments about what you've done in the last five years and how your family will be harmed. That's what we have. We should simply go to the sentencing on Friday and be done. Putting this off will only make it worse.

I do think, given the rough victim letters and Mr. Caffarone's letter, a probationary sentence is out of the question. But I've always thought that. I do not know what Judge Spatt will do, but I think we can expect a jail sentence, and it may be of some length. How long, I cannot say. But I will say asking for anything less than a modest jail sentence would simply not be credible in the circumstances we have before us.

Do try to shoot me a copy of your statement in the morning so I can look it over.

Regards,

Roland G. Riopelle, Esq.
Sercarz & Riopelle, LLP
810 Seventh Avenue, Suite 620
New York, NY  10019
(212) 586-4900
Fax: (212) 586-1234
www.sercarzandriopelle.com

1



This email is sent by an attorney and may contain privileged and/or confidential information. If you have received it in error, please delete it and contact Mr. Riopelle at the telephone number indicated above.

**From:** Brian Gmail [mailto:callbrian50@gmail.com]
**Sent:** Wednesday, September 13, 2017 10:28 PM
**To:** Roland Riopelle <RRiopelle@sercarzandriopelle.com>
**Subject:** RE: Callahan sentencing memorandum

He has now taken the position that I ran a Ponzi scheme.

**From:** Roland Riopelle [mailto:RRiopelle@sercarzandriopelle.com]
**Sent:** Wednesday, September 13, 2017 9:45 PM
**To:** callbrian50@gmail.com
**Subject:** FW: Callahan sentencing memorandum

Brian:

Here is the government's letter, filed about an hour ago. I've skimmed it quickly. I recommend that we do not seek an adjournment, because I believe, based on all I know, that will irritate the judge. I will be happy to discuss your thoughts on this tomorrow when I get in.

Regards,

Roland G. Riopelle, Esq.
Sercarz & Riopelle, LLP
810 Seventh Avenue, Suite 620
New York, NY 10019
(212) 586-4900
Fax: (212) 586-1234
www.sercarzandriopelle.com



This email is sent by an attorney and may contain privileged and/or confidential information. If you have received it in error, please delete it and contact Mr. Riopelle at the telephone number indicated above.

EXHIBIT I

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x

BRIAN R. CALLAHAN,

    Petitioner,

       - against -

UNITED STATES OF AMERICA,

    Respondent.

13 CR 453 (ADS)

-------------------------------------------------------- x

UNITED STATES OF AMERICA,

       - against -

ADAM MANSON,

    Defendant.

13 CR 453 (ADS)

-------------------------------------------------------- x

## DECLARATION OF MICHAEL KUPKA

Michael Kupka declares under 28 U.S.C. §1746 as follows:

1. I am the managing director of the Forensic Accounting and Dispute Resolution Department of Mazars USA ("**Mazars**"), a full-service accounting, tax and consulting firm, and independent member firm of the Mazars Group, a global organization consisting of over 23,000 professionals with 310 offices in 89 countries.

2. I have over eighteen years of forensic and public accounting experience with a specialty in complex business, commercial, criminal and multi-party matters. I have worked on hundreds of engagements for clients ranging from Fortune 500 companies to small entrepreneurial business. I am a Certified Public Accountant (CPA) in New York State and

accredited as a Certified Fraud Examiner (CFE) by the Association of Certified Fraud Examiners, and as a Certified Financial Forensic (CFF) accounting by the American Institute of Certified Public Accountants, among other professional certifications and memberships. I was appointed by the Supreme Court of the State of New York to and currently serve as a fiduciary with the New York State Office of Court Administration to conduct forensic audits and accounting. My *curriculum vitae* accompanies this Declaration.

3. In February 2019, Mazars was engaged by The Law Offices of Andrew J. Frisch to assist with the defense of Brian Callahan ("**Callahan**") and Adam Manson ("**Manson**") in the above-captioned cases. I was requested to determine financial loss pursuant to the below-discussed indictment and the plea agreements entered into ("**financial loss**").

4. My analysis primarily consisted of analyzing a government-prepared spreadsheet ("**government's spreadsheet**"), containing 32 columns and 1,917 rows and an associated one-page summary, which I understood was disclosed as support for the government's view of loss, as set forth in a letter submitted by the government to the Court, dated September 13, 2017, in connection with the sentencing of Mr. Callahan.

5. The government's spreadsheet appears to disclose and summarize monetary transfers (cash movements) between various accounts and was the basis for the government's predicated conclusions of loss. In my analysis, I assumed that this government's spreadsheet was correct because the government did not provide any documentation which would allow me to independently test its accuracy. More specifically, I have not been provided by any backup data, such as, for example: underlying account statements, wire transfer information or bank statements to independently test the accuracy of the government's spreadsheet.

6. In addition to the government's spreadsheet and its accompanying one-page summary, I also reviewed: (i) the indictment, (ii) the plea agreements, and (iii) the government's letter of September 13, 2017. Furthermore, I met twice with Mr. Callahan at the facility where he was imprisoned.

7. As part of my analysis, I examined and compared the information provided on the government's spreadsheet with the indictment, especially but not limited to paragraphs 14 through 17 and 22. In particular, I was also made aware that the government had described this case in the indictment and in other documents as a $96 million Ponzi scheme, a charge that, I understand, Mr. Callahan plead guilty to.

8. Next, in determining financial losses, I relied on the government's list of applicable credits, as set forth in its letter of September 13, 2017, at page 3 that totaled $120,839,000.

9. According to the government's letter, those credits included: (i) $74 million of redemptions to Mr. Callahan's investors, (ii) $40.3 million from the sale of the Panoramic View resort, and (iii) $6.4 million recovered from hedge funds when Mr. Callahan's assets were seized.

10. Based on my analysis of determining financial losses and by considering the **$96 million** of total Ponzi scheme, as the starting point for my analysis, I concluded that the applicable amount of credits (per the above government-presented categories) should be **$95,541,738**, instead of **$120,839,000** (a difference of **$25,297,262**), before any consideration of the fair market value relating to Mr. Callahan's services associated with managing various investments not alleged as fraud.

11. As presented on the attached exhibits, the **$25,297,262** reduction consists of **three** separate adjustments. *First*, I assumed that the **$6.4 million**, identified by the government as recovered from the hedge funds when assets in this case were seized, was not considered loss. Therefore, I deemed this credit to be inapplicable. *Second*, in estimating the loss associated with the fraud, the government apparently did not include the entirety of certain investments made in one of Mr. Callahan's investment vehicles known as Pangea Offshore High Yield Portfolio, LLC ("Pangea"). For this reason, I concluded that redemptions, totaling **$4,364,045**, redeemed by investors in Pangea prior to February 5, 2008 (beginning of the described Ponzi scheme) should not be considered applicable credits against the financial loss. *Third*, I reduced the net proceeds from the sale of the Panoramic View resort by the amount of monies, totaling **$14,533,217**, that were transferred from Pangea and/or Pangea investors to purchase this asset.

12. Next, because the government in this case alleged that Mr. Callahan's investments in certain hedge funds were properly made, not induced by the charged fraud, I estimated a minimum of additional credits for the fair market value of hedge-fund related services by calculating: (i) applicable management fees (**$1,316,844**) and (ii) incentive fees (**$2,084,394**) which I understood were in fact paid in connection with the investments in the hedge funds. The value of that additional credit is **$3,401,238**. I was advised that, under sentencing guidelines, such credit can be considered.

13. My conclusion was that applying the above-presented credits to amount of the Ponzi scheme (as per the Indictment) resulted in a gain of **$2,942,976** ($96 million the Ponzi scheme per indictment, less $95,541,738 of applicable credits categories, per government's presentation, and less $3,401,238 of credits relating to the fair market value of services rendered). My full analysis is attached.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 19, 2019

Michael Kupka

# Financial Advisory Services

## FORENSIC ACCOUNTING AND DISPUTE RESOLUTION SERVICES

13 CR 453 (ADS)

CONFIDENTIAL

**M** MAZARS

Case 19-2413, Document 11, 08/08/2019, 2628105, Page125 of 197

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

## Table of contents

1. **Revised Calculation**

2. **Management Fees Calculation**

3. **Incentive Fees Calculation**

**M**☼ **MAZARS**

Case 19-2413, Document 11, 08/08/2019, 2628105, Page126 of 197

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

## 1. Revised Calculation

| Calculation of the revised Actual Loss (Gain) | Initial Amount | Adjustments | Notes | Revised Amounts |
|---|---|---|---|---|
| Amount of the Ponzi scheme, as per the Indictment | | | (a) | $    96,000,000 |
| | | | | |
| Redemptions paid to prior investors | $    74,000,000 | $    (4,364,045) | (b) | 69,635,955 |
| Monies recovered by the Receiver | 6,400,000 | (6,400,000) | (c) | - |
| Net proceeds from sale of 47 Clock Tower | 139,000 | | | 139,000 |
| Net proceeds from the sale of the Panoramic | 40,300,000 | (14,533,217) | (d) | 25,766,783 |
| Total Credit | $    120,839,000 | $    (25,297,262) | | $    95,541,738 |
| | | | | |
| Actual Loss (Gain) | | | | $    458,262 |
| Estimated Amount of Management Fees (Hedge Funds) | | | (e) | (1,316,844) |
| Estimated Incentive Fees (Hedge Funds) | | | (f) | (2,084,394) |
| Actual Loss (Gain) | | | | $    (2,942,976) |

Notes:

(a)  Amount of the Ponzi scheme, as per the Indictment.

(b)  Redemptions made from Pangea prior to February 5, 2008 (see listing).

(c)  Monies invested/held in hedge funds as of May 2012 (not considered part of the fraud).

(d)  Monies transferred from Pangea and/or Pangea investors to Panoramic.

(e)  See Page 6.

(f)  See Page 7.

3

MAZARS

Case 19-2413, Document 11, 08/08/2019, 2628105, Page127 of 197

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

## (b) Redemptions made from Pangea prior to February 5, 2008

| DATE | 01 - Bank of America - Business Economy CHKG - Pangea Offshore High Yield Portfolio LLC (004831243074) | 02 - Bank of America - Business Interest Maximizer - Pangea Offshore High Yield Portfolio LLC (004834015322) | | Description |
|---|---|---|---|---|
| 01/13/06 | (52,500) | | - | Redemption: Cliff Silverstein - Citizens Bank |
| 02/13/06 | (1,400,000) | | - | Redemption: 208880 ROCHDALE OFFSHORE GLOBAL OP FUND (Shai Reshef - Remini Trust?) |
| 03/17/06 | (275,000) | | - | Redemption: Shai Reshef - Pictet & Cie Act J720157 (Remini Trust?) |
| 03/31/06 | (725,000) | | - | Redemption: ROCHDALE OFFSHORE GLOBAL OP FUND (Shai Reshef - Remini Trust?) |
| 09/06/06 | (11,945) | | - | Redemption: Lane Group International (Lighthouse) - Cheryl Lane |
| 09/19/06 | (11,945) | | - | Redemption: Lane Group International (Lighthouse) - Cheryl Lane |
| 10/04/06 | (11,945) | | - | Redemption: Lane Group Intl (Lighthouse - Cheryl Lane) |
| 10/05/06 | - | (175,114) | | Redemption: Royal Bank of Canada Lighthouse (Cheryl Lane group) |
| 02/02/07 | (1,751) | | - | Redemption: Lighthouse / Lane Group / Cheryl Lane |
| 02/02/07 | (116,000) | | - | Redemption: National Bank Of Anguilla (Westminster Hope and Turnberry) |
| 02/27/07 | (225,000) | | - | Redemption: National Bank Of Anguilla (Westminster Hope and Turnberry) |
| 02/27/07 | (16,107) | | - | Redemption:National Bank Of Anguilla Citadel Insurance Comp |
| 02/27/07 | (124,809) | | - | Redemption:National Bank Of Anguilla Fidelity Insurance Company |
| 03/30/07 | (15,688) | | - | Redemption:National Bank Of Anguil Pangea Global Opportunities (Westminster Hope and Turnberry) |
| 03/30/07 | (550,000) | | - | Redemption:National Bank Of Anguil Pangea Global Opportunities (Westminster Hope and Turnberry) |
| 04/13/07 | (93,958) | | - | Redemption:National Bank Of Anguila Fidelity Ins. Company |
| 05/01/07 | (287,713) | | - | Redemption:National Bank Of Anguila Westminster, Hope and Turnberry |
| 06/04/07 | (8,818) | | - | Redemption:National Bank Of Anguila Pangea Conservative Fund (Westminster Hope and Turnberry) |
| 06/04/07 | (104,955) | | - | Redemption:National Bank Of Anguila Pangea Global Opportunities (Westminster Hope and Turnberry) |
| 06/04/07 | (43,218) | | - | Redemption:National Bank Of Anguila Pangea High Yield Portfolio (Westminster Hope and Turnberry) |
| 08/14/07 | (35,863) | | - | Redemption:National Bank Of Anguila Pangea Global Opportunities Portfolio (Westminster Hope and Turnberry) |
| 11/08/07 | (33,265) | | - | Redemption:National Bank Of Anguila Westminster, Hope Turnberry |
| 12/07/07 | (43,449) | | - | Redemption:National Bank Of Anguila Pangea Global Opportunities Westminster Hope and Turnberry |

MAZARS

Case 19-2413, Document 11, 08/08/2019, 2628105, Page128 of 197

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

## (d) Monies transferred from Pangea and/or Pangea investors to Panoramic

| DATE | 16 - Amounts Transferred to: Dist-Inv., Dist-Vent., Pan-View, Trimont, Bay-YC, Dune-Harbor. | Description |
|---|---|---|
| 06/06/05 | 260,000 | Subscription/MISUSE: American Trust (Aidan Tinney)/Pictet And Cie directly into BM IOLA (4365) - used for checks 101092-101093 Dune Harbor/BayPointe Yacht Club |
| 11/28/05 | 250,000 | MISUSE: Pangea (3074) to BM IOLA Escrow (4365) to Deposit on Panoramic View |
| 11/28/05 | 65,000 | MISUSE: Pangea (3074) to BM IOLA Escrow (4365) to Deposit on Panoramic View |
| 12/13/05 | 250,000 | MISUSE: Pangea (3074) to BM IOLA Escrow (4365) to Deposit on Panoramic View |
| 12/13/05 | 250,000 | MISUSE: Pangea (3074) to BM IOLA Escrow (4365) to Deposit on Panoramic View |
| 12/19/05 | 400,000 | Subscription/MISUSE: American Trust (Aidan Tinney)/Pictet And Cie directly into BM IOLA (4365) to Deposit on Panoramic View |
| 12/27/05 | 800,000 | MISUSE: Pangea (3074) to BM IOLA Escrow (4365) to Deposit on Panoramic View |
| 02/13/06 | 70,000 | MISUSE: Pangea (3074) to BM IOLA Escrow (4365) to Dist-Inv Checking (1665): Check 101624 - Distinctive Ventures / Panoramic View Due Dilligence |
| 09/14/06 | 150,000 | MISUSE: Pangea (3074) to Dist-Inv Checking (1665) |
| 10/05/06 | 60,000 | MISUSE: Pangea (5322) to BM IOLA Escrow (4365) to Dist-Inv Savings (3642): Check 101625 - Dis |
| 10/11/06 | 356,217 | MISUSE: Pangea (3074) to BM IOLA Escrow (4365) to Dist-Inv Savings (3642): Check 101628 Distinctive Investments / From Pangea (Panoramic) |
| 11/14/06 | 2,940,000 | MISUSE: Pangea (3074) to BM Escrow (4365) to Dist-Inv Savings (3642) |
| 12/07/06 | 6,950,000 | MISUSE: Pangea (3074) to BM IOLA Escrow (4365) to Dist-Inv Savings (4365) |
| 12/19/06 | 245,000 | MISUSE: Pangea (3074) to BM IOLA Escrow (4365) to Dist-Inv Checking (1665) |
| 01/31/07 | 300,000 | MISUSE: Pangea (3074) to Dist-Inv Checking (1665) |
| 02/27/07 | 350,000 | MISUSE: Pangea (3074) to Dist-Inv Checking (1665) |
| 03/30/07 | 348,000 | MISUSE: Pangea (3074) to Dist-Inv Checking (1665) |
| 05/01/07 | 348,000 | MISUSE: Pangea (3074) to Dist-Inv Checking (1665) |
| 06/04/07 | 348,000 | MISUSE: Pangea (3074) to Dist-Inv Checking (1665) |
| 10/22/07 | 260,000 | MISUSE: Pangea (3074) transfer to BM IOLA Escrow (4365) withdrawn as a fake deposit from a l |
| 04/07/08 | 250,000 | MISUSE: Pangea (3074) to BM IOLA Escrow (4365) to Trimont Real Estate |
| 01/26/09 | (199,150) | MISUSE: Diversified Fund VPB (760) to BM IOLA Escrow (4365) to $192,500 deposited in CHASE ( |
| 01/29/09 | (517,869) | MISUSE: Pangea (3074) to BM IOLA Escrow (4365) $250K withdrawn to BM Escrow (4498) as a |
| 02/03/09 | 328,000 | MISUSE: Pangea (3074) to BM IOLA Escrow (4365) |
| 02/04/09 | (327,980) | Returned MISUSE: BM IOLA Escrow (4365) to Pangea (3074) |

MAZARS

Case 19-2413, Document 11, 08/08/2019, 2628105, Page129 of 197

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

## 2. Management Fees Calculation - Estimate

| Calculation of the Management Fees | | | | | | |
|---|---|---|---|---|---|---|
| Period | Diversified Global Investments | | The Masters Global Fund | | Horizon Millennium Investments | |
| | Ending Balance | Calculated Management Fee (0.375% on the ending balance) | Ending Balance | Calculated Management Fee (0.375% on the ending balance) | Ending Balance | Calculated Management Fee (0.375% on the ending balance) |
| Q1 2007 | $  28,778,888 | $  107,921 | $  - | $  - | $  - | $  - |
| Q2 2007 | 38,963,752 | 146,114 | - | - | 5,767,064 | 21,626 |
| Q3 2007 | 37,143,262 | 139,287 | - | - | 5,020,772 | 18,828 |
| Q4 2007 | 38,681,246 | 145,055 | 158,435 | 594 | 5,055,744 | 18,959 |
| Total 2007 | | 538,377 | | 594 | | 59,413 |
| Q1 2008 | 27,585,349 | 103,445 | 1,232,312 | 4,621 | 6,139,327 | 23,022 |
| Q2 2008 | 24,219,926 | 90,825 | 1,357,774 | 5,092 | 6,203,232 | 23,262 |
| Q3 2008 | 16,158,603 | 60,595 | 1,356,699 | 5,088 | 6,253,911 | 23,452 |
| Q4 2008 | 1,333,697 | 5,001 | 1,148,595 | 4,307 | 6,157,467 | 23,090 |
| Total 2008 | | 259,866 | | 19,108 | | 92,827 |
| Q1 2009 | 1,934,639 | 7,255 | 1,149,635 | 4,311 | 6,158,141 | 23,093 |
| Q2 2009 | 682,145 | 2,558 | 1,148,745 | 4,308 | 6,125,827 | 22,972 |
| Q3 2009 | 898,564 | 3,370 | 1,148,689 | 4,308 | 6,156,178 | 23,086 |
| Q4 2009 | 1,078,000 | 4,042 | 1,148,669 | 4,308 | 7,260,639 | 27,227 |
| Total 2009 | | 17,225 | | 17,234 | | 96,378 |
| Q1 2010 | 961,202 | 3,605 | 1,149,063 | 4,309 | 7,113,106 | 26,674 |
| Q2 2010 | 483,197 | 1,812 | 1,077,263 | 4,040 | 7,112,697 | 26,673 |
| Q3 2010 | 563,876 | 2,115 | 1,077,263 | 4,040 | 4,912,697 | 18,423 |
| Q4 2010 | 687,870 | 2,580 | 1,077,263 | 4,040 | 4,912,697 | 18,423 |
| Total 2010 | | 10,111 | | 16,428 | | 90,192 |
| Q1 2011 | 733,741 | 2,752 | 1,077,263 | 4,040 | 4,912,697 | 18,423 |
| Q2 2011 | 728,382 | 2,731 | 852,906 | 3,198 | 4,912,697 | 18,423 |
| Q3 2011 | 554,955 | 2,081 | 852,906 | 3,198 | 5,206,640 | 19,525 |
| Q4 2011 | 645,519 | 2,421 | 739,890 | 2,775 | 5,206,640 | 19,525 |
| Total 2011 | | 9,985 | | 13,211 | | 75,895 |
| Total 2007 to 2011 | | $   835,563 | | $   66,575 | | $   414,706   $   1,316,844 |

MAZARS

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

## 3. Incentive Fees Calculation - Estimate

**Incentive fees Calculation**

| Year | Diversified Global Investments | | The Masters Global Fund | | Horizon Millennium Investments | | |
|------|---|---|---|---|---|---|---|
| | Calculated Profit/Loss | Calculated Incentive Fees (20% of Calculated Net Profit) | Calculated Profit/Loss | Calculated Incentive Fees (20% of Calculated Net Profit) | Calculated Profit/Loss | Calculated Incentive Fees (20% of Calculated Net Profit) | |
| 2007 | $ 7,493,418 | $ 1,498,684 | - | - | - | - | |
| 2008 | (21,845,899) | n/a | - | - | - | - | |
| 2009 | 495,763 | 99,153 | - | - | 987,697 | 197,539 | |
| 2010 | 151,147 | 30,229 | - | - | - | - | |
| 2011 | (42,351) | n/a | (15,017) | n/a | 1,293,943 | 258,789 | |
| **Total** | | $ 1,628,066 | | $ - | | $ 456,328 | $ 2,084,394 |

7

**M☀ MAZARS**

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

## 3. Incentive Fees Calculation - Details

| DATE | 04 - Citibank/Smith Barney/Morgan Stanley - Horizon Global Investments LP - Horizon Research Portfolio (3890024C13) | 05 - Citibank/Smith Barney/Morgan Stanley - Horizon Global Investments LP - Horizon Large Cap Value (3890023C15) | 06 - Kinetics Hedge Fund | 08 - Morgan Stanley Masters Global Fund Account | 10 - Millennium USA Hedge Fund | Description |
|---|---|---|---|---|---|---|
| 01/31/07 | 11,185 | 9,608 | - | - | - | Citibank Global Markets HGI Accounts: Reinvestments (dividends, etc) |
| 01/31/07 | 160,702 | 53,160 | - | - | - | Citibank Global Markets HGI Accounts: Unrealized P&L |
| 02/28/07 | 35,980 | - | - | - | - | Citibank Global Markets HGI Accounts: Realized P&L |
| 02/28/07 | 17,376 | 6,717 | - | - | - | Citibank Global Markets HGI Accounts: Reinvestments (dividends, etc) |
| 02/28/07 | 38,432 | (324,579) | - | - | - | Citibank Global Markets HGI Accounts: Unrealized P&L |
| 03/30/07 | 29,596 | 11,580 | - | - | - | Citibank Global Markets HGI Accounts: Reinvestments (dividends, etc) |
| 03/30/07 | 359,151 | 314,853 | - | - | - | Citibank Global Markets HGI Accounts: Unrealized P&L |
| 04/30/07 | 10,680 | 6,749 | - | - | - | Citibank Global Markets HGI Accounts: Reinvestments (dividends, etc) |
| 04/30/07 | 762,956 | 538,460 | - | - | - | Citibank Global Markets HGI Accounts: Unrealized P&L |
| 05/11/07 | - | - | - | - | - | Account Interest/Fees |
| 05/30/07 | 13,850 | 16,139 | - | - | - | Citibank Global Markets HGI Accounts: Reinvestments (dividends, etc) |
| 05/30/07 | 589,105 | 1,015,404 | - | - | - | Citibank Global Markets HGI Accounts: Unrealized P&L |
| 06/29/07 | - | - | - | - | - | Account Interest/Fees |
| 06/30/07 | - | 447 | - | - | - | Citibank Global Markets HGI Accounts: Realized P&L |
| 06/30/07 | 41,679 | 37,320 | - | - | - | Citibank Global Markets HGI Accounts: Reinvestments (dividends, etc) |
| 06/30/07 | 91,353 | (50,891) | - | - | - | Citibank Global Markets HGI Accounts: Unrealized P&L |
| 07/31/07 | 766,203 | 1,310,069 | - | - | - | Realized P&L |
| 07/31/07 | 10,513 | 14,761 | - | - | - | Reinvestments (dividends, etc) |
| 07/31/07 | (1,792,663) | (1,546,407) | - | - | - | Unrealized P&L |
| 08/31/07 | - | - | 418,986 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 08/31/07 | 98,993 | - | - | - | - | Realized P&L |
| 08/31/07 | 2,053 | 8,048 | - | - | - | Reinvestments (dividends, etc) |
| 08/31/07 | (206,583) | - | - | - | - | Unrealized P&L |
| 09/30/07 | - | - | 3,331,808 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 09/30/07 | 24 | 17 | - | - | - | Reinvestments (dividends, etc) |
| 10/31/07 | - | - | 3,348,443 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 10/31/07 | 25 | 17 | - | - | - | Reinvestments (dividends, etc) |
| 11/30/07 | - | - | (2,593,484) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 12/31/07 | - | - | 525,583 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 01/31/08 | - | - | (6,050,358) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 02/29/08 | - | - | (1,596,091) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 03/31/08 | - | - | (1,815,968) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 04/30/08 | - | - | 2,853,537 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 05/30/08 | - | - | 966,371 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 06/30/08 | - | - | (4,410,765) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 07/30/08 | - | - | (2,072,818) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 08/31/08 | - | - | (132,309) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 09/30/08 | - | - | (5,821,542) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 10/31/08 | - | - | (2,642,906) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |

MAZARS

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

## 3. Incentive Fees Calculation - Details

| DATE | 04 - Citibank/Smith Barney/Morgan Stanley - Horizon Global Investments LP - Horizon Research Portfolio (3890024C13) | 05 - Citibank/Smith Barney/Morgan Stanley - Horizon Global Investments LP - Horizon Large Cap Value (3890023C15) | 06 - Kinetics Hedge Fund | 08 - Morgan Stanley Masters Global Fund Account | 10 - Millennium USA Hedge Fund | Description |
|---|---|---|---|---|---|---|
| 11/30/08 | - | - | (1,126,736) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 12/31/08 | - | - | 3,686 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 01/31/09 | - | - | (121,639) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 02/28/09 | - | - | (116,297) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 03/31/09 | - | - | 177,893 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 04/30/09 | - | - | 249,696 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 05/30/09 | - | - | 114,897 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 06/30/09 | - | - | (13,230) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 07/31/09 | - | - | 75,025 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 08/31/09 | - | - | 42,656 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 09/30/09 | - | - | 66,337 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 10/31/09 | - | - | (52,616) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 11/30/09 | - | - | 50,375 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 12/31/09 | - | - | 22,666 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 12/31/09 | - | - | - | - | 987,697 | Millennium USA LP Investment unrealized gain per Deloitte 2009 audit |
| 01/31/10 | - | - | (59,120) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 02/28/10 | - | - | 36,839 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 03/31/10 | - | - | 84,419 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 04/30/10 | - | - | 63,987 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 05/31/10 | - | - | (144,932) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 06/30/10 | - | - | (34,719) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 07/31/10 | - | - | 32,198 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 08/31/10 | - | - | (28,932) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 09/30/10 | - | - | 77,413 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 10/31/10 | - | - | 60,070 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 12/31/10 | - | - | 63,924 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 03/31/11 | - | - | 45,871 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 06/30/11 | - | - | (5,359) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 07/15/11 | - | - | - | - | 1,293,943 | Millennium USA LP Investment gain |
| 09/30/11 | - | - | (173,427) | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 12/31/11 | - | - | 90,564 | - | - | Kinetics Institutional Partners - Investment Gains (Losses) |
| 12/31/11 | - | - | - | (15,017) | - | Unrealized loss on Investments |

| | | | | | |
|---|---|---|---|---|---|
| 2007 | 1,040,610 | 1,421,471 | 5,031,336 | - | - |
| 2008 | - | - | (21,845,899) | - | - |
| 2009 | - | - | 495,763 | - | 987,697 |
| 2010 | - | - | 151,147 | - | - |
| 2011 | - | - | (42,351) | (15,017) | 1,293,943 |

9

MAZARS

Case 19-2413, Document 11, 08/08/2019, 2628105, Page133 of 197

Case 19-2413 Document 11 08/08/2019 2628405 Page 134 of 197

# MICHAEL KUPKA, CPA/ABV/CFF, CFE, CVA

**Practice Leader – Mazars USA**
Forensic Accounting and Dispute Resolution Services

Michael possesses over 18 years of forensic and public accounting experience with a specialty in complex business, commercial, criminal and multi-party matters including:

- contractual disputes / economic damages,
- insurance claims,
- white-collar criminal defense,
- business valuations / impact of wrong data,
- matrimonial matters,
- bankruptcies and restructuring,
- partnership disputes,
- fraud examinations,
- internal controls,
- mergers and acquisitions, and
- reconstruction of records.

He has been involved in hundreds of engagements for clients ranging from Fortune 500 companies to small entrepreneurial businesses in a variety of industries. Currently, Michael is the managing director of the Forensic Accounting and Dispute Resolution Department at Mazars USA.

| | |
|---|---|
| **LICENSES & CERTIFICATIONS** | **CPA** - Certified Public Accountant (2003). |
| | **CFE** - Accredited as a Certified Fraud Examiner by the Association of Certified Fraud Examiners (2003). |
| | **CVA** - Accredited as a Certified Valuation Analyst by the National Association of Certified Valuation Analysts (2005). |
| | **ABV** - Accredited in Business Valuation by the American Institute of Certified Public Accountants (2010). |
| | **CFF** - Accredited as a Certified Financial Forensic Accountant by the American Institute of Certified Public Accountants (2011). |
| **EDUCATION** | Schulich School of Business, York University - Bachelor of Business Administration, Accounting and Finance (2000). |
| **MEMBERSHIPS** | Member of the American Institute of Certified Public Accountants. |
| | Member of the Association of Certified Fraud Examiners. |
| | Member of the National Association of Certified Valuators and Analysts. |
| | Board Member of the Association of Insolvency and Restructuring Advisors. |
| **PROFESSIONAL HISTORY** | Mazars USA (formerly WeiserMazars), Forensic Accounting and Dispute Resolution Services, New York, NY (2014-Present). |
| | Citrin Cooperman and Company, Valuation and Forensic Services, New York, NY (2007 – 2014). |
| | DelBrocco and Associates, Assurance and Consulting Services, Memphis, TN (2005 –2007). |
| | MJC Forensic Accountants (formerly RGL Forensics), Forensic Accounting Services, Nashville, TN (2003 – 2005). |
| | A. Neuman Associates, Forensic and Investigative Accounting Services, Toronto, ON (2000 – 2003). |

**MAZARS**

Mazars USA LLP is an independent member firm of Mazars Group.

| | |
|---|---|
| PUBLICATIONS AND SPEAKING ENGAGEMENTS (LAST FOUR YEARS) | • "*Fraud Prevention and Detection Tools*"; Webinar – WeiserMazars; (*August 2015*).<br>• "*Troubled Asset Relief Program*"; Speaker – New York Bar Association – Consumer Affairs Committee; (*April 6, 2016*).<br>• "*How to Defeat Charges of Accounting Frauds*"; Speaker - 2016 Fraud Seminar for CPAs 22nd Annual NJ Accounting Show; (*May 2016*).<br>• "Are your Prepared? New York State Issues New BSA/AML/OFAC Transaction Monitoring and Filtering Program Regulation (Part 504)"; Article – Financial Advisory Services Alert WeiserMazars; (*July 2016*).<br>• "*Fraud Issues in Consumer Products*"; Webinar – WeiserMazars; (*August 2016*).<br>• "*Occupational Fraud: There's a good chance you're a victim*"; Article – Insights/Ledger WeiserMazars; (*October 2016*).<br>• "*Fraud in Non-for-Profit Industry*"; Speaker - New York State Society of CPAs; (*December 2016*).<br>• "*Split-up Season: The Tope 10 guide to Divorce*"; Article – Insights/Ledger WeiserMazars; (*December 2016*).<br>• "F for fraud" by Claude Solnik; Long Island Business News; (*February 2017*).<br>• "Addressing the Issue of Occupational Fraud at Your Not-For-Profit Organization"; Article – Insights/Ledger Mazars; (*April 2017*).<br>• "Forensic Accounting and Litigation: Tools and Strategies for 2017 and Beyond"; The Knowledge Group; (*October 2017*).<br>• "Culture of Compliance"; Speaker – Financial Services Symposium Panelist; (*October 2017*).<br>• "Whistleblowers: A Path to Combatting Fraud"; Article – Ledger Mazars; (*December 2017*).<br>• "Forensic Accounting"; Speaker – Hunter College (Accounting Society); (*March 2018*).<br>• "Using Experts Before, During and After the Trial"; Speaker – City Bar Matrimonial Law Committee; (*September 2018*).<br>• "The Art of Cross-Examining the Valuation Expert"; Speaker – Panelist Illinois Institute for Continuing Legal Education; (*January 2019*). |
| TESTIFYING ENGAGEMENTS (LAST FOUR YEARS) | Trial Testimony, Laurie A Uher v. Gary R. Uher, **Supreme Court of the State of New York, County of Westchester** (March 2015).  Nature of the Testimony: True Economic Income.<br><br>Deposition, Olympic Ice Cream Co., Inc. et al. v Brian R. Heitner et al. **Supreme Court of the State of New York, County of Queens (**November 2016). Nature of the Testimony: Partnership Dispute.<br><br>Bankruptcy Court Testimony, Novapro Holdings, LLC, et al., v. U.S. Risk Insurance Group, Inc., et al., **United States Bankruptcy Court, for The District of Delaware** (October 2017).  Nature of the Testimony: Reconstruction of Records, Business Insolvency and Fraudulent Conveyances.<br><br>Expert Testimony Arbitration, Fifth Quadrant Analytics, LLC, et al., v. Richard Donavan., et al., **American Arbitration Association,** New York, NY (March 2018).  Nature of the Testimony: Partnership Dispute and Reconstruction of Records.<br><br>Deposition, Rose Ann Paguirigan, individually and on behalf of all others similarly situated v. Prompt Nursing Employment Agency LLC d/b/a Sentosa Services, et al., **United States District Court, Eastern District of New York** (June 2018). Nature of the Testimony: Employment Contractual Dispute.<br><br>Expert Testimony Arbitration, Joseph Caracappa v. Albert Gallo, **American Arbitration Association,** New York, NY (July 2018).  Nature of the Testimony:  Shareholder Dispute/Buy-out provisions. |
| OTHER | Fiduciary with the New York State's Office of Court Administration – Appointed by Supreme Court of the State of New York to conduct forensic audit and accounting. |

M MAZARS

Mazars USA LLP is an independent member firm of Mazars Group.

EXHIBIT J



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

---

*610 Federal Plaza*
*Central Islip, New York 11722-4454*

September 13, 2017

By Hand and ECF

The Honorable Arthur D. Spatt
Senior United States District Judge
United States District Court
Eastern District of New York
1020 Federal Plaza
Central Islip, New York 11722

> Re:   United States v. Brian Callahan
> Criminal Docket No. 13-453 (ADS)

Dear Judge Spatt:

The government writes in connection with the sentencing of the defendant Brian Callahan, which is scheduled for September 15, 2017.

For approximately seven years, the defendant abused his position of trust as an investment advisor to convince dozens of unsuspecting investors to part with their hard-earned money for what they believed were strong, well-performing investments. In reality, the defendant was running a Ponzi scheme. He used investor monies to pay redemptions to prior investors, to pay himself approximately $6 million, and to fund his personal investment in the Panoramic View, a cooperative development in Montauk. Rather than using his own money to acquire and develop the Panoramic, the defendant used investor monies, unbeknownst to them, without their approval and directly contrary to how he told them that their monies would be invested. The defendant went to great lengths to execute his fraud. He lied to investors. He lied to the auditors. And he lied to the bank. He also employed every trick in the fraudster book. He created completely fake documents. He forged people's signatures. And he even stole a person's identity. In the end, the defendant caused victims to lose approximately $19.7 million. For this, the defendant argues that a fair and just sentence is a sentence of no more than a year and a day. That is ridiculous. For the reasons set forth below, a fair and just sentence is a sentence within the applicable Guidelines range of 151 to 188 months.

2

PRESENTENCE INVESTIGATION REPORT ("PSR")

The United States Probation Department ("Probation") prepared and submitted the PSR on December 16, 2015.  Probation concluded that the defendant's advisory Guidelines offense level was 40 and he was a criminal history category I, resulting in a range of imprisonment of 292 to 365 months.  (PSR ¶¶ 45-57, 90.)  This offense level was calculated using a base offense level of seven (U.S.S.G. § 2B1.1(a)(1)), adding twenty-six levels because the defendant intended to cause more than $100 million in losses (U.S.S.G. § 2B1.1(b)(1)(N)), adding two levels because the defendant victimized ten or more people (U.S.S.G. § 2B1.1(b)(2)(A)), adding four levels because the defendant was an investment advisor (U.S.S.G. § 2B1.1(b)(17)(A)(iii)), adding two levels because the defendant and his crew employed sophisticated means (U.S.S.G. § 2B1.1(b)(10)), adding two levels for being an organizer, leader, manager or supervisor (U.S.S.G. § 3B1.1(c)), and subtracting three levels for timely acceptance of responsibility (U.S.S.G. §§ 3B1.1(a), (b)).  (PSR ¶¶ 45-57.)

The government only has one objection to that calculation.  The government believes that the loss that the defendant caused is approximately $19.7 million, resulting in a 20-level increase (§ 2B1.1(b)(1)(K)).

The defendant has three objections to Probation's calculation.  First, he argues that there is no loss, or at most there is $2.7 million, which would result in a 16-level increase (§ 2B1.1(b)(1)(I)).  (Def. Mem. at 29-40.)  Second, he claims that he was not an investment advisor, despite that he was paid handsomely to manage investors' monies.  (Id. at 40.)  Third, he objects to the aggravating role enhancement for organizing, leading, managing and supervising his coconspirator, Adam Manson.  (Id. at 40-41.)  For the reasons set forth below, those arguments lack merit.

The government thinks it would be helpful to provide a chart detailing the differences between Probation's, the government's and the defendant's Guidelines calculations.

|  | **Probation** | **Government** | **Defendant** |
|---|---|---|---|
| Base offense level (U.S.S.G. § 2B1.1(a)(1)) | 7 | 7 | 7 |
| Plus: loss (U.S.S.G. § 2B1.1(b)(1)) | 26 | 20 | 0 or 16 |
| Plus: more than 10 victims (U.S.S.G. § 2B1.1(b)(2)(A)) | 2 | 2 | 2 |
| Plus: investment advisor (U.S.S.G. § 2B1.1(b)(17)(A)(iii)) | 4 | 4 | 0 |
| Plus: sophisticated means (U.S.S.G. § 2B1.1(b)(10)) | 2 | 2 | 2 |
| Plus: leadership role (U.S.S.G. § 3B1.1(c)) | 2 | 2 | 0 |
| Less: acceptance of responsibility (U.S.S.G. §§ 3B1.1(a), (b)) | <3> | <3> | <3> |
| *Adjusted Offense Level* | 40 | 34 | 9 or 24 |

Case 19-2413, Document 11, 08/08/2019, 2628105, Page139 of 197

3

| *Guidelines Range* | 292-365 months | 151-188 months | 4-10 months or 51-63 months |
|---|---|---|---|

Before discussing the merits of the defendant's objections to Probation's Guidelines calculation, the government wants to address two footnotes in the defendant's sentencing memorandum. In those footnotes, the defendants states that the PSR's description of the offense conduct is factually inaccurate in "many respects." (Def. Mem. at 29 n. 4, 40 n. 13.) He does not specify which facts Probation purportedly got wrong. He asserts that the Court need not decide these factual issues in fashioning a sentence. (Id.) The government respectfully disagrees. Either the defendant should raise a specific objection to the factual description in the PSR and we can have a Fatico hearing to decide the issue, or the defendant waives those objections and the Court can adopt the facts contained in the PSR.

1. Loss

Probation holds the defendant accountable for all the money that he took from investors—more than $100 million--on the theory that he was running a Ponzi scheme and therefore intended to cause that much loss. (PSR ¶ 39.) While that theory is viable, the government has decided to take a more conservative approach and will use the actual loss that the defendant caused. After giving the defendant credit for (1) net proceeds from the sales of the Panoramic and 47 Clock Tower, (2) investor monies recovered by the Receiver in the SEC action, (3) any legitimate market losses and (4) redemptions paid to investors, the government concluded that the defendant caused $19.7 million in loss--this is for Guidelines purposes only, the amount of restitution is $67.6 million. The government calculated the actual loss as follows:

| Total money received from investors | $140.6 million |
|---|---|
| Redemptions paid to prior investors | $74 million |
| Monies recovered by the Receiver | $6.4 million |
| Net proceeds from sale of 47 Clock Tower | $139 thousand |
| Net proceeds from the sale of the Panoramic | $40.3 million |
| *Actual Loss* | $19.7 million |

Because the defendant's fraudulent conduct cause $19.7 million, his offense level should be increased by 20 levels. See U.S.S.G. § 2B1.1(b)(1)(K).

The defendant's arguments regarding loss miss the mark. First, he argues that legitimate market losses caused investor loss. He is wrong. The government has reduced the loss listed above for any legitimate market losses. The defendant references a loss in the Kinetics fund. The government agrees that there was a $15 million loss in the Kinetics fund, but that loss was directly caused by the defendant's fraud, namely, the defendant caused this

loss when he illegally diverted funds from the Kinetics fund into the Panoramic View without investors' approval. This was not a legitimate business loss.

The investors in the Kinetics fund only gave the defendant authorization to put their monies in the Kinetics fund. They did not authorize the defendant to remove money from that fund for any other purpose, and they certainly did not consent to the defendant misappropriating their investment for a real estate venture. But the defendant did not care. He needed the money for the Panoramic. Specifically, Panoramic's lender demanded several million dollars, otherwise it was going foreclose on the Panoramic. Manson and the defendant obviously did not want this to happen. So, the defendant illegally removed millions of dollars from the Kinetics fund causing significant losses. Significantly, if the defendant had not improperly and illegally removed investor monies from the Kinetics fund at that time and left the monies in those funds as he was required to do, investors would have lost nothing. The Kinetics fund wound up increasing in value after the defendant illegally diverted investor monies. The losses suffered in this fund were plainly caused by the defendant's illegal diversion of investor monies, not a legitimate business loss.

The defendant's argument that market forces and the government caused the sales price of the Panoramic to be lower than it should have been is baseless. (Def. Mem. at 34.) First, the defendant's argument is completely speculative and unsupported by any facts.

Second, because of the government's efforts, investors are going to receive $2 million more than the defendant diverted to the Panoramic. Specifically, the defendant illegally diverted approximately $38 million of investor monies to the Panoramic. The government recovered approximately $40.3 million from the sale of the Panoramic. As a result of the government's tremendous work, investors will recoup $40.3 million or $2 million more than the $38 million that the defendant diverted. Accordingly, the defendant's criticism of the government's efforts falls flat.

The government's efforts to sell the Panoramic were strong. Indeed, the government received inquiries from more than 50 potential buyers and received several offers. The government's marketing efforts didn't depress the sales prices. To the extent there was such a depression, perhaps it was due to the fact that the property was under the clould of a Ponzi scheme, which was no doubt the defendant's, not the government's, doing.

Additionally, the net proceeds from the sale would have been higher if the defendant and Manson did not stop paying the mortgage. Because the defendant stopped paying the mortgage, the property accrued substantial late fees and defaults fees. Those fees, which were caused by the defendant and Manson, reduced the monies that will be returned to the investors.

The defendant argues that he did not operate a Ponzi scheme. (Def. Mem. at 22-27.) That argument is inconsistent with the facts. The defendant correctly states the law explaining that in Ponzi schemes, a defendant typically uses subsequent investors' monies to pay redemptions to prior investors. (Id. at 22.) That is exactly what occurred here. Moreover,

the defendant identified some other conduct indicative of a Ponzi scheme, including the falsification of records to conceal losses and to attract new investors, and the use of investors' funds to finance a lavish lifestyle. (Id.) Again, that is exactly what happened here. As set forth below, the defendant created numerous fictitious documents to conceal losses, to conceal that he used investor monies to pay redemptions and to fund his Panoramic venture. As a result of his deception, he successfully convinced investors not to withdraw their investments and to invest additional funds. And the defendant paid himself handsomely to fund a lavish lifestyle. He paid himself approximately $6 million, which he used to purchase luxury homes in Old Westbury and Westhampton, to pay for luxury cars, including a Range Rover and a BMW, and to pay large credit card bills and dues associated with his golf club.

To be clear, when the defendant diverted investor monies to the Panoramic, he did so out of self-interest because he had a 50% ownership interest in the Panoramic and stood to gain if the units were sold for a profit. Investors had no idea that their money was going to be invested in this property and never gave the defendant permission to do this. The defendant's diversion of these funds was criminal. Making matters worse, if that is possible, is that the investor monies were not secured by the property or units at the property. So, investors provided the money to acquire and develop the Panoramic, bore all the risk, and had none of the upside.

The defendant further argues that the Guidelines generate unreasonable results based on the loss-driven formula and applicability of numerous enhancements in U.S.S.G. § 2B1.1. (Def. Mem. at 41-44.) While courts may have discretion to impose a non-Guidelines sentence in light of their policy disagreement with a Guideline or a disagreement with the results of an application of § 2B1.1 to a particular fraud defendant, it is also proper for a court to decline to deviate from the Guidelines range after consideration of the § 3553(a) factors, especially in a case such as this one, where a defendant does not present a compelling reason for departure. In light of the defendant's crime, where he lied to dozens of victims, auditors and to a bank, where he profited considerably, and where he caused almost $20 million in loss, the Court should decline to depart from the Guidelines range.

Accordingly, because the loss amount calculated here is conservative and does not overstate the harm caused by the defendant's fraudulent scheme, a Guidelines sentence is warranted.

2. Investment Advisor

Next, the defendant argues that the investment advisor enhancement does not apply because he falsely claims that he was not compensated by the Montauk Fire Department ("MFD") in connection with the advice that he provided. (Def. Mem. at 40.) This argument is patently false. First, in a different part of his sentencing memorandum concedes that he was paid more than $5 million for managing investors' monies. (Def. Mem. at 27.) How the defendant can now claim that he was not compensated for providing investment advice is puzzling. Perhaps, the defendant is attempting to limit his fraud to the MFD, but that argument fails because it obviously ignores the fact that he is responsible for all the relevant conduct,

Case 19-2413 Document 11 08/08/2019 2628105 Page 142 of 197

6

including all of his other victims. He cannot limit the investment advisor enhancement, or any Guidelines enhancement, to just the one victim.

However, even if he did, his argument still fails because he always intended to be compensated to manage the MFD's money—this was not a charitable endeavor. Indeed, the offering memorandum that the defendant provided to the MFD stated that the defendant would be paid an annual management fee of 1% of net assets under control. (See Government's Letter to U.S. Probation Officer Lisa Langone, dated February 1, 2017, Exh. 20.) Not only was the plan to pay himself for managing the MFD's investment, he actually paid himself after the MFD invested. While the MFD had money under management with the defendant, the defendant compensated himself.

For those reasons, Probation correctly concluded that the defendant was investment advisor, resulting in a four-level increase in the defendant's offense level. (PSR ¶ 48.)

3. <u>Aggravating Role</u>

Finally, the defendant contends that an aggravating role enhancement is not warranted because he did not organize, lead, manage or supervise Adam Manson or any other participants. (Def. Mem. 40-41.) He claims that he and Manson are equally culpable. (<u>Id</u>.) That argument is also without merit.

Although the defendant did not organize, lead, manage or supervise the bank fraud of Barclays, he certainly played a leadership role in defrauding the auditors. To prevent the auditors from uncovering his fraud, he enlisted Manson's help. The defendant then directed Manson to complete various documents, including audit confirmations and closing statements, and to hide their familial relationship from the auditors. There are numerous examples of this, some of which are detailed in the government's February 1, 2017 submission. (<u>See, e.g.</u>, pp. 14-18 (iii), (iv), (v), (vi), (vii), (xi), (xiv).)

Hiding their relationship was necessary, because if this information had been disclosed, the auditors would have scrutinized the investment in the Panoramic View and may have uncovered that the defendant had a 50% ownership interest in the property. This revelation would have been devastating (and likely would have put an end) to the defendant's fraudulent scheme. The auditors would have learned that the defendant diverted investor monies to fund an investment (the Panoramic View) that was solely to benefit the defendant and Manson, not the investors. As set forth above, according to the defendant, investors were only going to receive interest on the monies he diverted to the Panoramic; they were not going to get a share of the profits from the sales of the units. And they bore all the risk.

The defendant also directed and coached Manson to hide the familial relationship from the auditors because he did not want the auditors to learn investor monies were unsecured. He had falsely told the auditors that the investments were secured and there were no other debts associated with the Panoramic, both of which were lies.

Case 19-2413 Document 11 08/08/2019 2628105 Page 143 of 197

7

Accordingly, because the defendant organized, managed, led and supervised Manson in connection with their scheme to defraud the auditors, Probation correctly applied a two-level aggravating role enhancement.

\* \* \*

In sum, the defendant's adjusted offense level is 34, resulting in a Guidelines range of imprisonment of 151 to 188 months.

<u>ARGUMENT</u>

<u>THE SECTION 3553(A) FACTORS WEIGH TOWARDS A GUIDELINES SENTENCE</u>

As the Court knows, the advisory Guidelines are merely one step in the process of fashioning an appropriate sentence. The Court must consider the factors listed in 18 U.S.C. § 3553(a) in determining the defendant's sentence. <u>Gall v. United States</u>, 552 S.Ct. 586, 596 (2007). That section directs a court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the need for the sentence imposed:

> (A)     to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense;

> (B)     to afford adequate deterrence to criminal conduct;

> (C)     to protect the public from further crimes of the defendant; and

> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Here, the extremely serious nature of the offense, the need for deterrence, the history and characteristics of the defendant, the need to promote respect for the law and to provide just punishment warrants a Guidelines sentence.

   A.  <u>The Nature and Circumstances of the Offense (18 U.S.C. §  3553(a)(1))</u>

Section 3553(a) requires the Court to consider "the nature and circumstances of the offense" and to impose a sentence that "reflect[s] the seriousness of the offense." 18 U.S.C. §§ 3553(a)(1) and (a)(2)(A). Consideration of those factors strongly suggest that a strict sentence is appropriate.

Case 2:19-2413 Document 11 08/08/2019 2628105 Page 144 of 197

8

The seriousness of the offense speaks for itself: the defendant inflicted financial harm on dozens of investors. In total, investors lost approximately $19.7 million. Loss does not end the inquiry. Indeed, all the other objective metrics demand a significant sentence.

First, the defendant's role in the fraud demands a Guidelines sentence. He was the mastermind behind the fraud. He started the fraud. He solicited investments. And he repeatedly lied to investors, the auditors and the bank. As set forth above, he also held a supervisory position.

Second, the length of the fraud further warrants a substantial sentence. The defendant committed the fraud over the course of seven years. The defendant did not have a one time lapse in judgment. He made a daily decision to deceive investors for almost seven years.

Third, the defendant told many lies during his fraudulent scheme. For example, he repeatedly told victims that their monies would be placed in a certain type of investment, but then used those monies for a completely different, unapproved purpose, including to pay redemptions and to fund his personal investment in the Panoramic. (PSR ¶¶ 21-28.) He also falsely told investors that their investments had appreciated when, in fact, they had not. (Id. ¶ 24.)

Moreover, to conceal his misappropriation of investor funds, he also lied to the auditors. (PSR ¶¶ 25-28.) For example, he told the auditors that the Panoramic did not have any other debt associated with it, despite that there was a loan with Barclays. (Id. ¶ 26.) The defendant falsely claimed that the proceeds from the sale of units at Panoramic would go directly to investors, when he knew that was untrue because those proceeds would be used to pay the Barclays loan.

The defendant also told numerous lies to Barclays and participated in several fictitious straw transactions designed to deceive the bank. (PSR ¶ 29-35.) The defendant's fraud was extensive.

Fourth, the deceitful tactics that the defendant used to carry out the fraud further warrants a significant punishment. He created fake documents. He forged people's signatures. And he stole a person's identity to execute his fraud.

The defendant created fake documents to hide his losses, to hide that he was using subsequent investors monies to pay redemptions, among other things. For example, the defendant falsely informed an investor of his account balance, but the investor wanted to proof of that balance. The defendant did not have those monies as he had misappropriated them. Rather than admitting his deceit, the defendant created a fictitious HSBC bank account statement with a balance of approximately $600,000, when in fact there was no money in the account.

He did the same thing with another investor (i.e., created a completely fictitious HSBC bank account statement).

In another example of the defendant's fraudulent ways, the defendant falsely told an investor that he had executed a currency trade that she had asked him to make. To conceal that he had not made that trade, he created a fake HSBC bank account statement making it appear that he had made the trade.

Moreover, for approximately a year, the defendant sent false monthly account statements to the MFD making it appear that he invested the MFD's monies in 12 different funds, when in reality he had diverted the MFD's money to the Panoramic. (PSR ¶ 21.)

As set forth above, the defendant also created fake documents, including fictitious balance sheets, two fictitious letters, and closing statements from the sale of units at the Panoramic, and provided them to the auditors. (PSR ¶ 26.)

Furthermore, the defendant stole a person's identity to hide his misuse of investor monies from the auditors. Specifically, in February 2008, the defendant used $475,000 of investor monies to purchase a minority interest in a company that published archived church sermons, which interest was in the defendant's name. (PSR ¶ 27.) This was a misuse of investor monies because investors did not give the defendant permission to use their money for this purpose. (Id.) To conceal this fact, the defendant falsely told the auditors that this was a loan, not an investment. (Id.) The auditors asked for a contact person from archived church sermon company to verify this. (Id.) Realizing he would be caught if he provided the contact information for a person who actually worked at the company, the defendant decided to steal a person's identity and pretend to be that person. (Id.) He created a fake email account in that person's name and communicated with the auditors pretending to be that person. (Id.) During those communications, the defendant falsely confirmed that this was a loan. (Id.) The defendant also forged documents and provided those forged documents to the auditors. (Id.)

The defendant forged another person's signatures as well. (PSR ¶ 28.) In February 2008, the defendant created a fake promissory note and forged a different person's signature, which he again provided to the auditors. (Id.)

Fifth, another factor demonstrating the seriousness of the fraud warranting a significant sentence is the type of fraud this was. Unlike an accounting fraud, the defendant's fraud was very personal. The defendant had direct contact with his victims. He communicated with them via email. He talked to them over the telephone. He built trust with them and then exploited that trust for personal gain. The defendant's crimes were reprehensible.

Sixth, the defendant did not simply cause financial harm, he also caused intangible consequences that are far less obvious. Indeed, victims explained to the government how the defendant caused them to lose confidence in themselves and their own judgment. They blame themselves for falling victim to the defendant's lies. And they have explained to

us in painstaking detail how this horrible experience has caused them to be less trusting of others.  These intangible consequences are unfortunate and further demonstrate just how serious the instant crimes were.

And last but certainly not least, the harm that the defendant caused to the victims is real and devastating.  The impacted victims are real people whose lives were forever changed by the defendant's crime.  While there is, of course, a difference between the loss of human life and financial loss, that does not mean financial crimes are not serious.  Financial crimes affect victims in very real ways–ways that have enormous effects on their daily lives.  During the course of this investigation, the government talked to the victims and witnessed first-hand how the defendant's conduct irreparably harmed and continues to harm their lives to this very day.  Many victims lost their life savings; some had to put off retirement or came out of retirement; some lost their children's college savings – those kids may have to forgo getting an education, put it off, or drop out of school; and one victim feels tremendous shame because he was incapable of paying for his daughter's wedding.  While a financial crime may not be the equivalent of taking a life, it certainly can and in the instant case, actually did destroy lives and even caused some victims' pre-existing medical conditions to worsen and has caused at least one victim to contemplate suicide.  The Court has received letters from some of those victims giving the Court a glimpse into the effect that the defendant's conduct had on them. Excerpts from some of those letters are detailed below.

Gail Joyan, a retiree who suffers from Tourette Syndrome, spent a lifetime working hard to save money for retirement and entrusted Callahan with $500,000, which represented a "significant portion of her retirement fund." (Exh. 1.)  Within three months, her nest egg was gone. (Id.)  She was forced to rent two rooms in her home to strangers in order to prevent her house from going into foreclosure. (Id.)  This financial strain caused her Tourette Syndrome to worsen. (Id.)  For years, she had the condition under control but then she met the defendant. (Id.)  After the defendant caused her to lose her retirement, "[n]ot a minute has gone by for the last 2 ½ years that my body hasn't been in constant motion due to the ticking my central nervous system produces from the stress placed on it by this unimaginable event.  And I have continued to get sicker. . . . There are days I am unable to eat due to the pain in my face and jaw from the constant tics." (Id.)

The defendant's victimization of the Miskella family also reveals a lot about the defendant and the harm he caused. (Exh. 2.)  John and Denise Miskella are hard-working middle-class people who were looking to build a better life for their children and entrusted their savings to the defendant. (Id.)  As a result of the defendant's fraudulent conduct, Mr. Miskella was forced to go back to work-- it took him 18 months to find a job and the job paid less than 50% of his former job. (Id.)  Worse yet, Mr. Miskella was unable to pay for his daughter's wedding because of the losses he suffered at the defendant's hands.  Mr. Miskella explained how devastating this was:

> My sweet Anna got married in the fall of 2012.  One of the true
> joys of being a father is giving your daughter's hand way in
> marriage and providing a beautiful ceremony and wedding night.

Case 19-2413, Document 11, 08/08/2019, 2628105, Page147 of 197

11

> Well, Mr. Callahan, this is where you inserted a sharp knife deep into the chest of this proud father. My only daughter, my only chance to enjoy this once-in-a lifetime event, and you stole the funds that had been saved for this occasion and selfishly cheated this innocent young lady. You never met Anna but you did hurt her. Of the four children we have, she is the only that knows of your criminal actions. It is too embarrassing to admit our grave miscalculation of your character.

(Id.) Mr. Miskella begged the Court "not [to] let Mr. Callahan destroy the hopes and dreams of others." (Id.)

Another victim, 73-year old Garey Weber, explained how the defendant's fraud had a "devastating" effect on his "personal and family life." (Exh. 3.) As a direct result of the defendant's fraudulent conduct, Mr. Weber was forced to put off retirement. (Id.) He had hoped to retire by now so that he could spend more time with his wife, children and grandchildren but will likely to have work another dozen years. (Id.) Mr. Weber believes that the defendant "has robbed [his] wife and [him] of [their] Golden Years. It is a true travesty." (Id.)

The defendant's criminal conduct caused John Karagiannis to lose $900,000, which represented his life savings. (Exh. 8.) Mr. Karagiannis intended to use these monies for his children's education and for retirement. (Id.) He explained that he has "no hope of being able to recover financially and achieve the goals that we worked on for all of our lives. Needless to say this has caused a lot anguish, turmoil, sadness and any other negative emotion you can imagine to me and my family." (Id.) Mr. Karagiannis asked the Court to impose the statutory maximum penalties because although it "will not repair the damage done to all of us, [] at least it will possibly save other future possible victims and perhaps discourage others that would like to follow in Brian's and Adam's footsteps." (Id.)

Janice Witt, a 61-year-old small business owner, was not one of the biggest investors but the losses hit her particularly hard. (Exh. 4.) She lost $45,000, which represented a significant portion of her wealth and will take her three to four years to earn back. (Id.) Ms. Witt astutely pointed out that prior to committing the instant fraud, the defendant had his license taken away for "misbehavior." (Id.) She asked the Court to impose the maximum prison sentence "not because it will repair the emotional and financial damage. I ask you to mitigate FUTURE DAMAGES. HE WILL DO THIS AGAIN … He is a destructive predator who cuts a wide swath." (emphasis in original). Rehashing these events brought Ms. Witt to tears. (Id.) Clearly, the defendant's fraudulent ways took a toll on both her financial and emotional well- being. (Id. ("I am heart broken. . . . [T]he biggest crime is my loss of faith in our financial, legal and regulatory system. . . . I am very depressed and scared for my financial future. I have worked very hard to be a productive citizen who contributes to society. I am losing ground. . . . I thought I had processed all the emotions surrounding this misadventure … writing this I am reduced to tears.").)

Case 19-2413, Document 11, 08/08/2019, 2628105, Page 148 of 197

12

The story of Mary Thomajan, one of the defendant's other victims, is truly tragic and is worth emphasizing.  Ms. Thomajan wrote,

> I am a proud person, a person of integrity, I have striven to live a good, responsible and spiritual life, and it is absolutely abhorrent to me to put myself in the position of *victim*—it is humiliating, disempowering and painful to do so, but I acknowledge that I *am* a victim and I write this letter so that justice may be properly served by the court, by you, Judge.
>
> I pray this case does not go the way that so many of these cases do, with deals made and minimum sentences, or worse, no sentences delivered.  There *must* be an end to the countless Ponzi schemes that have destroyed so many lives in the last two decade in America.  It seems like it has become a business model and a badge of courage on Wall Street for these thieves to see how spectacularly they rip off their clients.  The consequences of their crimes are lives destroyed, families and relationships destroyed, productivity, intellectual capital and contribution to society.
>
> When I encountered Brian Callahan, I was 58-years old and single.  I had saved my money for my lifetime and I was on the cusp of my life-dream of opening a Foundation to contribute to and facilitate good works on the planet.
>
> That dream is far behind me now. . . .
>
> Just a few months after investing, I received the letter that the SEC was investigating Mr. Callahan for engaging in a Ponzi scheme.  He had $400,000, which represented my life's savings and retirement.
>
> Instead of moving forward with my plans and dreams, I was forced to sell my home in a depressed market to get enough money to pay the mortgage on the property I had purchased for my foundation.  I put the second property up for sale, but there has been no buyer.  I am forced now to give it back to the bank at a huge loss, as I can no longer pay the mortgage, if I can be assured that they will not come after the few dollars I have left to live on.
>
> As a survival strategy, I moved to Cuenca, Ecuador in order to be able to live on my social security, which is not adequate to cover my expenses and medical needs in America. . . .

I am now 61 years old, I no longer own a home or a car, I am living (renting) in a third world country, I do not have medical insurance and I have one functional eye (congenital defect). . . .

I am emotionally as well as financially devastated. I am in constant fear that I will not be able to take care of myself in the coming years, that I might be blind one day, and I try not to worry but I do not sleep at night with concern for my future… I have to take drugs in order to sleep. (Counseling is too much of a financial luxury for me now). I suffer from depression and anxiety and considered suicide at times, even as a strategy if I run out of money.

I desperately miss my country, my community and friends, and my family.

So here is a victim statement: *Brian Callahan with his calloused malfeasance has robbed my fortune, my dreams, and destroyed my life. He has negatively impacted many other lives as well, because he effectively erased the significant impact my resources might have had on my fellow man in my remaining years.*

Instead of being a proud, intelligent, contributing member of American society in my wisdom years, and living the life of abundance and joy and contribution that I and planned, I am relegated to a marginal existence in Ecuador. Words cannot express my disappointment and grief.

I believe in the laws of compensation, and accountability.

I hope this man is prosecuted to the fullest extent of the law, and I pray for some recovery of the victim's losses. Please, I beg you to *right this wrong*.

(Exh. 5 (italics in original).)

One final investor's letter is worth highlighting. Scott Johanson, a psychologist with a PhD, wrote,

It is important that you understand Brian Callahan's consistent performance in spite of what we now know. He is clearly capable of repeatedly mis-representing his true intentions even though his intentions are anti-social in nature. As a psychologist who previously had an active private practice, I developed the ability to assess the psychological profile of individuals with whom I

worked. I placed some weight upon that ability to form an impression while speaking to Brian Callahan [for approximately 5 hours over three months]. Unfortunately for me, Brian Callahan's ability to mis-represent his true intentions are exceptional. Without data from a psychological assessment, I cannot offer a diagnosis, but I suggest that you consider Brian Callahan to be a socially dangerous person who is likely to continue his pattern of bad behavior when not under supervision.

Brian Callahan's deceit has had a dramatic impact on my financial status. I placed the majority of my retirement funds with Horizon Millennium, as well as one-third of each of my children's trusts that are intended to pay for their higher education. There is no way he can suggest there was a mis-understanding between us as the intent and purpose of the funds that I placed with him. . . .

His behavior showed a clear disregard for social conventions, a failure to exercise moral judgment, and highly organized ability to deceive. He is a very intelligent and skilled person who has repeatedly chosen to use his skills to deceive and defraud other people. It is my understanding that other than pleading guilty to the legal charges, Brian Callahan has not cooperated with the SEC efforts to find and return funds to the investors. Hence, his deceitful behavior continues to this day.

I urge that Brian Callahan be placed in a supervised setting for the rest of his life. This would permit him from using funds that have not been returned to investors and protect society from his poor judgment.

(Exh. 13.)

As these letters demonstrate, the defendant's callous conduct caused tremendous anguish. As set forth above, several of those victims ask the Court to impose the maximum penalty. Those requests are not unreasonable when considering the defendant's conduct, and the egregious nature of the crime. That being said, the government, after carefully considering the Guidelines and all the Section 3553(a) factors, is not asking the Court to impose a maximum sentence and instead believes that a Guidelines sentence is appropriate.

B. The History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

The next factor that the Court must consider is the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). This factor weighs in favor of the imposition of a significant term of imprisonment. Despite that the defendant has no criminal history, this is

not the first time that the defendant engaged in fraudulent conduct. When he worked at Rochdale—his last employer before he began the instant fraudulent scheme—he engaged in some of the same fraudulent conduct as here. Specifically, at Rochdale, he forged and fabricated documents, engaged in private securities transaction without providing the appropriate notice to Rochdale, and failed to respond to a Financial Industry Regulatory Authority ("FINRA") request for documents and information. Based on this conduct, in June 2009, FINRA barred the defendant from associating with any FINRA member—a fact that the defendant did not share with his investors or the auditors. This obviously did not deter the defendant from forging and fabricating documents and perpetrating a significant fraud; in fact, this experience with FINRA brings into view the recidivist nature of the defendant's crime.

Moreover, the defendant's age and educational background when he committed the instant crime counsels against a reduced sentence. Indeed, he was 38 years-old when he started defrauding investors; he was not a child. And he had a degree from a fine educational institution. Also, the fact that the defendant did not commit the instant crime because of financial duress calls for a significant term of incarceration. Indeed, before starting the instant fraud, the defendant was doing well financially. He had various jobs where he earned between $200,000 and $400,000 a year. This was not a crime of necessity. It was a crime of greed.

The defendant's positive upbringing also warrants a significant sentence. As the defendant explained, he experienced a loving family home where traditional family values were taught and lived. The defendant, unlike so many defendants that appear for sentencing, was raised by two loving parents in a home devoid of physical or verbal abuse. The defendant did not suffer from mental health or substance abuse problems that led him to commit this fraud. The defendant had every opportunity to lead a productive, law abiding life: he had a positive upbringing and a supportive, loving family. Despite all of this, he chose to defraud unsuspecting victims. And he should be punished accordingly. What makes the defendant's criminal conduct so appalling is that he learned work ethic from his parents, and he witnessed first-hand how hard his parents had to work to save money to purchase a home and to provide for him and his siblings. Instead of following his parents' path, he chose a different path, an easier path. A path where he victimized people who, like his parents, worked long hours to provide a better life for their families.

In stark contrast to how he depicts himself in his sentencing submissions, the defendant's conduct objectively casts him in a much different light. It shows that he is not someone with a strong moral compass. He is not someone with high character. Rather, years of objective evidence demonstrates that he is a calculating, dishonest person, and deserves an extremely significant sentence.

C. The Need to Promote Respect for the Law and to Provide Just Punishment for the Offense (18 U.S.C. § 3553(a)(2)(A))

The next factor that the Court must consider is "the need for the sentence imposed to promote respect for the law, and to provide for just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). A sentence below the Guidelines will not promote respect for the

Case 19-2413, Document 11, 08/08/2019, 2628105, Page152 of 197

law or provide just punishment. In fact, as the letters from the victims demonstrate, it will do the opposite. This case involves a substantial financial crime that devastated dozens of investors. Cases of this scale require significant custodial sentences. These sentences are among the best ways in which to communicate to the public that they will be protected and that the guilty will be punished.

Similarly, for a defendant to commit a crime of this magnitude, a sentence below the Guidelines would serve to erode respect for the law. Cases do not get much bigger and financial crimes do not get more brazen than the defendant's crimes. If the defendant walks away with a non-incarceratory sentence or a year and a day as the defendant requests, an unfortunate message would be sent that these crimes are unworthy of significant punishment.

D. The Need to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B))

Section 3553(a)(2)(B) further requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct." Id. This factor has two components: general and specific deterrence. Both factors point to the need for the imposition of a significant sentence here. As mentioned in the previous section, the Court has a responsibility to send clear, unambiguous messages that financial crimes will be punished. If that message is muted, criminals will quickly learn that blatant multi-million dollar fraud schemes do not merit significant prison sentences on Long Island. That message will have a disastrous effect upon our Long Island community.

Given the massive amount of money lavished on the defendant, those who are given the opportunity to participate in a fraud where they receive millions of dollars will not be deterred if the defendant is not punished severely. That is particularly so because frauds involving private companies, like here, are, by their very nature, opaque to investors, regulators and law enforcement officers, and thus exceptionally difficult to detect and prosecute. Here, it took the unwavering dedication of the FBI and the SEC who literally spent thousands of hours pouring over records, travelling internationally, and interviewing people to uncover sufficient evidence to prosecute and convict the defendant. In fact, it took years to arrest and convict the defendant. This demonstrates how difficult and time consuming investigating and prosecuting financial crimes actually are. Thus, the sentencing court's obligation to "afford adequate deterrence" for these kinds of offenses requires substantial sentences.

White collar criminals are among the most responsive to the general deterrence of a significant sentence. Unlike many of the criminals who pass through this Court, white collar criminals or those considering committing financial crimes are generally well-educated, have access to and are more acutely aware of information about white collar sentences. A significant sentence for the defendant can help protect the public by providing strong general deterrence to the next person considering participating in fraud. There is a greater need for general deterrence for fraud schemes than other crimes, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin,

455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

Moreover, although he does not have any criminal convictions, he poses a recidivist risk. As discussed above, the defendant was punished by FINRA in June 2009 for forging and fabricating documents, among other things. After that, the defendant started the instant fraud. He took more than $100 million from investors and used those monies to pay redemptions to prior investors and for his own personal benefit, causing more than $19 million in loss. Clearly, he was not deterred from his prior experience with FINRA. Thus, specific deterrence counsels toward a significant sentence in this case. See 18 U.S.C. § 3553(a)(2)(C).

A prison sentence within the Guidelines is therefore necessary not only to deter would-be fraudsters in general, but also to specifically deter the defendant from committing further crimes.

E. The Kinds of Sentences Available and the Sentencing Range (18 U.S.C. §§ 3553(a)(3), (4) & (5))

The Court is fully aware of all of the available sentencing options. It is no accident that the Guidelines counsel toward such a high sentence, (even after the defendant receives the benefit of the amended Guidelines that have been revised to address many of the criticisms from scholars and jurists). Those Guidelines serve as the reservoir for the collective sentencing wisdom of the entire nation of federal jurists. That wisdom, looking at the enormous scope of the instant crimes, counsels toward a very long custodial sentence. Ultimately, each sentence must be imposed according to the law and the individual conscience of the judge. However, these factors also suggest that the Court should consider the sentences that other judges would impose under similar facts. Since every sentence must begin with the Guidelines, it is safe to assume that the sentences in other Courts would often adhere to the advisory Guidelines. After all, those Guidelines are designed for the typical, or "heartland," case in mind. Accordingly, the Court should impose a Guidelines sentence.

F. The Need to Avoid Unwarranted Sentencing Disparity Among Defendants With Similar Records With Similar Conduct (18 U.S.C. § 3553(a)(6))

Section 3553(a)(6) requires the Court to consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Id. The government submits that it would be instructive to discuss

Case 19-2413, Document 11, 08/08/2019, 2628105, Page 154 of 197

some of the white collar sentences recently imposed in this district.  From these cases, it is clear that the defendant deserves a significant custodial sentence.

Among recent cases from this courthouse, in United States v. Joseph Romano, 09-CR-170 (Bianco, J.), the defendant Joseph Romano ran a boiler room that ensnared approximately 1,500 victims and caused a $41 million loss.  The defendant Joseph Romano pleaded guilty and was still sentenced to 15 years of incarceration by Judge Bianco.  His co-conspirators all received between 70 and 87 months of incarceration despite that they all pleaded guilty.  Joseph Romano's inexcusable reaction to his sentence resulted in another indictment, conviction and a life sentence after trial.

In a companion case, United States v. Michael Romano and William Kearney, 09-CR-168 (Johnson, J.), the defendants operated a boiler room that defrauded 1,450 elderly coin collectors and caused approximately $37 million in losses over an 11-year period.  After a trial, Judge Johnson sentenced supervisor Michael Romano to a term of imprisonment of 20 years.  Judge Johnson sentenced family man and operations manager William Kearney to a 13-year custodial sentence.

In United States v. Steven Meszaros, 06-CR-503 (Bianco, J.), the defendant defrauded five investors out of approximately $6 million in two separate schemes.  After a trial, Judge Bianco sentenced the defendant to 151 months of incarceration.  Clearly, the defendant's crimes were far more extensive with more schemes, caused greater losses and injured far more investors.  However, one of the takeaways is that even if the crimes were the same, the Court should impose a significant custodial sentence, not probation.

In United States v. Helen Michel, 07-CR-889 (Bianco, J.), the defendant defrauded Medicare of approximately $5 million.  After a trial, Judge Bianco sentenced the defendant to 144 months of incarceration.

In United States v. Mehdi Gabayzadeh, 03-CR-00162 (Seybert, J.), the defendant engineered a $64 million accounting fraud.  After a trial, Judge Seybert sentenced the defendant, an older man in failing health, to 15 years of incarceration.

In United States v. Emerson Corsey, John Juncal, Rodney Sampson and James Campbell, 06-CR-264 (Feuerstein, J.), the defendants tried to defraud a hedge fund, which was actually a cooperating witness, of $3 billion.  Since it was a sting, there was no actual loss.  Judge Feuerstein sentenced the defendants to sentences ranging from 15 to 20 years.

In United States v. Irina Shelikhova, 10-CR-771 (Gershon, J.), the defendant was the mastermind of a $70 million Medicare kickback fraud.  In that case, Judge Gershon sentenced the defendant to 15 years after a guilty plea.  Similarly, in United States v. Gustave Drivas, 10-CR-771 (Gershon, J), Judge Gershon sentenced a "no show" doctor who took part in same fraud referenced above to 12 ½ years after a plea.

In <u>United States v. Stinn</u>, 07-CR-113 (Gershon, J.) the defendant falsified financial statements and Judge Gershon sentenced the defendant to 12 years after a trial.

In <u>United States v. Elgindy</u>, 04-CR-652 (Dearie, J.), the defendant made an insider trading gain of approximately $2.5 million, which is half of what the defendant earned in this case.   After a trial, Judge Dearie sentenced the defendant to a term of incarceration of 11 years because of the defendant's psychiatric issues, mistreatment in jail and family circumstances.  Significantly, the defendant has no such mitigating issues, and his crimes are more egregious.

In <u>United States v. Joseph Mazella</u>, 11-CR-300 (Amon, J.), the defendant operated a fraudulent investment scheme that caused a $14 million loss but injured fewer than 200 victims.  In that case, after a trial, Judge Amon sentenced the defendant to a term of imprisonment of 10 years.

In <u>United States v. Nicholas Cosmo</u>, 09-CR-255 (Hurley, J.), the defendant engaged in a 6-year Ponzi scheme that impacted 4,100 victims and resulted in a $179 million loss.  That defendant, unlike the defendant, had a prior felony fraud conviction and was sentenced to 25 years of incarceration.

In <u>United States v. Philip Barry</u>, 09-CR-833 (Dearie, J.), the defendant operated the longest running Ponzi scheme in U.S. history, which resulted in a $24 million loss.  After a trial, Judge Dearie imposed a term of imprisonment of 20 years.  While the defendant's crimes did not span as long, they were wide-ranging, complex and caused almost as much harm as Barry's.  Despite that, the government is not asking the Court to impose the same sentence that Judge Dearie imposed, rather it recommends a sentence that is significantly shorter.

In <u>United States v. Michael MacCaull</u>, 08-CR-401 (Irizary, J.), the defendant operated a Ponzi scheme, which resulted in a $66 million loss. Despite that MacCaull waived indictment and pleaded guilty to an information, sparing the government the time and resources of a grand jury presentment and a trial, Judge Irizary still sentenced him to 14 years of incarceration.

In <u>United States v. Santiago Ramirez</u>, 12-CR-579 (Seybert, J.), a defendant committed food stamp fraud, over the course of less than two years.  The only victim was the government and the loss was less than $500,000.  Judge Seybert sentenced the defendant to 8 years of incarceration.

In <u>United States v. Scott</u>, 13-CR-520 (Mauskopf, J.), the defendant Fredrick Douglas Scott, the Chief Executive Officer ("CEO") of ACI Capital Group LLC, was an investment adviser who falsely claimed to manage $3.7 billion in assets.  The defendant was responsible for causing more than a million dollars in losses.  Scott waived indictment, pleaded guilty, and Judge Mauskopf sentenced him to 63 months' imprisonment.

In <u>United States v. Bannon, et al.</u>, 12-CR-471 (Garaufis, J.), the defendants Thomas Bannon and Theodore Sweeten defrauded a sole investor of $5 million in an advance fee scheme. Both defendants pleaded guilty. Judge Garaufis sentenced Bannon to 57 months' imprisonment while Sweeten was sentenced to 48 months' imprisonment.

In <u>United States v. Liounis, et al.</u>, 12-CR-350 (Glasser, J.), the defendants Peter Liounis and Ruslan Rapoport ran three successive fraudulent investment schemes through which they obtained more than $15 million from more than 250 investors based on false promises about investment opportunities. After a trial conviction, Judge Glasser sentenced Liounis to 292 months' imprisonment.

In <u>United States v. Okhio</u>, 12-CR-179 (Mauskopf, J.), the defendant Telson Okhio, an investment adviser who stole $1 million from one victim, pleaded guilty to one count of wire fraud. Judge Mauskopf sentenced the 52-year-old Okhio to a Guidelines sentence of 46 months' imprisonment.

In <u>United States v. Lange, et al.</u>, 10-CR-968 (Irizarry, J.), the defendant William Lange and his co-defendants were charged with orchestrating two schemes: (i) defrauding land developers and their customers looking to build houses in areas affected by Hurricane Katrina of more than $9 million through an advance fee scheme; and (ii) defrauding investors in an Alaskan gold mine scheme of almost $1 million. Following an eve-of-trial guilty plea, Judge Irizarry sentenced Lange to 262 months' imprisonment (high end of the Guidelines). The court sentenced co-defendant Frank Perkins, the CFO, to 9 years' imprisonment following a pre-trial guilty plea and co-defendant Brad Russell, the loan processor, to 10 years' imprisonment after his conviction at trial.

In <u>United States v. Marsh</u>, 10-CR-480 (Weinstein, J.), Kenneth Marsh, the co-owner and CEO of Gryphon Financial ("Gryphon"), an investment advisory services company based in Staten Island, sold Gryphon's customers purportedly expert investment advice from two fictitious financial advisers and defrauded more than 5,000 investors in a $20 million scheme. Marsh pleaded guilty and Judge Weinstein sentenced him to 8 years' imprisonment.

In <u>United States v. Regan</u>, 09-CR-370 (Amon, J.), the defendant Michael Regan, an investment pool manager, orchestrated a $9 million Ponzi scheme that impacted more than 70 investors. The defendant waived indictment, pleaded guilty, and Chief Judge Amon sentenced him to 7 years' imprisonment.

In <u>United States v. Diaz</u>, 14-CR-133 (Spatt, J.), the defendant Robert Diaz participated in a scheme to defraud the United States causing the United States to lose approximately $450,000. Diaz pleaded guilty, and Your Honor sentenced him to a 24 months' imprisonment (a sentence at the low end of the Guidelines).

In <u>United States v. Vega</u>, 07-CR-707 (Ross, J.), the defendant Roman Vega pleaded guilty to credit card fraud in excess of $200 million. After he moved to withdraw his guilty plea unsuccessfully, Judge Ross sentenced the defendant to 216 months' imprisonment.

In <u>United States v. Efrosman</u>, 06-CR-095 (Garaufis, J.), the defendant Aleksander Efrosman, the investment manager of Century Maxim Fund, Inc., and AJR Capital, Inc., defrauded more than 100 investors of more than $5 million. Efrosman pleaded guilty and Judge Garaufis sentenced him to 188 months' imprisonment.

Finally, it is useful to discuss a recent white collar sentence imposed by Your Honor to demonstrate how anything less than a significant custodial sentence would create a sentencing disparity. In <u>United States v. Scully</u>, 14-CR-208 (Spatt, J.), following a trial, the Court sentenced Scully, for operating a scheme to sell misbranded and unapproved prescription drugs causing between $1.5 and $3.5 million, to five years of incarceration. Here, the defendant was the mastermind a massive fraudulent conduct, caused 10 times the loss, defrauded dozens of innocent victims, and therefore should receive a sentence significantly higher than the 5-year sentence that Your Honor imposed less than two years ago.

Because, as set forth above, the government's recommendation falls squarely within the range of sentences imposed in this district for financial crimes, the Court should impose a Guidelines sentence of 151 to 188 months.

G.   The Defendant's Other Arguments

In his sentencing memorandum, the defendant asks the Court to impose a reduced sentence because he is supposedly indispensable to the business that his wife started. (Def. Mem. at 50-53.) The Court should decline this request. While the government has no reason to question whether the defendant plays an important role in the operation of the business, there are options short of imposing a non-incarceratory sentence or a significantly-reduced sentence. For example, the defendant's wife, who started the company, can play a more active role; the company can hire more employees; or it can promote one of its current employees to handle the defendant's responsibilities. For those reasons, the Court should not credit this argument.

The defendant also requests a reduced sentence based on his purported extraordinary post-offense rehabilitation. (Def. Mem. at 55-57.) The Court should reject that request. Obtaining legitimate employment and accepting responsibility for one's crimes falls short of the extraordinary rehabilitation that might warrant a non-Guidelines sentence. <u>See</u> <u>United States v. Bryson</u>, 163 F.3d 742, 747 (2d Cir. 1998) ("[A] sentencing judge may exercise discretion and depart from the applicable guideline range in light of a defendant's efforts toward rehabilitation, provided those efforts are extraordinary."). That the defendant has not committed any additional crimes while being monitored by Pre-Trial Services in a case where he was facing 40 years in prison does nothing to alter the conclusion that a significant custodial sentence is appropriate here. The best gauge of the defendant's character is not how he behaved under such constant supervision, but how he acted when free from such constant monitoring. When the defendant chose to continue take millions of dollars from his victims, he was not a child, he was an adult whose character was fully formed. That character was on display when he chose to continue to enrich himself at the expense of the innocent investors

Case 19-2413, Document 11, 08/08/2019, 2628105, Page 158 of 197

22

who unfortunately placed their trust in him. Such self-serving behavior from someone who was given every advantage in life amply supports the imposition of a Guidelines sentence between 151 and 188 months.

The defendant next argues that his familial situation warrants a sentence below the Guidelines. (Def. Mem. at 53-55.) While the government is sympathetic to the fact that the defendant's criminal conduct has had an adverse impact on innocent individuals, particularly the defendant's children, this impact alone does not warrant a below-Guidelines sentence. The Guidelines provide that family ties and relationships warrant a downward departure only when they are truly "extraordinary." See United States v. Galante, 111 F.3d 1029, 1033 (2d Cir. 1997). Absent extraordinary circumstances, courts are discouraged from downwardly departing based upon family circumstances. Id. at 1034; United States v. Johnson, 964 F.2d 124, 128 (2d Cir. 1992) ("[d]isruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration").

Such extraordinary circumstances are present where family members are "uniquely dependent" upon a defendant for financial or emotional support. United States v. Faria, 161 F.3d 761, 762 (2d Cir. 1998). In Faria, the Second Circuit reaffirmed its position that adverse consequences to a family, even a family which includes young children, due to a defendant's incarceration do not warrant a downward departure without truly exceptional circumstances. Id. at 763. More recently, in United States v. Seliotsky, 409 F.3d 114, 119 (2d Cir. 2005), the Second Circuit observed that a family circumstances departure is "impermissible in less compelling circumstances, especially where other relatives could meet the family's needs."

Here, the defendant's circumstances, while unfortunate, do not warrant a downward departure or a reduced sentence. The defendant has two children who have a devoted caring mother who is fully employed, as well as an extended network of adults, including his parents, his siblings, his wife's father and numerous close friends, who—although they may not be in a position to prove full-time childcare—appear available to provide financial and/or emotional support to the family. Also, the defendant, his wife and children presently live in a "large" home that has a pool and a tennis court in Old Westbury, which Probation described as an "upper income area." (PSR ¶ 73.) Perhaps, as a result of the defendant's incarceration, which he brought upon himself, the defendant's wife and children will have to move back in with her father, which is where they lived before their current residence (PSR ¶ 73), or they may have to downsize and move to a more modest home. The takeaway is that clearly the defendant's circumstances are not comparable to those rare cases contemplated in U.S.S.G. § 5H1.6, App. note 1(B)(iii) in which "the loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available." See also United States v. Madrigal, 331 F.3d 258 (2d Cir. 2003) (refusing to depart where only one child is under eighteen, and can be cared for by older siblings); United States v. Selioutsky, 409 F.3d 114 (2d Cir. 2005) (departure for family circumstance is not permissible where "other relatives could meet the family's needs.").

23

Finally, the defendant's argument for a reduced sentence based on his attempted cooperation is without merit. (See Def. Mem. at 57-59.) The defendant claims that he attempted to cooperate with the U.S. Attorney's Office for the Middle District of Florida ("USAO-MDF"), the New York County District Attorney's Office and the Receiver in the SEC action. (Id.) First, he did not voluntarily or timely cooperate with the Receiver in the SEC action. The only information the defendant provided came in response to an order to produce such information. For example, the Court ordered the defendant to turn over all documents and information relating to his funds, and the Court further ordered the defendant to take such steps as necessary to repatriate funds located outside the United States. Significantly, as the defendant concedes, he refused to provide sworn statements to the Receiver, even though the Court ordered him to do so. To give him credit for providing information that the Court had to order him to provide would be absurd.

Second, the defendant was not offered a cooperation agreement because he did not satisfy the most basic and threshold component of cooperation: providing substantial assistance to the government. While he provided some documents to the USAO-MDF and talked to them on the phone for a couple of hours, he never testified at trial or before a grand jury, he did not make any consensual recordings, and did not otherwise contribute to arrest or conviction of anyone.

Significantly, in the present case, he never met with the government to assist in its prosecution of Manson or any others who may have been involved in the present fraud. Like in the USAO-MDF's case, in the instant case, he did not contribute to the arrest or conviction of anyone, he did not make any consensual recordings, and he did not testify at trial. Thus, the defendant did not provide the government with substantial assistance and was not offered a cooperation agreement.

While, of course, the Court may consider the fact that the defendant attempted to cooperate with other offices, along with the other § 3553(a) factors discussed above, the government respectfully submits that the defendant should not receive the benefits of cooperation or a reduced sentence without fulfilling the essential prerequisite: providing substantial assistance to the government.

CONCLUSION

In sum, the defendant is an intelligent, well-educated man who was raised by loving parents in a middle-class home with every opportunity to lead a law abiding productive life. Instead, he elected to run a Ponzi scheme. He elected to lie to investors day after day, month after month, year after year for more than seven years. He elected to take advantage of innocent, unsuspecting victims who placed their trust in him. And for what? So that he could make money. The lies that the defendant sold to investors inflicted ruinous financial consequences upon honest hard-working people. Victims have been saddled with debt, their retirements have been delayed, their children have been crippled by unforeseen student loan payments, and they have lost their life savings. All because of the defendant's actions. For these reasons, and for all the reasons set forth above, the government respectfully submits that

Case 19-2413, Document 11, 08/08/2019, 2628105, Page 160 of 197

24

a sentence within the advisory Guidelines range of 151 to 188 months is sufficient, but not greater than necessary to serve the mandates of Section 3553(a).

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney

By:      /s/
Christopher Caffarone
Assistant U.S. Attorney

Encls.

cc:    Roland Riopelle, Esq. (Via ECF and Email)

EXHIBIT K

SC:CCC/WMP/BDM/KKO
F. #2012R00953

COURT EXHIBIT
CR-13-453
①
4-29-2014

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

— — — — — — — — — — — — — — — — X

UNITED STATES OF AMERICA

     - against -

BRIAN R. CALLAHAN,

         Defendant.

— — — — — — — — — — — — — — — — X

**PLEA AGREEMENT**

13 CR 453 (ADS)

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States Attorney's Office for the Eastern District of New York (the "Office") and BRIAN R. CALLAHAN (the "defendant") agree to the following:

1.       The defendant will plead guilty to Counts Four and Eleven of the above-captioned indictment charging violations of 15 U.S.C. §§ 78j(b) and 78ff and 18 U.S.C. § 1343, respectively. The counts carry the following statutory penalties:

Count Four – Securities Fraud

       a.       Maximum term of imprisonment: 20 years
(15 U.S.C. §§ 78j(b), 78ff).

       b.       Minimum term of imprisonment: 0 years
(15 U.S.C. §§ 78j(b), 78ff).

       c.       Maximum supervised release term: 3 years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced to up to 2 years without credit for pre-release imprisonment or time previously served on post-release supervision
(18 U.S.C. § 3583 (b) & (e)).

       d.       Maximum fine: $5,000,000
(15 U.S.C. §§ 78j(b), 78ff).

    e.    Restitution: Mandatory, in an amount to be determined by the Court at sentencing
        (18 U.S.C. § 3663A).

    f.    Criminal forfeiture: as set forth below in paragraphs 6 through 12 (18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p) and 28 U.S.C. § 2461(c)).

    g.    Other penalties: Civil remedies, possibly including disgorgement, penalties and injunctive relief, sought in a separate action by the United States Securities and Exchange Commission.

    h.    $100 special assessment
        (18 U.S.C. § 3013).

### Count Eleven – Wire Fraud

    a.    Maximum term of imprisonment: 20 years
        (18 U.S.C. § 1343).

    b.    Minimum term of imprisonment: 0 years
        (18 U.S.C. § 1343).

    c.    Maximum supervised release term: 3 years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced to up to 2 years without credit for pre-release imprisonment or time previously served on post-release supervision
        (18 U.S.C. § 3583 (b) & (e)).

    d.    Maximum fine: $250,000, or twice the gross gain or gross loss, whichever is greater
        (18 U.S.C. § 3571(d).

    e.    Restitution: Mandatory, in an amount to be determined by the Court at sentencing
        (18 U.S.C. § 3663A).

    f.    Criminal forfeiture: as set forth below in paragraphs 6 through 12 (18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p) and 28 U.S.C. § 2461(c)).

    g.    Other penalties: Civil remedies, possibly including disgorgement, penalties and injunctive relief, sought in a separate action by the United States Securities and Exchange Commission.

h.    $100 special assessment
(18 U.S.C. § 3013).

The sentences imposed on each count of conviction may run consecutively.

2.    The defendant understands that although imposition of a sentence in accordance with the United States Sentencing Guidelines (the "Guidelines" and "U.S.S.G.") is not mandatory, the Guidelines are advisory and the Court is required to consider any applicable Guidelines provisions as well as other factors enumerated in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence in this case. The Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence. The Office estimates the likely adjusted offense level under the Guidelines to be level 41, which is predicated on the following Guidelines calculation:

| | | |
|---|---|---:|
| Base Offense Level (§ 2B1.1(a)(1)) | | 7 |
| Plus: | Loss amount of more than $50,000,000 (§ 2B1.1(b)(1)(M)) | +24 |
| Plus: | More than 10 victims (§ 2B1.1(b)(2)(C)) | +2 |
| Plus: | Sophisticated Means (§ 2B1.1(b)(10)(C)) | +2 |
| Plus: | Investment Adviser (§ 2B1.1(b)(19)(A)(iii)) | +4 |
| Plus: | Aggravating Role (§ 3B1.1(c)) | +2 |
| Total: | | 41 |

If the defendant clearly demonstrates acceptance of responsibility, through allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a), resulting in an adjusted offense level of 39 and a range of imprisonment of 262 – 327 months, assuming that the defendant falls within Criminal History Category I. Furthermore, if the defendant has accepted responsibility as described above, and if

3

the defendant pleads guilty on or before May 2, 2014, an additional one-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b), resulting in an adjusted offense level of 38. This level carries a range of imprisonment of 235 – 293 months, assuming that the defendant falls within Criminal History Category I.

3. The Guidelines estimate set forth in paragraph 2 is not binding on the Office, the Probation Department or the Court. If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

4. The defendant agrees not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 327 months or below. This waiver is binding without regard to the sentencing analysis used by the Court. The defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution that is not time-barred on the date that this agreement is signed in the event that (a) the defendant's conviction is later vacated for any reason, (b) the defendant violates this agreement, or (c) the defendant's plea is later withdrawn. The defendant waives any right to additional disclosure from the government in connection with the guilty plea. The defendant agrees that with respect to all charges referred to in paragraphs 1 and 5(a) he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. § 3006A note, and will not file any claim under that law. The defendant agrees to pay the special assessment by check payable to the Clerk of the Court at or before sentencing.

4

5.     The Office agrees that:

a.     no further criminal charges will be brought against the defendant for the fraud schemes detailed in the Indictment 13-CR-453 (ADS) and any of the following or related conduct: (1) obtaining money from investors in the following investment funds: Pangea Offshore High Yield Portfolio, LLC; Pangea Global Opportunities Portfolio LLC; Diversified Global Investments (BVI) LP; Horizon Millennium Investments LP; The Masters Global Fund LP; Fiduciary Select Income Fund LP; and any other off-shore investment fund that the defendant controlled between 2004 and 2012; (2) audits by Deloitte & Touche of investment funds controlled by the defendant; (3) obtaining loans and financing from the following lenders: Gibraltar Private Bank and Trust; Barclays Capital Real Estate, Inc.; OreXus Investment Corp.; and Annaly Capital Management; and (4) the filing of false tax returns on the defendant's behalf, and on behalf of the investment funds that the defendant controlled, for tax years 2004 through 2012, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 et seq., and at the time of sentence, it will move to dismiss the remaining counts of the indictment with prejudice;

and, based upon information now known to the Office, it will

b.     take no position concerning where within the Guidelines range determined by the Court the sentence should fall; and

c.     make no motion for an upward departure under the Sentencing Guidelines.

If information relevant to sentencing, as determined by the Office, becomes known to the Office after the date of this agreement, the Office will not be bound by paragraphs 5(b) and 5(c). Should it be judged by the Office that the defendant has violated any provision of this agreement, the defendant will not be released from his plea of guilty but this Office will be released from its obligations under this agreement, including but not limited to: (a) moving for the additional one-level downward adjustment for timely acceptance of responsibility described in paragraph 2 above; and (b) the provisions of paragraph 5 (a)-(c).

5

6. The defendant acknowledges that property is subject to forfeiture as a result of his violations of 15 U.S.C. §§ 78j(b) and 78ff and 18 U.S.C. § 1343. Pursuant to 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p) and 28 U.S.C. § 2461(c), the defendant consents to the forfeiture of the following:

(a) entry of a forfeiture money judgment in the amount of $67,498,201.84 (the "Forfeiture Money Judgment");

(b) approximately four hundred seven thousand three hundred sixty-six dollars and fifty-seven cents ($407,366.57) seized on or about August 1, 2013 from J.P. Morgan Chase Bank account number XXXXXX2092 held in the name of Barry Manson Attorney at Law Savings for Adam Manson;

(c) approximately one million thirty-eight thousand two hundred sixty-six dollars and no cents ($1,038,266.00) seized on or about August 1, 2013 from First National Bank of Long Island account number XX-XXX1526 held in the name of Law Offices of Barry Manson PC ESC FBO Adam J. Manson;

(d) the real property, together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings, located at 272 Old Montauk Highway, Montauk, New York 11954, and all proceeds traceable thereto;

(e) any and all shares of 93 Old Montauk Owners, Inc., a New York cooperative corporation, held in the name of Distinctive Ventures, LLC, together with the proprietary leases associated therewith for various units at the real property located at 272 Old Montauk Highway, Montauk, New York 11954, and all proceeds traceable thereto;

(f) any and all shares of 93 Old Montauk Owners, Inc., held in the name of Brian Callahan and Sheri Callahan, together with the proprietary lease for Cooperative

6

Unit Salt Sea #4 at the real property located at 272 Old Montauk Highway, Montauk, New York 11954, and all proceeds traceable thereto;

> (g)    one hundred thirty-nine thousand two hundred fifty-four dollars and seventy-nine cents ($139,254.79) of the proceeds from the interlocutory sale of the real property, together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings, located at 47 Clock Tower Lane, Old Westbury, New York 11568 (the "Old Westbury Property") in connection with the pending civil forfeiture action captioned United States v. 272 Old Montauk Highway, 12-CV-1880 (ADS) (ETB) (the "Civil Forfeiture Action"), and all proceeds traceable thereto (the "Forfeited Sales Proceeds"); and

> (h)    the real property, together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings, located at 538 Dune Road, Unit #10, Westhampton Beach, New York 11978, and all proceeds traceable thereto (items (b) through (h), collectively, the "Forfeited Assets").

7.    The defendant agrees that the amount of the Forfeiture Money Judgment and the Forfeited Assets represent (a) property, real or personal, that constitutes or is derived from proceeds traceable to the defendant's violations of 15 U.S.C. §§ 78j(b) and 78ff and 18 U.S.C. § 1343 and/or (b) substitute assets pursuant to 21 U.S.C. § 853(p). The defendant consents to the entry of a Preliminary Order of Forfeiture as to the Forfeited Assets and the amount of the Forfeiture Money Judgment pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure. The defendant further consents to the civil forfeiture of the Forfeited Assets and any other property to satisfy the Forfeiture Money Judgment as a substitute res, including but not limited to in connection with the Civil Forfeiture Action. The defendant hereby waives the filing of a civil forfeiture complaint as to the Forfeited Assets and any other property to satisfy

7

the Forfeiture Money Judgment in accordance with the procedures set forth in 18 U.S.C. § 983. The value of the Forfeited Assets that are forfeited to the United States shall be credited towards payment of the Forfeiture Money Judgment.

8.      The defendant shall fully assist the government in effectuating the forfeiture of the Forfeited Assets and the payment of the Forfeiture Money Judgment. The Forfeiture Money Judgment shall be due and payable in full on or before the date of the entry of the defendant's guilty plea (the "Due Date"). The Forfeiture Money Judgment shall be paid by certified or bank check, made payable to the "United States Marshals Service" and shall be delivered by overnight via Federal Express to Asset Forfeiture Paralegal Brian Gappa, United States Attorney's Office, Eastern District of New York, at 610 Federal Plaza, Central Islip, New York 11722, with the criminal docket number noted on the face of the check. Interest on any unpaid balance of the Forfeiture Money Judgment shall begin to accrue after the Due Date at the rate of interest set forth in 18 U.S.C. § 3612(f)(2).

9.      The defendant acknowledges that, prior to the interlocutory sale of the Old Westbury Property in the Civil Forfeiture Action, the property was held in the name of his wife, Sheri Manson-Callahan. The defendant hereby waives any claim to any proceeds of the sale of the Old Westbury Property, including but not limited to any sales proceeds to be returned to Sheri Manson-Callahan pursuant to the forfeiture stipulation attached as Exhibit A hereto (the "Forfeiture Stipulation"), the terms of which are incorporated herein by reference.

10.     The defendant agrees not to file or interpose any claim or to assist others to file or interpose any claim to the Forfeited Assets or to any other property forfeited to satisfy the Forfeiture Money Judgment in any administrative or judicial proceeding. If payment of the Forfeiture Money Judgment is not made as provided above, the defendant consents to the

8

forfeiture of any other property of his, real or personal, up to the value of the unpaid portion of the Forfeiture Money Judgment, pursuant to 21 U.S.C. § 853(p), the Federal Debt Collection Procedures Act or any other applicable law. The defendant agrees to execute any documents to effectuate the forfeiture of the Forfeited Assets and the amount of Forfeiture Money Judgment. In addition, the defendant knowingly and voluntarily waives his right to notice in connection with the forfeiture of the Forfeited Assets and the entry of the Forfeiture Money Judgment, waives any right, if any, to a jury trial on the forfeiture of the Forfeited Assets and the entry of the Forfeiture Money Judgment, and waives all constitutional, legal and equitable defenses to the forfeiture of the Forfeited Assets and the entry of the Forfeiture Money Judgment, including, but not limited to, any defenses based on principles of double jeopardy, the Ex Post Facto clause of the Constitution, the Eighth Amendment of the Constitution (including a claim of excessive fines), the statute of limitations, or venue.

11.     The failure of the defendant to forfeit the Forfeited Assets and the amount of Forfeiture Money Judgment as required under this agreement or to perform any obligation arising under the Forfeiture Stipulation, including the failure of the defendant to execute any document to accomplish the same on timely notice to do so, shall constitute a material breach of this plea agreement. Upon such a breach, the defendant will not be entitled to withdraw the plea, but the Office may bring additional criminal charges against the defendant. The defendant agrees that the forfeiture of the Forfeited Assets and the entry of the Forfeiture Money Judgment are not to be considered a fine, penalty, a restitution loss amount, and/or a payment on any income taxes that may be due, and shall not be discharged in any bankruptcy proceedings.

12.     The defendant shall disclose all of his assets to the United States on the financial statement, titled "United States Department of Justice Financial Statement" no later

promises, agreements or conditions between the parties. To become effective, this agreement must be signed by all signatories listed below.

Dated: Brooklyn, New York
        April 29, 2014

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

By: _____

Christopher C. Caffarone
Winston M. Paes
Assistant United States Attorneys

Approved by:

_____

Sarah Coyne
Supervising Assistant U.S. Attorney

I have read the entire agreement and discussed it with my attorney. I understand all of its terms and am entering into it knowingly and voluntarily.

_____

BRIAN R. CALLAHAN
Defendant

Approved by:

_____

Michael Tremonte, Esq.
Robert Knuts, Esq.
Counsel to Defendant

EXHIBIT L



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SLR:BDM:KKO
F. #2010V00608
F. #2012R00953

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 9, 2014

<u>By Hand and ECF</u>
The Honorable Arthur D. Spatt
United States District Court
Eastern District of New York
100 Federal Plaza
P.O. Box 9014
Central Islip, New York 11722

> Re:    United States v. Brian R. Callahan, *et al.*
>        Criminal Docket No. 13-453 (ADS)
>
>        United States v. Brian Raymond Callahan, *et al.*
>        <u>Civil Docket No. 12-1065 (ADS)</u>

Dear Judge Spatt:

The government respectfully writes in response to defendant Brian Callahan's motions filed on March 26, 2014, which seek permission for Sher Tremonte LLC to withdraw as his counsel in the above-captioned criminal and SEC enforcement cases. (13-CR-453, Docket nos. 46-48; 12-CV-1065, Docket nos. 211-13). Defendant Callahan requests that his counsel be permitted to withdraw if certain funds held in an attorney escrow account and other funds under the control of a court-appointed receiver in the SEC enforcement action are not released to pay his attorney's fees and expenses. (12-CV-1065, Docket nos. 208-209).

Specifically, defendant Callahan seeks to have over $480,000 in attorney's fees and expenses paid from funds held by Horizon Millennium Investments, L.P. ("Horizon Millennium"), which were frozen and placed under the receiver's control pursuant to a temporary restraining order and preliminary injunction issued in the SEC enforcement action. (12-CV-1065, Docket nos. 4, 22 and 33). In addition, Defendant Callahan seeks to have approximately $26,000 of attorney's fees and expenses paid out of an escrow account held by Park & Jenson LLP, the law firm with which his counsel was formerly associated. (12-CV-1065, Docket no. 209, at 1, 4). That account was also apparently frozen at the same time as the funds held by Horizon Millennium. The government takes no position on the defendant's motions, but notes that the funds at issue are subject to forfeiture to the United States, for reasons discussed below.

## I.  Background

On April 17, 2012, the government filed a Verified Complaint In Rem in a civil forfeiture proceeding captioned United States v. 272 Old Montauk Highway, et al., 12-CV-1880 (ADS), which is also pending before Your Honor.  Among other assets, that action seeks the forfeiture of all cooperative shares held by Distinctive Ventures, LLC which are associated with the Panoramic View oceanfront resort located in Montauk, New York (the "Distinctive Shares"), as property constituting or derived from proceeds traceable to securities fraud offenses.  (12-CV-1880, Docket no. 1, at ¶¶ 4, 65-81, 102-104).  The Verified Complaint alleges that, during the period from August 31, 2010 through and including November 1, 2011, at least $2.9 million was wired directly or indirectly from an account used by defendant Callahan to accept deposits from investors — HSBC Bank of Bermuda account number XXXXXXX9563 held in the name of Waterstreet Corporate Services (the "Waterstreet Account") — to pay loans secured by the Distinctive Shares.  (12-CV-1880, Docket no. 1, at ¶¶ 72-79).  Notably, during the period from approximately June 2010 through on or about March 16, 2011, investors in the Callahan funds wired over $21 million to the Waterstreet Account.  (13-MJ-670, Docket no. 1, at ¶ 15).

On July 31, 2013, a grand jury returned a twenty-four count indictment charging defendant Brian Callahan, along with his brother-in-law Adam Manson, with conspiracy to commit securities and wire fraud, as well as substantive securities and wire fraud offenses, for their roles in operating a $96 million Ponzi scheme.  (13-CR-453, Docket no. 1).  The indictment alleges that between December 2006 and February 2012, defendant Callahan raised more than $118 million from at least forty investors in connection with four different investment funds that he managed, which included the Horizon Millennium fund.  The indictment also included a criminal forfeiture allegation reflecting the government's intent to seek forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), of any property constituting or derived from proceeds of the charged wire and securities fraud-related offenses including, among other assets, the Distinctive Shares and two other parcels of real property.  (13-CR-453, Docket no. 1, at ¶ 72).

The day after the indictment was returned, on August 1, 2014, agents of the Federal Bureau of Investigation also seized over $1.4 million of criminal proceeds on deposit in attorney escrow accounts held by defendant Manson's father, Barry Manson, pursuant to seizure warrants issued by United States Magistrate Judge William D. Wall.  (13-MJ-670, Docket nos. 6-7).  As set forth in the affidavit in support of those warrants, over $900,000 of the monies seized were traceable to investor funds deposited into the Waterstreet Account.  (13-MJ-670, Docket no. 1, at ¶¶ 17-21, 22-26, 27-29).

## II.  The Funds That Callahan Seeks To Have Released Are Subject To Forfeiture

To date, the government's investigation has revealed that approximately $25,000 on deposit in the escrow account of Park & Jensen, LLP, which defendant Callahan now seeks to have released, was derived from the Waterstreet Account.  As described above, the Waterstreet Account received over $21 million of investor funds, which served as a factual basis for the government's civil and criminal forfeiture actions against the Distinctive

2

Shares, as well as the seizure of over $900,000 from attorney escrow accounts held by Barry Manson. Specifically, a review of bank records confirms that on or about January 12, 2012, the sum of $25,000 was wired from the Waterstreet Account to Park & Jensen. At least $25,000 of the approximately $26,000 that defendant Callahan seeks to have released is therefore subject to forfeiture as proceeds of securities fraud offenses, pursuant to 18 U.S.C. § 981(a)(1)(C).

The remainder of the monies that defendant Callahan seeks to have released are derived from the Horizon Millennium fund which, as charged in the indictment, was among the investment funds at the center of the Ponzi scheme orchestrated by the defendants. (13-CR-453, Docket no. 1, at ¶¶ 2, 5, 22). In this regard, Horizon Millennium transferred at least $6,125,000 from VP Bank Account Number XXXX2430 held in the name of Horizon Millennium to a New York-based hedge fund. (12-CV-1065, Docket no. 11, at ¶ 5). The government's investigation has revealed that these funds were derived solely from investors in the Callahan funds. Accordingly, like the monies held by Park & Jensen from which defendant Callahan seeks to have his attorney's fees and expenses paid, these funds are also subject to forfeiture as proceeds of securities fraud offenses.

III.    Conclusion

At present, the government has not taken any action against the funds held by Horizon Millennium or in the Park & Jensen escrow account that defendant Callahan asks be released in order to pay his attorney's fees and expenses. The government therefore takes no position on Callahan's motions for release of these funds. For the reasons set forth above, however, these funds are subject to forfeiture to the United States. Accordingly, to the extent that the Court is inclined to release any of the funds, the government respectfully requests permission to present an application for their seizure and/or restraint prior to any release in accordance with the provisions of 18 U.S.C. § 981(b), 21 U.S.C. § 853(e) and/or 21 U.S.C. § 853(f).

Thank you for Your Honor's consideration of this submission.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:    /s/_____
Christopher Caffarone
Brian D. Morris
Karin Orenstein
Winston Paes
Assistant U.S. Attorneys
(718) 254-7000

cc:    All Counsel of Record (By ECF)

3

EXHIBIT M



| United States Department of Justice | Offices of the United States Attorneys |
|---|---|

### THE UNITED STATES ATTORNEY'S OFFICE
# EASTERN DISTRICT *of* NEW YORK

Search

SEARCH

**Department of Justice**

U.S. Attorney's Office

Eastern District of New York

FOR IMMEDIATE RELEASE                                                  Thursday, August 1, 2013

# Fund Manager And Real Estate Developer Arrested And Charged In $96 Million Securities Fraud

### Defendants Diverted Investor Funds To Purchase 'Panoramic View Resort & Residences' In Montauk, New York And Fund Lavish Lifestyles

A 24-count indictment was unsealed this morning in federal court in Central Islip, New York, charging Brian R. Callahan, an investment fund manager, and Adam J. Manson, a real estate developer, with conspiracy to commit securities and wire fraud for their roles in operating a $96 million Ponzi scheme. Both defendants are in custody and will be arraigned this afternoon before United States Magistrate Judge A. Kathleen Tomlinson at the United States Courthouse in Central Islip. In addition, the government seized over $1 million of alleged criminal proceeds and moved to forfeit the defendants' interest in the Panoramic View Resort & Residences in Montauk, New York (the "Panoramic View").

The charges were announced by Loretta E. Lynch, United States Attorney for the Eastern District of New York; George Venizelos, Assistant Director-in-Charge, Federal Bureau of Investigation, New York Field Office (FBI); and Toni Weirauch, Special Agent-in-Charge, United States Internal Revenue Service, Criminal Investigation, New York (IRS).

According to the indictment and other court filings, between December 2006 and February 2012, Callahan raised more than $118 million from at least 40 investors in connection with four different investment funds that he managed. He had assured those investors that their money would be invested in mutual funds, hedge funds and other securities. Instead of investing the money as he promised, Callahan misappropriated approximately $96 million and began to operate the investment funds as a large-scale Ponzi scheme. Among other things, Callahan diverted millions of dollars

towards the Panoramic View, an unprofitable 117-unit beachfront resort and residence development in Montauk, New York, that he owned with his brother-in-law and co-defendant, Adam Manson. He also commingled the money from the various investment funds and used it to pay tens of millions of dollars in partial redemptions to his victim investors to keep the Ponzi scheme afloat, and to purchase luxury items such as expensive cars and homes in Old Westbury and Westhampton, New York. To avoid detection and continue the scheme, Callahan sent fake account statements to investors that falsely showed that their funds were invested and performing well, and he repeatedly lied to his investors about both the nature and status of their investments.

"As alleged, the defendants used one of Long Island's landmarks, the Panoramic View Resort, to perpetrate a wide-ranging fraud," stated United States Attorney Lynch. "Callahan gave his word that he would invest his clients' funds safely and responsibly in established vehicles. Instead, he simply stole the funds to prop up his partner's failing investment. To conceal their status as business failures, the defendants employed all the tricks in the typical con man's bag. They created fake documents, stole a person's identity and engaged in forgery. The defendants allegedly lied to the lender, they lied to the auditor, and Callahan repeatedly lied to his investors. The lies stop now. Today's arrests demonstrate the Office's commitment to aggressively prosecute those individuals who commit financial crimes." Ms. Lynch expressed her grateful appreciation to the Securities and Exchange Commission and the British Virgin Islands Financial Investigation Agency for their cooperation and assistance in the investigation.

FBI Assistant Director-in-Charge Venizelos stated, "Allegedly, Mr. Callahan and Mr. Manson violated the trust of their clients, stealing victims' hard earned money to perpetuate their fraud. Instead of investing the funds as promised, Mr. Callahan used the deposits to perpetuate the scheme, all while buying luxury cars and an estate in Westhampton. Mr. Callahan was so indiscriminant, he even stole from a Long Island Fire Department. Today, the game is up. The FBI will continue working to protect investors and stop alleged fraudsters."

IRS Special Agent-in-Charge Weirauch stated, "The architects of Ponzi-type schemes often employ a variety of sophisticated measures to keep them operating without detection. However, the cooperation between IRS-Criminal Investigation, the U.S. Attorney's Office, and the FBI should give the investing public confidence that such schemes will ultimately be uncovered and thoroughly investigated, and that the scammers will be prosecuted."

In one instance, Callahan allegedly solicited a $600,000 investment from a Long Island-based fire department by promising to invest the fire department's money in mutual funds and other securities. Instead of investing the money, Callahan fraudulently diverted the fire department's funds to the Panoramic View, and sent bogus account statements to the fire department that falsely showed that the funds had been invested in mutual funds. Callahan also convinced a Maryland resident to invest approximately $11 million after promising to invest those funds in low-risk securities. Callahan used the investor's money to make redemption payments to other investors whom he had previously defrauded and to keep the Ponzi scheme afloat.

According to the indictment, Manson managed the Panoramic View property and poured the money that Callahan had diverted from the investors into Manson's struggling real estate project at the Panoramic View. To help Callahan carry out his investment scheme, Manson lied to the independent auditor of Callahan's investment funds and, together with Callahan, provided fake documents, including bogus promissory notes and doctored balance sheets, to the independent

Case 2:13-cr-00453-ADS-AKT Document 196-8 Filed 09/28/18 Page 3 of 8 PageID #: 1481

auditor. Manson's and Callahan's fraudulent actions concealed the misuse of the investors' funds and caused the auditor to overstate the value and profits of Callahan's investment funds to the victim investors. As a result of Manson and Callahan's fraudulent actions, investors were lulled into believing that the funds were performing, and they continued to "invest" their money with Callahan.

As alleged in the indictment, Manson also defrauded a New York-based lending institution that had loaned more than $45 million to Manson in connection with his real estate development project at the Panoramic View. While attempting to extend these loans past their maturity date, Manson misled the lender about the money that the Panoramic View had received from Callahan's funds, and falsely told the lender that the funds were from his father. Manson engaged in this fraudulent conduct in an effort to conceal the fact that he was simultaneously telling the independent auditor of the Callahan funds that there were no other creditors or debt associated with the Panoramic View.

The charges contained in the indictment are merely allegations, and the defendants are presumed innocent unless and until proven guilty. If convicted, the defendants each face a maximum sentence of twenty years' imprisonment on each of the securities fraud, wire fraud and conspiracy to commit wire fraud counts, five years' imprisonment on the conspiracy to commit securities fraud count, and Callahan faces two years' imprisonment for each of the aggravated identity theft counts. Additionally, if convicted, Callahan and Manson may be fined up to $5,000,000 for each of the securities fraud counts, $250,000 for each of the wire fraud, conspiracy to commit wire fraud and conspiracy to commit securities fraud counts, and Callahan may be fined up to $250,000 for each of the aggravated identity theft counts. In addition to seizing over $1 million in alleged criminal proceeds, the government is also seeking to forfeit all Panoramic View cooperative units held by Callahan and Manson, together with Callahan's residence in Old Westbury, New York, and Manson's beachfront condominium in Westhampton, New York.

The government's case is being prosecuted by Assistant United States Attorneys David C. Woll, Jr., Christopher C. Caffarone, Brian D. Morris, and Karin Orenstein.

This prosecution was the result of efforts by President Barack Obama's Financial Fraud Enforcement Task Force (FFETF) which was created in November 2009 to wage an aggressive, coordinated, and proactive effort to investigate and prosecute financial crimes. With more than 20 federal agencies, 94 U.S. Attorneys' Offices, and state and local partners, it's the broadest coalition of law enforcement, investigatory, and regulatory agencies ever assembled to combat fraud. Since its formation, the task force has made great strides in facilitating increased investigation and prosecution of financial crimes; enhancing coordination and cooperation among federal, state, and local authorities; addressing discrimination in the lending and financial markets; and conducting outreach to the public, victims, financial institutions, and other organizations. Over the past three fiscal years, the Justice Department has filed more than 10,000 financial fraud cases against nearly 15,000 defendants. For more information on the task force, visit http://www.StopFraud.gov.

### The Defendants:

BRIAN R. CALLAHAN
Age: 43
Old Westbury, New York

ADAM J. MANSON
Age: 41

Case 2:13-cr-00453-ADS-AKT   Document 196-8   Filed 09/28/18   Page 4 of 8 PageID #: 1482

Old Westbury, New York

**Component(s):**                                    <u>USAO - New York, Eastern</u>

Updated July 2, 2015

**U.S. Attorney's Office**
Eastern District of New York
(718) 254-7000

April 28, 2014

# Investment Fund Manager Pleads Guilty in $96 Million Ponzi Scheme

Earlier today, Brian R. Callahan, 44, pleaded guilty to one count of securities fraud and one count of wire fraud for operating a $96 million Ponzi scheme through his various offshore investment funds. Pursuant to his plea agreement with the government, Callahan has agreed to the forfeiture of $67.4 million, which includes proceeds from the sale of his former residence in Old Westbury, New York and a beachfront condominium in Westhampton, New York. When sentenced, Callahan faces up to 40 years in prison and the payment of approximately $96 million in restitution to the victims of his fraud.

The guilty plea was announced by Loretta E. Lynch, United States Attorney for the Eastern District of New York; George Venizelos, Assistant Director in Charge, Federal Bureau of Investigation, New York Field Office (FBI); and Shantelle P. Kitchen, Acting Special Agent in Charge, United States Internal Revenue Service, Criminal Investigation, New York (IRS).

"Callahan used six offshore entities to perpetrate one of the largest investment frauds in Long Island history. Through lies and deceit, he misled investors and stole investor funds, including investments from a local fire department, to support a lavish lifestyle and operate a multi-million-dollar Ponzi scheme. Today's guilty plea marks the end of Callahan's schemes and his lavish lifestyle and demonstrates this office's steadfast commitment to protect the investing public from fraud," stated United States Attorney Lynch. Ms. Lynch expressed her grateful appreciation to the FBI, the IRS, Securities and Exchange Commission, and the British Virgin Islands Financial Investigation Agency for their cooperation and assistance in the investigation and prosecution of this case.

According to court filings and facts presented at the plea hearing, between December 2006 and February 2012, Callahan raised more than $118 million from at least 40 investors in connection with four different investment funds that he managed. He had assured those investors that their money would be invested in mutual funds, hedge funds, and other securities. Instead of investing the money as he promised, Callahan misappropriated approximately $96 million and began to operate the investment funds as a large-scale Ponzi scheme. Among other things, Callahan diverted millions of dollars towards the Panoramic View, an unprofitable 117-unit beachfront resort and residence development in Montauk, New York, that he owned with his brother-in-law and co-defendant, Adam Manson.[1] He also commingled the money from the various investment funds and used it to pay tens of millions of dollars in partial redemptions to his victim investors to keep the Ponzi scheme afloat, and to purchase luxury items such as expensive cars and homes in Old Westbury and Westhampton, New York. To avoid detection and continue the scheme, Callahan sent fake account statements to investors that falsely showed that their funds were invested and performing well, and he repeatedly lied to his investors about both the nature and status of their investments.

Today's guilty plea took place before United States Magistrate Judge A. Kathleen Tomlinson.

The government's case is being prosecuted by Assistant United States Attorneys Christopher C. Caffarone, Winston M. Paes, Brian D. Morris and Karin K. Orenstein.

Today's announcement is part of efforts underway by President Obama's Financial Fraud Enforcement Task Force (FFETF) which was created in November 2009 to wage an aggressive, coordinated, and proactive effort to

investigate and prosecute financial crimes. With more than 20 federal agencies, 94 U.S. attorneys' offices, and state and local partners, it is the broadest coalition of law enforcement, investigatory, and regulatory agencies ever assembled to combat fraud. Since its formation, the task force has made great strides in facilitating increased investigation and prosecution of financial crimes; enhancing coordination and cooperation among federal, state, and local authorities; addressing discrimination in the lending and financial markets; and conducting outreach to the public, victims, financial institutions, and other organizations. Over the past three fiscal years, the Justice Department has filed more than 10,000 financial fraud cases against nearly 15,000 defendants including more than 2,900 mortgage fraud defendants. For more information on the task force, visit www.stopfraud.gov (http://www.stopfraud.gov/).

**The Defendant:**
BRIAN R. CALLAHAN
Age: 44 Old Westbury, New York
E.D.N.Y. Docket No. 13-CR-453

[1] *The charges against co-defendant Manson are merely allegations, and he is presumed innocent unless and until proven guilty.*

This content has been reproduced from its original source (http://www.justice.gov/usao/nye/).

Case 2:13-cr-00453-ADS-AKT Document 196-8 Filed 09/28/18 Page 7 of 8 PageID #: 1485



United States Department of Justice        Offices of the United States Attorneys

THE UNITED STATES ATTORNEY'S OFFICE

EASTERN DISTRICT *of* NEW YORK

Search

SEARCH

**HOME**    **ABOUT**    **NEWS**    **U.S. ATTORNEY**    **DIVISIONS**    **PROGRAMS**    **EMPLOYMENT**

**CONTACT US**

U.S. Attorneys » Eastern District of New York » News

**Department of Justice**

U.S. Attorney's Office

Eastern District of New York

FOR IMMEDIATE RELEASE                                    Monday, May 12, 2014

# Long Island Real Estate Manager Pleads Guilty In $96 Million Ponzi Scheme

### Investor Funds Diverted To Purchase 'Panoramic View Resort & Residences' In Montauk, New York

Earlier today, Adam J. Manson, 42, pleaded guilty to conspiracy to commit securities fraud for engaging in a $96 million Ponzi scheme with co-defendant and former investment fund manager Brian R. Callahan. Pursuant to his plea agreement with the government, Manson has agreed to forfeit all unsold units at the Panoramic View beachfront resort and residence development in Montauk, New York, valued in excess of $60 million, and an additional $3.9 million in criminal proceeds. When sentenced on October 3, 2014, Manson faces up to five years in prison and the payment of approximately $96 million in restitution to the victims of his fraud. Callahan pleaded guilty on April 29, 2014, to one count of securities fraud and one count of wire fraud and faces up to 40 years in prison when sentenced on August 8, 2014.

The guilty pleas were announced by Loretta E. Lynch, United States Attorney for the Eastern District of New York; George Venizelos, Assistant Director-in-Charge, Federal Bureau of Investigation, New York Field Office (FBI); and Shantelle P. Kitchen, Acting Special Agent-in-Charge, United States Internal Revenue Service-Criminal Investigation, New York (IRS).

"Adam Manson assisted his brother-in-law Brian Callahan in orchestrating one of the largest Ponzi schemes in Long Island history by lying to independent auditors and lending institutions. Today's guilty plea, together with Callahan's guilty plea approximately two weeks ago, demonstrates this Office's dedication and commitment to aggressively pursue those who seek to defraud the investing public through lies and deceit. We hope that the guilty pleas provide some measure of relief and

Case 2:13-cr-00453-ADS-AKT Document 196-8 Filed 09/28/18 Page 8 of 8 PageID #: 1486

closure to the defrauded investors," stated United States Attorney Lynch. Ms. Lynch expressed her grateful appreciation to the FBI, the IRS, Securities and Exchange Commission, and the British Virgin Islands Financial Investigation Agency for their cooperation and assistance in the investigation and prosecution of this case.

According to court filings and facts presented at the plea hearing, between December 2006 and February 2012, co-defendant Callahan raised more than $118 million from at least 40 investors in connection with four different investment funds that he managed. Callahan had assured those investors that their money would be invested in mutual funds, hedge funds, and other securities. Instead of investing the money as he promised, Callahan misappropriated approximately $96 million and began to operate the investment funds as a large-scale Ponzi scheme. Among other things, Callahan diverted millions of dollars towards the Panoramic View, an unprofitable 117-unit beachfront resort and residence development in Montauk, New York, which he owned with Manson. In furtherance of the scheme, Manson assisted Callahan in deceiving the independent auditors of the Callahan funds by submitting bogus promissory notes that overvalued the assets of the funds and by lying about the debts owed by the Panoramic View.

Today's guilty plea took place before United States Magistrate Judge A. Kathleen Tomlinson.

The government's case is being prosecuted by Assistant United States Attorneys Christopher C. Caffarone, Winston M. Paes, Brian D. Morris, and Karin K. Orenstein.

Today's announcement is part of efforts underway by President Obama's Financial Fraud Enforcement Task Force (FFETF) which was created in November 2009 to wage an aggressive, coordinated, and proactive effort to investigate and prosecute financial crimes. With more than 20 federal agencies, 94 U.S. attorneys' offices, and state and local partners, it is the broadest coalition of law enforcement, investigatory, and regulatory agencies ever assembled to combat fraud. Since its formation, the task force has made great strides in facilitating increased investigation and prosecution of financial crimes; enhancing coordination and cooperation among federal, state, and local authorities; addressing discrimination in the lending and financial markets; and conducting outreach to the public, victims, financial institutions, and other organizations. Over the past three fiscal years, the Justice Department has filed more than 10,000 financial fraud cases against nearly 15,000 defendants including more than 2,900 mortgage fraud defendants. For more information on the task force, visit www.stopfraud.gov.

The Defendant:

ADAM J. MANSON

Age: 42

Old Westbury, New York

E.D.N.Y. Docket No. 13-CR-453

---

**Component(s):**                                                     USAO - New York, Eastern

Updated July 6, 2015

EXHIBIT N

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------X
UNITED STATES OF AMERICA,

                  :   CR-3-453(ADS)

     -against-

                  :   United States Courthouse
                     Central Islip, New York

BRIAN CALLAHAN,

                  :   September 15, 2017
         Defendant.    1:30 p.m.
----------------------------------X

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE ARTHUR D. SPATT
UNITED STATES DISTRICT COURT SENIOR JUDGE

APPEARANCES:

For the Government:         BRIDGET M. RHODE, ESQ.
                        UNITED STATES ATTORNEY
                        BY: CHRISTOPHER CAFFARONE, ESQ.

For the Defendant:          ROLAND C. RIOPELLE, ESQ.
                        SERCARZ & RIOPELLE
                        810 Seventh Avenue  Suite 620
                        New York, N.Y. 10009

For Probation:              LISA LANGONE

Official Court Reporter:    Frederick R. Guerino, CSR
Ph. (631) 712-6105         100 Federal Plaza - Suite 1180
Fax (631) 712-6119         Central Islip, New York 11722

Proceedings recorded by mechanical stenography.
Transcript produced by CAT.

Frederick R. Guerino, CSR
Official Court Reporter

46

money, unbeknownst to them, and completely without their authority, and puts it into the Panoramic View for his own benefit, so that he could increase his own personal investments, and loses money as a result of that, your Honor.

Those victims, they didn't have a lien on the property. So when he talks about protecting the victims, if he was protecting the victims, he would have asked for a lien to be placed on that investment. But those were unsecured investments.

Your Honor, this conduct is egregious. It's horrendous. It deserves a significant punishment, consistent with the punishment we've seen in this district. I cited some of them. I will not go through all of them.

When we look at this, he's the mastermind behind this scheme. This is not an employee. This is Bernie Madoff like. This is Nicholas Cognol(ph) like. These are the folks that are behind the curtain. He started the fraud. He knew from day one that every single day, day after day, month after month, when he's talking to Mr. Ostry, when he's talking to Mr. Claus, when he's talking to all of the other victim investors, that he's lying to them.

This is not a one time event, Judge. This is

59

your Honor will give us an opportunity to do right going forward.

Thank you, Judge.

THE COURT: Counsel, is there any legal cause why sentence should not now be pronounced, or anything additional you would like to say?

MR. CAFFARONE: No, your Honor.

MR. RIOPELLE: No, your Honor. We have some requests after sentence is imposed, but we'll deal with those then. Thank you.

THE COURT: The reasons for the Court's imposition of sentence are as follows:

Initially I would like to say that that was an excellent sentencing memorandum by Roland Riopelle. I appreciate that.

MR. RIOPELLE: Thank you, Judge.

THE COURT: And I would have to say there was an equally excellent response by Assistant United States Attorney Christopher Caffarone. I thought you did an excellent job, especially with the exploratory chart.

MR. CAFFARONE: Thank you.

THE COURT: That was very helpful.

I accept the facts set forth in the Presentence Report and the addendum. In particular, between 2005 and 2012, this defendant created and maintained multiple

EXHIBIT O

THE LAW OFFICES OF
## ANDREW J. FRISCH, PLLC

ONE PENN PLAZA
53rd FLOOR
NEW YORK, NEW YORK 10119
(212) 285-8000
FAX: (646) 304-0352

JASON D. WRIGHT
ADMITTED IN NEW YORK, VIRGINIA
AND THE DISTRICT OF COLUMBIA
OF COUNSEL

July 23, 2019

*By ECF*

The Honorable Arthur D. Spatt
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

        *Re: Brian Callahan v. United States;*
         *Docket Number 13-453 (ADS)*

Dear Judge Spatt:

      I received notice this afternoon that the Court granted the government's application, filed yesterday at 5:50 p.m. (Dkt 209), for an additional thirty days to respond to Mr. Callahan's petition pursuant to 28 U.S.C. §2255, filed on September 28, 2018 (Dkt 196) and related motions. Dkt 205-07. The government stated in its letter filed yesterday afternoon that I would file a letter today explaining my opposition, and I notified the Court's case manager this morning by email that I would do so this afternoon upon returning to New York from an out-of-state work trip. I submit this letter to explain my opposition and to request an immediate hearing on bond for Mr. Callahan.

      The government in its letter to the Court correctly noted Mr. Callahan's opposition to its application for an extension of time, but failed to report the basis therefor. I advised the government that I would consent to an extension of time if the government consented to or took no position on an immediate application by Mr. Callahan for bond. As Mr. Callahan explains in his pending motion [Dkt 206-1 at 17-18], he has established or made at least a substantial showing that bond is necessary to preserve the effectiveness and adequacy of the requested relief. *See Illarremendi v. United States*, 906 F.3d 268, 271 (2d Cir. 2008), *citing Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001). As explained in the pending motion (Dkt 206-1 at 17-18), Mr. Callahan has already served his legal Guideline sentence.

      While Mr. Callahan waited to press his application for bond until the government's response on July 19, 2019, it is not fair that he wait further. The government has had Mr. Callahan's petition for literally ten months since it was filed in September 2018 (Dkt 196); and the government presumably was fully prepared to address the underlying loss issues

last month before the Court rescheduled the sentencing of co-defendant Adam Manson, against whom the government is pressing the same arguments at issue in Mr. Callahan's pending petition. More, the report of a defense expert provided in the defendant's motion papers, cited by the government in its letter as a basis of its need for more time, is an analysis of the government's own spreadsheet provided to the undersigned more than four months ago. *See* Dkt 206-1 at 4-8. It is not clear why the government needed more time, but a consequence of the additional delay should be bond to a defendant who has established or made, at the very least, a substantial showing that he is currently suffering irreparable prejudice.

An additional fact further counsels in favor of bond. Though the government's responsive submission was due July 19, 2019, that day came and went with governmental silence, without any filing or any indication that the government would seek more time, let alone double the thirty days that the Court initially granted the government for its response. On July 20, 2019, the day after the Court's deadline passed without any word from the government, I emailed the government, asking about the government's response. Exhibit A. Only on July 22, 2019, after the Court's deadline passed without action and my subsequent inquiry, did the government surface, unsuccessfully seeking my consent for more time and then submitting its application to the Court. Even then, the government did not explain why it had not taken any action before the Court's deadline had passed. One of the bases for Mr. Callahan's petition is that the government has not played by the rules, breached its plea agreement and failed its duty of candor. It is difficult to understand how the government could let a deadline pass in a case raising issues of the nature and magnitude raised here and not even attempt to explain its default.

The government favorably cites the Second Circuit's dismissal of Mr. Callahan's direct appeal on grounds of appellate waiver, but the Circuit's ruling was based on the four corners of the appellate record. The pending petition, however, by its very nature is a collateral challenge, and proffers facts *de hors* the appellate record that invalidate the appellate waiver. *See United States v. Wilson*, 920 F.3d 155, 168 (2d Cir 2019); *United States v. Palladino*, 347 F.3d 29, 33 (2d Cir. 2007). The facts *de hors* the appellate record include the government's recently-produced spreadsheet underlying its calculation of loss and helping to demonstrate the government's breach of the plea agreement; relevant emails between Mr. Callahan and his counsel; and evidence of Mr. Callahan's expectation of substantial credits against loss and reasonable reliance on the government's repeated express valuation of the fraud at $96 million. Mr. Callahan's collateral challenge is a different proceeding than the direct appeal and is based on facts not part of the appellate record, making the Second Circuit's ruling on the direct appeal inapplicable.

Mr. Callahan is neither a risk of flight nor a danger to the community. During the pendency of Mr. Callahan's case, he was fully compliant with the terms of his release, including during the approximately four months between sentencing and surrender. His bond was secured by three properties, the owners of which remain willing and able to post their properties and co-sign a new bond, and other members of Mr. Callahan's family are willing and able to post other properties and co-sign a bond. Mr. Callahan poses no risk of flight.

The parties have extended professional courtesies to each other, some of which the government cited in its letter in support of its application, and the defense will continue to extend its courtesies whenever it can; the lawyers in the case have maintained cordiality and

2

professionalism, as the Court would expect. Professional courtesy must yield, however, in the face of a substantial showing of unjust deprivation of liberty.

As with an indicted pre-trial defendant, the Court need not rule favorably for a defendant on the merits to grant bond. Instead, the Court need find that Mr. Callahan has made a substantial showing that bond is necessary to make the requested relief effective and adequate. *See Illarremendi v. United States*, 906 F.3d at 271; *Mapp v. Reno*, 241 F.3d at 221. That standard is amply met here.

For these reasons, I respectfully request that the Court grant bond on the papers or schedule a hearing as expeditiously as the Court's calendar permits. Mr. Callahan is currently lodged at the Metropolitan Detention Center, so it would not be logistically difficult to secure his appearance for such a hearing.

Respectfully submitted,

/s/
Andrew J. Frisch

Attachment

cc: AUSA Cafferone
     U.S.P.O. Langone

## Andrew Frisch

| | |
|---|---|
| **From:** | Andrew Frisch |
| **Sent:** | Saturday, July 20, 2019 3:13 PM |
| **To:** | Caffarone, Christopher (USANYE) |
| **Cc:** | Morris, Brian (USANYE); Orenstein, Karin (USANYE) |
| **Subject:** | Manson/Callahan |

Chris, I was expecting to see something from the government yesterday.  Can you please let me know where things are?

Thanks,

*Andrew J. Frisch*
*Attorney At Law*
*The Law Offices of Andrew J. Frisch*
*One Penn Plaza – 53rd Floor*
*New York, New York 10119*
*(212) 285-8000*
*(646) 304-0352 facsimile*
afrisch@andrewfrisch.com
http://andrewfrisch.com

**From:** MaryEllen_Kirchner@nyed.uscourts.gov [mailto:MaryEllen_Kirchner@nyed.uscourts.gov]
**Sent:** Tuesday, June 25, 2019 10:41 AM
**To:** Andrew Frisch <afrisch@andrewfrisch.com>
**Cc:** Morris, Brian (USANYE) <Brian.Morris2@usdoj.gov>; Caffarone, Christopher (USANYE)
<Christopher.Caffarone@usdoj.gov>; Orenstein, Karin (USANYE) <Karin.Orenstein@usdoj.gov>; Lisa Langone
<Lisa_Langone@nyep.uscourts.gov>
**Subject:** Re: Manson

Andrew,

The Gov't was given 30 days from 6/19, the date you email the copies to Chris, to respond to your motion(s). You will also
have time to reply. Please let us know how much time you will need to reply, if any.

Thank you,

Mary Ellen

| | |
|---|---|
| From: | Andrew Frisch <afrisch@andrewfrisch.com> |
| To: | "MaryEllen_Kirchner@nyed.uscourts.gov" <MaryEllen_Kirchner@nyed.uscourts.gov> |
| Cc: | "Morris, Brian (USANYE)" <Brian.Morris2@usdoj.gov>, "Caffarone, Christopher (USANYE)" <Christopher.Caffarone@usdoj.gov>, "Orenstein, Karin (USANYE)" <Karin.Orenstein@usdoj.gov>, Lisa Langone <Lisa_Langone@nyep.uscourts.gov> |
| Date: | 06/25/2019 09:22 AM |
| Subject: | Re: Manson |

Mary Ellen, that date is good for the Manson sentencing, but in the papers is also an application for bond for
Callahan.  I realize that this is not a simple bond application, but can you please let me know the Judge's

summer schedule so it can be factored in thinking through the timing of that application?

Thank you!

Sent from my iPhone

On Jun 25, 2019, at 9:06 AM, "MaryEllen_Kirchner@nyed.uscourts.gov"
<MaryEllen_Kirchner@nyed.uscourts.gov> wrote:

Thanks Andrew.

| | |
|---|---|
| From: | Andrew Frisch <afrisch@andrewfrisch.com> |
| To: | Lisa Langone <Lisa_Langone@nyep.uscourts.gov> |
| Cc: | Mary Kirchner <MaryEllen_Kirchner@nyed.uscourts.gov>, "Morris, Brian (USANYE)" <Brian.Morris2@usdoj.gov>, "Caffarone, Christopher (USANYE)" <Christopher.Caffarone@usdoj.gov>, "Orenstein, Karin (USANYE)" <Karin.Orenstein@usdoj.gov> |
| Date: | 06/25/2019 09:04 AM |
| Subject: | Re: Manson |

The date and time are good for me.

Sent from my iPhone

On Jun 25, 2019, at 9:03 AM, Lisa Langone <Lisa_Langone@nyep.uscourts.gov> wrote:

Good morning,
That date/time is OK with me.

thanks

**From:** Maryellen Kirchner <MaryEllen_Kirchner@nyed.uscourts.gov>
**Sent:** Tuesday, June 25, 2019 8:54 AM
**To:** Andrew Frisch <afrisch@andrewfrisch.com>; Morris, Brian (USANYE) <Brian.Morris2@usdoj.gov>; Caffarone, Christopher (USANYE) <Christopher.Caffarone@usdoj.gov>; Orenstein, Karin (USANYE) <Karin.Orenstein@usdoj.gov>; Lisa Langone <Lisa_Langone@nyep.uscourts.gov>
**Subject:** RE: Manson
**Importance:** High

Hello,

The sentence date will need to be adjourned until the defendant's motion is fully briefed and a decision is rendered. Therefore, the sentence date of 6/28 is being adjourned to **10/18 @ 1:30**.

Please respond to this email as to your availability.

Thank you,

Mary Ellen

EXHIBIT P



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

CCC

*610 Federal Plaza*
*Central Islip, New York 11722*

July 22, 2019

<u>By Hand and ECF</u>

The Honorable Arthur D. Spatt
United States Senior District Judge
United States District Court
Eastern District of New York
1020 Federal Plaza
Central Islip, New York 11722

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 23 2019 ★

LONG ISLAND OFFICE

> Re: United States v. Brian Callahan and Adam Manson
> <u>Criminal Docket No. 13-CR-453 (S-1)(ADS)</u>

Dear Judge Spatt:

The government respectfully moves for an extension to file a response to the above-referenced defendants' motions filed on June 19, 2019 (docket nos. 205 and 206) until August 19, 2019. This is the government's first request for an extension.

On September 2017, Your Honor sentenced defendant Brian Callahan to 144 months' incarceration. Callahan began serving that sentence in January 2018 and is not scheduled to be released from prison until 2028. Callahan appealed his sentence to the United States Court of Appeals for the Second Circuit. On December 28, 2017, the Second Circuit dismissed that appeal on the ground that the defendant waived his right to appeal if he received a sentence of imprisonment of 327 months or below. Defendant Manson was scheduled to be sentenced on June 28, 2019. Less than ten days before that sentencing, the defendants filed a twenty page motion along with more than seventy pages of exhibits, including a report of a forensic accounting firm retained by the defendants. In those motions, the defendants requested the following relief: (1) disqualification of the U.S. Attorney's Office; (2) recusal of Your Honor; (3) an order requiring enforcement of Manson's plea agreement; (4) permission for Callahan to file supplemental briefing to support his § 2255 motion; and (5) Callahan's release from prison. Manson is now scheduled to be sentenced in October 2019.

The government requests permission to file its opposition brief to the defendants' various motions by August 19, 2019. Despite that the government has repeatedly consented to lengthy adjournments to Callahan's sentencing (<u>see, e.g.</u>, docket nos.

Case 2:13-cr-00453-ADS-AKT Document 209 Filed 07/22/19 Page 2 of 2 PageID #: 1951

103 and 111), ten requests by Callahan to modify his bail to permit him to travel mostly for family vacations (see, e.g., docket nos. 38, 84, 90, 96, 102, 108, 110, 133, 151 and 153) and did not object to giving Callahan two months after sentencing to self surrender to the United States Marshals Service, counsel for Callahan refused to consent to the instant request and notified the undersigned AUSA that he intends to file a letter opposing the instant request on Tuesday, July 23, 2019.  Because this is the government's first (and will be the only) request for an extension, and because the requested extension is necessary to give the government sufficient time to fully respond to all of defendants' motions, the government asks the Court to grant the instant request.

*Request granted*.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:   _____/s/_____

Christopher C. Caffarone
Assistant U.S. Attorney
(631) 715-7868

/s/ Arthur D. Spatt

U.S.D.J.

7/23/19

CC:    Andrew Frisch, Esq.  (By ECF and email)

2